[No. S147999. May 15, 2008.]

In re MARRIAGE CASES. [Six consolidated appeals, see *post*, page 778, footnote 1.]

760

762

## COUNSEL

Alliance Defense Fund, Benjamin W. Bull, Glen Lavy, Timothy Donald Chandler, Christopher R. Stovall, Dale Schowengerdt; Advocates for Faith and Freedom, Robert Henry Tyler; Law Offices of Terry L. Thompson, Terry L. Thompson; Law Offices of Andrew P. Pugno and Andrew P. Pugno for Plaintiff and Appellant Proposition 22 Legal Defense and Education Fund.

Jay Alan Sekulow, Stuart J. Roth, Laura B. Hernandez, Vincent P. McCarthy, Kristina J. Wenberg; Schuler and Brown and John D. Hardy for American

Center for Law & Justice as Amicus Curiae on behalf of Plaintiff and Appellant Proposition 22 Legal Defense and Education Fund.

Stewart & Stewart and John Stewart for Jews Offering New Alternatives to Homosexuality, Parents and Friends of Ex-Gays & Gays and Evergreen International as Amici Curiae on behalf of Plaintiff and Appellant Proposition 22 Legal Defense and Education Fund.

Liberty Counsel, Mathew D. Staver, Rena M. Lindevaldsen and Mary E. McAlister for Plaintiff and Appellant Campaign for California Families.

Kevin T. Snider and Matthew B. McReynolds for Pacific Justice Institute and Capitol Resource Institute as Amici Curiae on behalf of Plaintiffs and Appellants Proposition 22 Legal Defense and Education Fund and Campaign for California Families.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Manuel M. Medeiros, State Solicitor General, David S. Chaney, Chief Assistant Attorney General, Louis R. Mauro, Stacy Boulware Eurie and Christopher E. Krueger, Assistant Attorneys General, James M. Humes, Douglas J. Woods, Kathleen A. Lynch, Hirem M. Patel and Zackery P. Morazzini, Deputy Attorneys General, for Defendant and Appellant State of California.

Kenneth W. Starr; Kirton & McConkie and Alexander Dushku for The Church of Jesus Christ of Latter-Day Saints, California Catholic Conference, National Association of Evangelicals and Union of Orthodox Jewish Congregations of America as Amici Curiae on behalf of Defendant and Appellant State of California.

Marriage Law Foundation and Monte N. Stewart for United Families International, Family Watch International and Family Leader Foundation as Amici Curiae on behalf of Defendant and Appellant State of California.

Natalie A. Panossian for Professors of Law Douglas W. Kmiec, Helen M. Alvare, George W. Dent, Jr., Stephen G. Calabresi, Steven B. Presser and Lynn D. Wardle as Amici Curiae on behalf of Defendant and Appellant State of California.

Mazur & Mazur, Janice R. Mazur and William E. Mazur, Jr., for Leland Traiman and Stewart Blandon as Amici Curiae on behalf of Defendant and Appellant State of California.

The Western Center for Law & Policy, Dean R. Broyles and James M. Griffiths for California Ethnic Religious Organizations for Marriage, National Hispanic Christian Leadership Conference, African-American High Impact

Leadership Coalition, Korean Church Coalition for North Korea Freedom, Council of Korean Churches in Southern California, Traditional Family Coalition, Chinese Family Alliance, America Chinese Evangelical Seminary, The Lord's Grace Christian Church of Mountain View, Grace Gospel Christian Church at San Mateo, Mandarin Baptist Church, Home of Christ Church at Saratoga, Fremont Chinese Evangelical Free Church, West Valley Christian Alliance Church, Evangelical Free Church of San Francisco, San Francisco Agape Christian Church, HIS Foundation and Chinese Christians for Justice as Amici Curiae on behalf of Defendant and Appellant State of California.

Jeffrey N. Daly for Professors of Law John Coverdale, Scott Fitzgibbon, Martin R. Gardner, Kris W. Kobach, Earl M. Maltz, Laurence C. Nolan and John Randall Trahan as Amici Curiae on behalf of Defendant and Appellant State of California.

Wild, Carter & Tipton, Patrick J. Gorman; Thomas More Society, Thomas Brejcha and Paul Benjamin Linton for Knights of Columbus as Amicus Curiae on behalf of Defendant and Appellant State of California.

The Claremont Institute Center for Constitutional Jurisprudence, John C. Eastman; Institute for Marriage and Public Policy and Joshua K. Baker for Legal and Family Scholars James Q. Wilson, Douglas Allen, Hadley P. Arkes, David Blankenhorn, Steven G. Calabresi, Lloyd R. Cohen, David K. DeWolf, Edward J. Erler, Robert P. George, Bernard E. Jacob, William H. Jeynes, Leon R. Kass, Charles Kesler, Douglas W. Kmiec, Daniel Hays Lowenstein, David Popenoe, Stephen B. Presser, Katherine Shaw Spaht and Thomas G. West as Amici Curiae on behalf of Defendant and Appellant State of California.

Brian Chavez-Ochoa and Steven W. Fitschen for The National Legal Foundation as Amicus Curiae on behalf of Defendant and Appellant State of California.

Derek L. Gaubatz and Roger Severino for The Beckett Fund for Religious Liberty as Amicus Curiae on behalf of Defendant and Appellant State of California.

Robert A. Destro and Lincoln C. Oliphant for African-American Pastors in California Reverend Joshua Beckley, Pastor Dr. Timothy Winters, Pastor Chuck Singleton and Pastor Dr. Raymond W. Turner as Amici Curiae on behalf of Defendant and Appellant State of California.

Mennemeier, Glassman & Stroud, Kenneth C. Mennemeier, Andrew W. Stroud and Kelcie M. Gosling for Defendants and Appellants Governor Arnold Schwarzenegger and State Registrar of Vital Statistics Teresita Trinidad.

Sterling E. Norris for Judicial Watch, Inc., as Amicus Curiae on behalf of Defendants and Appellants State of California and Governor Arnold Schwarzenegger.

Dennis J. Herrera, City Attorney, Therese M. Stewart, Chief Deputy City Attorney, Danny Chou, Chief of Appellate Litigation, Julia M. C. Friedlander, Kathleen S. Morris, Sherri Sokeland Kaiser and Vince Chhabria, Deputy City Attorneys; Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Bobbie J. Wilson and Amy Margolin for Plaintiff and Respondent City and County of San Francisco.

R. Bradley Sears and Clifford J. Rosky for M. V. Lee Badgett and Gary J. Gates as Amici Curiae on behalf of Plaintiff and Respondent City and County of San Francisco.

Aderson B. Francois; Altshuler Berzon, Michael Rubin and Barbara J. Chisholm for Howard University School of Law Civil Rights Clinic as Amicus Curiae on behalf of Plaintiff and Respondent City and County of San Francisco.

Nanci L. Clarence; Law Offices of Amitai Schwartz and Amitai Schwartz for Bar Association of San Francisco as Amicus Curiae on behalf of Plaintiff and Respondent City and County of San Francisco.

Ronald A. Lindsay and Edward Tabash for Council for Secular Humanism and Center for Inquiry as Amici Curiae on behalf of Plaintiff and Respondent City and County of San Francisco.

Michael Jenkins and J. Stephen Lewis for City of Los Angeles, City of San Diego, City of San Jose, City of Long Beach, City of Oakland, City of Santa Rosa, City of Berkeley, City of Santa Monica, City of Santa Cruz, City of Palm Springs, City of West Hollywood, City of Signal Hill, City of Sebastopol, Town of Fairfax, City of Cloverdale, County of Santa Clara, County of San Mateo, County of Santa Cruz and County of Marin as Amici Curiae on behalf of Plaintiff and Respondent City and County of San Francisco.

Allred, Maroko & Goldberg, Gloria Allred, Michael Maroko and John Steven West for Plaintiffs and Respondents Robin Tyler, Diane Olson, Troy Perry and Phillip De Blieck.

Heller Ehrman, Stephen V. Bomse, Richard DeNatale, Christopher F. Stoll, David J. Simon, Ryan R. Tacorda; National Center for Lesbian Rights, Shannon Minter, Vanessa H. Eisemann, Melanie Rowen, Catherine Sakimura,

Courtney Joslin; Lambda Legal Defense and Education Fund, Inc., Jon W. Davidson, Jennifer C. Pizer; ACLU Foundation of Southern California, Christine P. Sun, Peter J. Eliasberg, Clare Pastore; ACLU Foundation of Northern California, Tamara Lange, Alan L. Schlosser, Alex M. Cleghorn; Steefel, Levitt & Weiss, Dena Narbaitz, Clyde J. Wadsworth; Law Office of David C. Codell and David C. Codell for Plaintiffs and Respondents Lancy Woo, Cristy Chung, Joshua Rymer, Tim Frazer, Jewelle Gomez, Diane Sabin, Myra Beals, Ida Matson, Arthur Frederick Adams, Devin Wayne Baker, Jeanne Rizzo, Pali Cooper, Karen Shain, Jody Sokolower, Janet Wallace, Deborah Hart, Corey Davis, Andre LeJeune, Rachel Lederman, Alexsis Beach, Stuart Gaffney, John Lewis, Phyllis Lyon, Del Martin, Sarah Conner, Gillian Smith, Margot McShane, Alexandra D'Amario, David Scott Chandler, Jeffery Wayne Chandler, Theresa Michelle Petry, Cristal Rivera-Mitchel, Our Family Coalition and Equality California.

Law Offices of Waukeen Q. McCoy, Waukeen Q. McCoy, Aldon L. Bolanos; Paul, Hanley & Harley and Jason E. Hasley for Plaintiffs and Respondents Gregory Clinton, Gregory Morris, Anthony Bernan, Andrew Neugenbauer, Stephanie O'Brien, Janet Levy, Joseph Faulkner, Arthur Healey, Kristen Anderson, Michele Bettega, Derrik Anderson and Wayne Edfors II.

Natalie F. P. Gilfoyle; Jenner & Block, Paul M. Smith, William M. Hohengarten and Anjan Choudhury for American Psychological Association, California Psychological Association, American Psychiatric Association, National Association of Social Workers and National Association of Social Workers, California Chapter as Amici Curiae on behalf of Plaintiffs and Respondents.

Keker & Van Nest and Jon B. Streeter for Professor Jesse H. Choper as Amicus Curiae on behalf of Plaintiffs and Respondents.

O'Melveny & Myers, Peter Obstler, Nikhil Shanbhag, Flora Vigo, Jee Young You; John D. Trasvina, Cynthia A. Valenzuela; Law Office of Ellen Forman Obstler and Ellen Forman Obstler for Asian American Justice Center, Asian Pacific American Bar Association, Asian Pacific American Legal Center, Asian and Pacific Islander Lesbian, Bisexual Women and Transgender Network, Asian Pacific Islander Pride Council, Disability Rights Education and Defense Fund, Equal Justice Society, Japanese American Bar Association, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Multicultural Bar Alliance of Los Angeles, People for the American Way Foundation, United Lesbians of African Heritage, Ventura Black Attorneys Association, Mexican American Legal Defense and Educational Fund, Aguilas, Bienestar Human Services, Coalition for Humane Immigrant Rights, La Raza Centro Legal, National Black Justice Coalition, National Lawyers Guild of San Francisco and Zuna Institute as Amici Curiae on behalf of Plaintiffs and Respondents.

Sideman & Bancroft and Diana E. Richmond for American Academy of Matrimonial Lawyers, Northern California Chapter of the American Academy of Matrimonial Lawyers and California District of the American Academy of Pediatrics as Amici Curiae on behalf of Plaintiffs and Respondents.

Covington & Burling, Sonya D. Winner, David M. Jolley and Erin C. Smith for American Psychoanalytic Association, American Anthropological Association and Lawyers' Committee for Civil Rights of the San Francisco Bay Area as Amici Curiae on behalf of Plaintiffs and Respondents.

Proskauer Rose, Clifford S. Davidson, Scott P. Cooper, Bert H. Deixler, Gil N. Peles, Lary Alan Rappaport and Lois D. Thompson for Anti-Defamation League, Los Angeles Gay and Lesbian Center, Sacramento Gay and Lesbian Center, San Diego Lesbian Gay, Bisexual and Transgender Community Center, San Francisco LGBT Community Center, Billy DeFrank Center, The Gay and Lesbian Center of Greater Long Beach, Desert Pride Center, Lighthouse Community Pride Center, The Pacific Center and Stanislaus Pride Center as Amici Curiae on behalf of Plaintiffs and Respondents.

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong; Daisy J. Hung, Victor M. Hwang; Karin H. Wang and Julie Su for Asian American Bar Association of the Greater Bay Area, Asian Pacific American Bar Association of Los Angeles County, Asian Pacific Bar Association of Silicon Valley, Japanese American Bar Association of Greater Los Angeles, Korean American Bar Association of Southern California, National Asian Pacific American Bar Association, Pan Asian Lawyers of San Diego, Philippine American Bar Association, South Asian Bar Association of Northern California, South Asian Bar Association of San Diego, South Asian Bar Association of Southern California, Southern California Chinese Lawyers Association, Vietnamese American Bar Association of Northern California, Asian Equality, Asian Pacific Islander Legal Outreach, API Equality, API Equality-SF, Asian Communities for Reproductive Justice, Asian Law Alliance, Asian Law Caucus, Asian Pacific American Labor Alliance-Alameda, Asian Pacific Islander Family Pride, Asian Pacific Islander Wellness Center, Asian Women's Shelter, Chinese for Affirmative Action, Chinese Progressive Association, Filipinos for Affirmative Action, Gay Asian Pacific Alliance, Institute for Leadership Development and Study of Pacific Asian North American Religion, Korean Community Center of the East Bay, My Sister's House, Asian Pacific American Legal Center, Asian/Pacific Bar of California, API Equality-LA, Asian American Institute, Asian American Justice Center, Asian Pacific American Legal Center of Southern California, Asian American Legal Defense and Education Fund, Asian American Psychological Association, Asian American Queer Women Activists, Asian and Pacific Islander American Health Forum, Asian and Pacific Islander Lesbian, Bisexual Women and Transgender Network, Asian

and Pacific Islander Parents and Friends of Lesbians and Gays, Asian Pacific AIDS Intervention Team, Asian Pacific American Labor Alliance-Los Angeles, Asian Pacific Americans for Progress-Los Angeles, Asian Pacific Islander Pride Council, Asian Pacific Policy & Planning Council, Asian Pacific Women's Center, Center for the Pacific Asian Family, Asian Youth Promoting Advocacy and Leadership, Conference of Asian Pacific American Law Faculty, Gay Asian Pacific Support Network, Japanese American Citizens League, Khmer Girls in Action, Korean Resource Center, Koreatown Immigrant Workers Alliance, National Asian Pacific American Law Student Association, National Asian Pacific American Women's Forum, National Korean American Service & Education Consortium, Orange County Asian Pacific Islander Community Alliance, Organization of Chinese Americans San Francisco Chapter, Satrang, South Asian American Leaders of Tomorrow, South Asian Network, Southeast Asian Community Alliance, Southeast Asian Community Center and Southeast Asia Resource Action Center as Amici Curiae on behalf of Plaintiffs and Respondents.

Munger, Tolles & Olson, Jerome C. Roth and Daniel J. Powell for Bay Area Lawyers for Individual Freedom, Children of Lesbians and Gays Everywhere, The Disability Rights Education and Defense Fund, Family Pride, Freedom to Marry, Human Rights Campaign, Human Rights Campaign Foundation, Legal Aid Society-Employment Law Center, Lesbian and Gay Lawyers Association of Los Angeles, Marriage Equality USA, The National Lesbian and Gay Law Association, Parents, Families & Friends of Lesbians and Gays, Inc., People for the American Way Foundation, Pride at Work, SacLEGAL and Tom Homann Law Association as Amici Curiae on behalf of Plaintiffs and Respondents.

Greines, Martin, Stein & Richland, Irving Greines and Cynthia E. Tobisman for Beverly Hills Bar Association, Los Angeles County Bar Association, San Francisco Trial Lawyers Association, California Women Lawyers and Women Lawyers Association of Los Angeles as Amici Curiae on behalf of Plaintiffs and Respondents.

Vicky Barker; Jennifer K. Brown, Deborah A. Widiss, Julie F. Kay; Irma D. Herrera; Irell & Manella, Laura W. Brill, Elizabeth L. Rosenblatt, Douglas NeJaime, Michael Bacchus, Richard M. Simon; and Herma Hill Kay for California Women's Law Center, Legal Momentum, Equal Rights Advocates, The Legal Aid Society-Employment Law Center and Queen's Bench Bar Association of the San Francisco Bay Area as Amici Curiae on behalf of Plaintiffs and Respondents.

Remcho, Johansen & Purcell, James C. Harrison, Thomas A. Willis and Kari Krogseng for Senators Elaine Alquist, Ellen Corbett, Christine Kehoe, Sheila

Kuehl, Carole Migden and Darrell Steinberg and Assemblymembers Noreen Evans, Loni Hancock, Jared W. Huffman, Dave Jones, John Laird, Mark Leno, Sally J. Lieber, Fiona Ma, Anthony J. Portantino and Lori Saldana as Amici Curiae on behalf of Plaintiffs and Respondents.

Eva Paterson, Tobias Barrington Wolff; McDermott Will & Emery, Anthony de Alcuaz, Rory K. Little and Bijal V. Vakil for Equal Justice Society as Amicus Curiae on behalf of Plaintiffs and Respondents.

Weixel Law Office, James V. Weixel, Jr.; Chapman, Popik & White, Susan M. Popik, Merri A. Baldwin; Mary L. Bonauto, Bennett H. Klein and Jamson Wu for Equality Federation and Gay and Lesbian Advocates & Defenders as Amici Curiae on behalf of Plaintiffs and Respondents.

Joseph R. Grodin as Amicus Curiae on behalf of Plaintiffs and Respondents.

Gibson, Dunn & Crutcher, Jeffrey F. Webb, Wendy L. Wallace, Sarah Piepmeier, Meghan Blanco and Douglas Champion for Children of Lesbians and Gays Everywhere, MassEquality, National Gay and Lesbian Task Force, Freedom to Marry, Out & Equal Workplace Advocates and Levi Strauss & Co., as Amici Curiae on behalf of Plaintiffs and Respondents.

Paul Weiss Rifkind Wharton & Garrison, Walter Rieman, Roberta A. Kaplan, Andrew J. Ehrlich; Theodore M. Shaw and Victor A. Bolden for NAACP Legal Defense and Educational Fund Inc., as Amicus Curiae on behalf of Plaintiffs and Respondents.

Eisenberg and Hancock, Jon B. Eisenberg and William N. Hancock for California State Conference of the National Association for the Advancement of Colored People as Amicus Curiae on behalf of Plaintiffs and Respondents.

Winston & Strawn, Michael S. Brophy, Peter E. Perkowski; Sexuality and Gender Law Clinic and Suzanne B. Goldberg for The National Gay & Lesbian Task Force Foundation as Amicus Curiae on behalf of Plaintiffs and Respondents.

Stanford Constitutional Law Center and Kathleen M. Sullivan for Professors of Constitutional Law Pamela S. Karlan, Paul Brest, Alan E. Brownstein, William Cohen, David B. Cruz, Mary L. Dudziak, Susan R. Estrich, David Faigman, Philip B. Frickey, Ronald R. Garet, Kenneth L. Karst, Goodwin Liu, Lawrence C. Marshall, Radkiha Rao, Jonathan D. Varat and Adam Winkler as Amici Curiae on behalf of Plaintiffs and Respondents.

Herma Hill Kay and Michael S. Wald for Professors of Family Law Scott Altman, R. Richard Banks, Grace Ganz Blumberg, Janet Bowermaster, Carol S.

Bruch, Jan C. Costello, Barbara J. Cox, Jay Folberg, Deborah L. Forman, Joan H. Hollinger, Lisa Ikemoto, Courtney G. Joslin, Jan Kosel, Lawrence Levine, Maya Manian, Mary Ann Mason, John Myers, E. Gary Spitko, D. Kelly Weisberg, Lois Weithorn and Michael Zamperini as Amici Curiae on behalf of Plaintiffs and Respondents.

Noah B. Novogrodsky; Cassel, Brock & Blackwell and Laurie J. Livingstone for The University of Toronto, Faculty of Law International Human Rights Clinic, Women's Institute For Leadership Development, Professors of International Law Mayo Moran, Brenda Cossman, Sujit Choudhry, Robert Wintemute, Paul Schiff Berman, Kenji Yoshino, Beth van Schaack, William Aceves, Margaret Satterthwaite and Barbara Cox as Amici Curiae on behalf of Plaintiffs and Respondents.

Noah B. Novogrodsky; Morrison & Foerster, Ruth N. Borenstein, Paul S. Marchegiani and Vincent J. Novak for The University of Toronto, Faculty of Law International Human Rights Clinic, Professors of International Law William Aceves, Brenda Cossman, Sujit Choudhry, Chai Feldblum, Hari Osofsky, Jaya Ramji-Nogales and Beth van Schaack as Amici Curiae on behalf of Plaintiffs and Respondents.

McManis Faulkner & Morgan, James McManis and Christine Peek for Santa Clara County Bar Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Caldwell Leslie & Proctor, Christopher G. Caldwell and Linda M. Burrow for Professor William N. Eskridge, Jr., as Amicus Curiae on behalf of Plaintiffs and Respondents.

Manning & Marder, Kass, Ellrod, Ramirez, Scott Wm. Davenport, Darin L. Wessel and Jason J. Molnar for The Southern Poverty Law Center as Amicus Curiae on behalf of Plaintiffs and Respondents.

Raoul D. Kennedy, Elizabeth Harlan, Nelson R. Richards, Joren S. Bass, Philip A. Leider, Michael D. Meuti, Stephen Lee; HoenningerLaw, Jo Ann Hoenninger; Eric Alan Isaacson; and Reverend Silvio Nardoni for Affirmation: Gay and Lesbian Mormons, Al-Fatiha Foundation, Dignity USA, Alliance of Baptists, Brethren Mennonite Council for Lesbian, Gay, Bisexual and Transgender Interests, Clergy United, Inc., Executive Committee of the American Friends Service Committee, Gay and Lesbian Vaishnava Association, General Synod of the United Church of Christ, Hebrew Union College-Institute for Judaism and Sexual Orientation, Integrity USA, Jewish Reconstructionist Federation, Lutherans Concerned/North America, More Light Presbyterians, Muslims for Progressive Values, National Coalition of

American Nuns, Network of Spiritual Progressives, New Ways Ministry, Religion-Outside-The-Box, Religious Institute on Sexual Morality, Justice, and Healing, Seventh-day Adventist Kinship, International Inc., Soka Gakkai International-USA, The Rabbinical Assembly, The Union for Reform Judaism, Unitarian Universalist Association of Congregations, Unitarian Universalist Ministers Association, United Centers of Spiritual Living, Universal Fellowship of Metropolitan Community Churches, Association of Welcoming & Affirming Baptists (Bay Area), California Church IMPACT, California Council of Churches, California Faith for Equality, Council of Churches of Santa Clara County, Friends Committee on Legislation of California, Jews for Marriage Equality (Southern California), Metropolitan Community Church (California/Region One), More Light Presbyterian Chapter of Pacific Presbytery, Pacific Central District Chapter of the Unitarian Universalist Ministers Association, Pacific Central West Council of the Union for Reform Judaism, Pacific Southwest Council of the Union for Reform Judaism, Pacific Southwest District Chapter of the Unitarian Universalist Ministers Association, Progressive Christians Uniting, Progressive Jewish Alliance-California, Reconciling Ministries Clergy of the California-Nevada Conference of the United Methodist Church, Unitarian Universalist Legislative Ministry-California, United Church of Christ-Southern California/Nevada Conference, All Saints Episcopal Church, All Saints Independent Catholic Parish, All Saints Metropolitan Community Church, Bay Area American Indian Two-Spirits, Berkeley Fellowship of Unitarian Universalists, Buena Vista United Methodist Church, Chalice Unitarian Universalist Congregation, Christ the Shepherd Lutheran Church, Church of the Brethren of San Diego, College Avenue Congregational Church United Church of Christ, Community Church of Atascadero United Church of Christ, Community Presbyterian Church, Conejo Valley Unitarian Universalist Fellowship, UCC Community Church of Atascadero, Congregation Beth Chayim Chadashim, Congregation Kol Ami, Congregation Sha'ar Za'hav, Congregation Shir Hadash, Conejo Valley Unitarian Universalist Fellowship Faith in Action Committee, Diamond Bar United Church of Christ, Dolores Street Baptist Church, Emerson Unitarian Universalist Church, First Christian Church of San Jose Disciples of Christ, First Congregational Church, First Congregational United Church of Christ, First Mennonite Church of San Francisco, First Presbyterian Church, First Unitarian Church of Oakland, First Unitarian Universalist Church of San Diego, First Unitarian Church of San Jose, First Unitarian Universalist Church of Stockton, First Unitarian Universalist Society of San Francisco, Humboldt Unitarian Universalist Fellowship, Inner Light Ministries, Kol Hadash Community for Humanistic Judaism, Lutherans Concerned/Los Angeles, Metropolitan Community Church in the Valley, Metropolitan Community Church of San Jose, Metropolitan Community Church Los Angeles, Monte Vista Unitarian Universalist Congregation Board of Trustees, Mt. Diablo Unitarian Universalist Church, Mt. Hollywood Congregational Church United

Church of Christ, Neighborhood Unitarian Universalist Church Board of Trustees, Niles Congregational Church United Church of Christ, Pacific School of Religion, Pacific Unitarian Church, Parkside Community Church, United Church of Christ, Peninsula Metropolitan Community Church, Pilgrim United Church of Christ, Religious Society of Friends/Quakers Pacific Yearly Meeting, San Leandro Community Church, Sierra Foothills Unitarian Universalist Congregation, Berkeley Unitarian Universalist Fellowship Social Justice Committee, Social Justice Ministry at First Church, St. Bede's Episcopal Church, St. Francis Lutheran Church, St. John Evangelist Episcopal Church, St. John's Presbyterian Church, St. Matthew's Lutheran Church, St. Paul's United Methodist Church, Starr King School for the Ministry, Starr King Unitarian Universalist Church, Temple Beth Hillel, The Center for Spiritual Awareness, The Church for the Fellowship of All Peoples, The Ecumenical Catholic Church, The Session (Governing Body) of West Hollywood Presbyterian Church, Trinity Lutheran Church, Unitarian Society of Santa Barbara, Unitarian Universalist Church of Anaheim Board of Trustees, Unitarian Universalist Church of Berkeley Board of Trustees, Unitarian Universalist Church of Davis, Unitarian Universalist Church of the Desert, Unitarian Universalist Church of Fresno, Unitarian Universalist Church of Long Beach Board of Trustees, Unitarian Universalist Church of the Monterey Peninsula, Unitarian Universalist Church of Palo Alto, Universalist Unitarian Church of Riverside Board of Trustees, Unitarian Universalist Church of Ventura Board of Trustees, Unitarian Universalist Community of the Mountains, Unitarian Universalist Community Church of Sacramento, Unitarian Universalist Community Church of Santa Monica, Unitarian Universalist Community Church of South County, Unitarian Universalist Congregation of Marin, Unitarian Universalist Congregation of Santa Rosa, Unitarian Universalist Fellowship of Kern County, Unitarian Universalist Fellowship of Laguna Beach, Unitarian Universalist Fellowship of Redwood City, Unitarian Universalist Fellowship of San Dieguito Welcoming Congregation Committee, Unitarian Universalist Fellowship of San Luis Obispo County Board of Trustees, Unitarian Universalist Fellowship of Stanislaus County, Unitarian Universalist Fellowship of Visalia, Unitarian Universalists of San Mateo, Unitarian Universalists of Santa Clarita, Unitarian Universalist Society of Sacramento, United Church of Christ in Simi Valley, Unity in the Gold Country, Universalist Unitarian Church of Santa Paula, University Lutheran Chapel, Valley Ministries Metropolitan Community Church, Rabbi Mona Alfi, Reverend Dr. Pam Allen-Thompson, Reverend Rachel Anderson, Reverend Sky Anderson, Rabbi Camille Angel, Rabbi Melanie Aron, Reverend Joy Atkinson, Reverend Dr. Brian Baker, Reverend Elizabeth O'Shaughnessy Banks, Reverend K. G. Banwart, Jr., Reverend Canon Michael Barlowe, William H. Bartosh, Rabbi Haim Dov Beliak, Reverend Chris Bell, Reverend JD Benson, Rabbi Linda Bertenthal, Pastor LeAnn Blackert, Reverend Dr. Dorsey O. Blake, Reverend James E. Boline, Pastor Kenny A. Bowen, Reverend Susan Brecht, Pastor Paul Brenner, Rabbi Rick Brody, Reverend

Dr. Ken Brown, Reverend Kevin Bucy, Reverend Jim Burklo, Nancy Burns, Reverend Dr. R. A. Butziger, Reverend Becky Cameron, Reverend Canon Grant S. Carey, Reverend Matthew M. Conrad, Reverend Helen Carroll, Rabbi Ari Cartun, Reverend Lauren Chaffee, Reverend Craig B. Chapman, Reverend Barbara M. Cheatham, Reverend Jan Christian, Reverend Bea Chun, Reverend June M. Clark, Reverend Anne G. Cohen, Rabbi Helen T. Cohn, Reverend Carolyn Colbert, Reverend Kenneth W. Collier, Reverend Dr. Gary B. Collins, Reverend Mary P. Conant, Rabbi Susan S. Conforti, Reverend Meghan Conrad, Rabbi Laurie Coskey, Reverend Lyn Cox, Reverend Sofia Craethnenn, Reverend Susan Craig, Reverend Robbie Cranch, Reverend Alexie Crane, Reverend Matthew Crary, Reverend Robert Crouch, Reverend Dr. Donald J. Dallmann, Reverend Cinnamon Daniel, Reverend Diann Davisson, Pastor Jerry De Jong, Rabbi Lavey Derby, Reverend Susan Wolfe Devol, Reverend Frances A. Dew, Reverend Brian K. Dixon, Rabbi Elliot Dorff, Reverend Terri Echelbarger, Rabbi Lisa A. Edwards, Reverend Leroy Egenberger, Rabbi Denise Eger, Reverend Michael Ellard, Diana Elrod, Reverend Stefanie Etzbach-Dale, Pastor Brenda Evans, Interim Minister Mark Evens, Reverend Renae Extrum-Fernandez, Reverend John Fanestil, Reverend Jerry Farrell, Reverend Lydia Ferrante-Roseberry, Reverend Michelle Favreult, Reverend Jeanne Favreau-Sorville, Rabbi Joel Fleekop, Reverend Dr. Yvette Flunder, Reverend Dr. John Forney, Reverend Jerry Fox, Reverend Canon Winifred B. Gaines, Reverend Ronn Garton, Rabbi Laura Geller, Reverend Diana Gibson, Reverend Dr. Robert Goldstein, Reverend Dr. Robert Goss, Reverend Dr. June Goudey, Reverend Robert C. Grabowski, Reverend Constance L. Grant, Reverend James Grant, Rabbi Bruce DePriester Greenbaum, Reverend William Greer, Reverend Dr. Ron Griffen, Thomas Grogan, Reverend Clyde E. Grubbs, Reverend Sara Haldeman-Scarr, Reverend Caroline Hall, Reverend Dr. Susan Hamilton, Reverend Bill Hamilton-Holway, Reverend Barbara Hamilton-Holway, Reverend Bet Hannon, Reverend Dr. Andrew F. Headden, Reverend Dr. Kathy Hearn, Reverend Jane Heckles, Rabbi Alan Henkin, Reverend Erika Hewitt, Rabbi Jay Heyman, Reverend Carol C. Hilton, Reverend Anne Felton Hines, Reverend Katie Hines-Shah, Reverend Martha Hodges, Reverend Jackie Holland, Reverend Marcia Hootman, Reverend Laura Horton-Ludwig, Reverend Sherri Hostetler, Reverend Ricky Hoyt, Reverend Kathy Huff, Minister Victoria Ingram, Reverend Keith Inouye, Reverend Steve Islander, Reverend Alyson E. Jacks, Rabbi Steven B. Jacobs, Berget Jelane, Reverend Bryan D. Jessup, Reverend Jeff Johnson, Reverend Beth Johnson, Reverend Deborah L. Johnson, Reverend Nancy Palmer Jones, Reverend Alan H. Jones, Reverend Roger Jones, Reverend Julie Kain, Reverend Kathryn Kandarian, Rabbi Jim Kaufman, Reverend John M. Kauffman, Reverend Canon Kathleen Kelly, Rabbi Paul Kipnes, Reverend John Kirkley, Reverend Benjamin A. Kocs-Meyers, Rabbi Douglas Kohn, Reverend Vicky Kolakowski, Reverend Douglas C. B. Kraft, Reverend Kurt Kuhwald, Joel L. Kushner, Reverend Richard Kuykendall, Reverend Peter Laarman, Rabbi Susan Laemmle, Rabbi Howard Laibson, Reverend Darcey Laine, Pastor Scott

Landis, Rabbi Moshe Levin, Reverend Tom Lewis, Reverend Catherine Linesch, Rabbi Michael Lotker, Reverend Marguerite Lovett, Reverend Carol Lowe, Rabbi Barry Lutz, Reverend Max Lynn, Reverend Ken MacLean, Rabbi Tamar Malino, Dr. Anthony Manousos, Reverend Luther J. Martell, Reverend Elder Debbie Martin, Pastor Michael-Ray Mathews, Reverend Russell Matteson, Rabbi Brian Zachary Mayer, Reverend Gregory W. McGonigle, Reverend Joseph McGowan, Reverend Janet Gollery McKeithen, Reverend Margo McKenna, Reverend William McKinney, Reverend Susan Meeter, Rabbi Norman Mendel, Pastor Ross D. Merkel, Reverend Eric H. Meter, Charles Metz, Reverend Judith Meyer, Reverend Barbara F. Meyers, Reverend Elisabeth Middleberg, Reverend Beth Miller, David Miller, Reverend Diane Miller, Reverend Terri Miller, Reverend John Millspaugh, Reverend Dr. Curt Miner, Rabbi Michelle Missaghieh, Reverend Sarah Moldenhauer-Salazar, Reverend Douglas J. Monroe, Reverend John Morehouse, Reverend Amy Zucker Morgenstern, Reverend David Moss, Reverend James A. Nelson, Reverend Drew Nettinga, Reverend Canon James A. Newman, Reverend Julia Older, Reverend Dr. Claudene F. Oliva, Reverend Elaine O'Rourke, Reverend Donna Owen, Reverend Dr. Carolyn S. Owen-Towle, Reverend Tom Owen-Towle, Reverend Kathleen Owens, Reverend Nancy Palmer Jones, Reverend Dr. Rebecca Parker, Reverend Ken Pennings, Reverend John Perez, Reverend Hannah Petrie, Reverend Jay K. Pierce, Reverend Ernest Pipes, Reverend Mary Elizabeth Pratt-Horsley, Reverend Georgia Prescott, Reverend Dr. Lisa Presley, Reverend Carolyn Price, Reverend Sherry Prud'homme, Reverend Jane Quandt, Reverend Fred Rabidoux, Reverend Lindi Ramsden, Rabbi Lawrence Raphael, Reverend George F. Regas, Reverend Dr. Mark Richardson, Reverend Scott Richardson, Reverend Bear Ride, Philip Boo Riley, Cantor Aviva Rosenbloom, Reverend John Robinson, Reverend Carol Rudisill, Reverend Susan Russell, Reverend Gerald Sakamoto, Reverend David Sammons, Lee Marie Sanchez, Reverend William C. Sanford, Reverend Charles Schepel, Reverend Michael Schiefelbein, Reverend Dr. Rick Schlosser, Reverend Brian Scott, Reverend Thomas Schmidt, Reverend Craig Scott, Reverend Wayna Scovell, Reverend Michael Schuenemeyer, Reverend Dr. Steven Shepard, Dr. John M. Sherwood, Reverend Mark Shirilau, Reverend Robert Shively, Reverend Madison Shockley II, Reverend Grace Simons, Reverend Bruce J. Simpson, Reverend Dan Smith, Reverend Linda Snyder, Reverend Jeffrey Spencer, Reverend June Stanford-Clark, Reverend Dr. Betty Stapleford, Reverend Stanley Stefancic, Rabbi Ron Stern, Reverend Gregory L. Stewart, Reverend Bob Stiles, Reverend Janine Stock, Reverend Arvid Straube, Reverend Dr. Archer Summers, Reverend Steven Swope, Reverend Paul Tellstrom, Reverend Margo Tenold, Reverend Byrd Tetzlaff, Reverend Neil Thomas, Reverend David Thompson, Reverend Mary Lynn Tobin, Mary A. Tolbert, Reverend Tarah Trueblood, Reverend Lynn Ungar, Reverend Nada Velimirovic, Reverend Jane E. Voigts, Reverend Canon Lynell Walker, Reverend Greg Ward, Rabbi Arthur Waskow, Reverend Theodore A. Webb, Reverend Dr. Petra Weldes, Reverend Vail Weller, Reverend Roger Wharton, Reverend Bets Wienecke, Reverend Lee Williamson, Reverend Elder

Nancy Wilson, Rope Wolf, Reverend Ned Wright, Rabbi Bridget Wynne and Reverend Michael Yoshi as Amici Curiae on behalf of Plaintiffs and Respondents.

Thomas J. Kuna-Jacob as Amicus Curiae.

## OPINION[1]

**GEORGE, C. J.**—In *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055 [17 Cal.Rptr.3d 225, 95 P.3d 459] (*Lockyer*), this court concluded that public officials of the City and County of San Francisco acted unlawfully by issuing marriage licenses to same-sex couples in the absence of a judicial determination that the California statutes limiting marriage to a union between a man and a woman are unconstitutional. Our decision in *Lockyer* emphasized, however, that the substantive question of the constitutional validity of the California marriage statutes was not before this court in that proceeding, and that our decision was not intended to reflect any view on that issue. (*Id.* at p. 1069; see also *id.* at p. 1125 (conc. opn. of Moreno, J.); *id.* at pp. 1132–1133 (conc. & dis. opn. of Kennard, J.); *id.* at p. 1133 (conc. & dis. opn. of Werdegar, J.).) The present proceeding, involving the consolidated appeal of six cases that were litigated in the superior court and the Court of Appeal in the wake of this court's decision in *Lockyer*, squarely presents the substantive constitutional question that was not addressed in *Lockyer*.

In considering this question, we note at the outset that the constitutional issue before us differs in a significant respect from the constitutional issue that has been addressed by a number of other state supreme courts and intermediate appellate courts that recently have had occasion, in interpreting the applicable provisions of their respective state constitutions, to determine the validity of statutory provisions or common law rules limiting marriage to a union of a man and a woman. (See, e.g., *Conaway v. Deane* (2007) 401 Md. 219 [932 A.2d 571]; *Goodridge v. Department of Public Health* (2003) 440 Mass. 309 [798 N.E.2d 941]; *Lewis v. Harris* (2006) 188 N.J. 415 [908 A.2d

---

[1] The six cases whose consolidated appeals are addressed in this opinion are: *City and County of San Francisco v. State of California* (A110449 [Super. Ct. S.F. City & County, No. CGC-04-429539]); *Tyler v. State of California* (A110450 [Super. Ct. L.A. County, No. BS-088506]); *Woo v. Lockyer* (A110451 [Super. Ct. S.F. City & County, No. CPF-04-504038]); *Clinton v. State of California* (A110463 [Super. Ct. S.F. City & County, No. CGC-04-429548]); *Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco* (A110651 [Super. Ct. S.F. City & County, No. CPF-04-503943]); *Campaign for California Families v. Newsom* (A110652 [Super. Ct. S.F. City & County, No. CGC-04-428794]).

196]; *Hernandez v. Robles* (2006) 7 N.Y.3d 338 [855 N.E.2d 1, 821 N.Y.S.2d 770]; *Baker v. State* (1999) 170 Vt. 194 [744 A.2d 864]; *Andersen v. King County* (2006) 158 Wn.2d 1 [138 P.3d 963]; *Standhardt v. Superior Court* (Ct.App. 2003) 206 Ariz. 276 [77 P.3d 451]; *Morrison v. Sadler* (Ind.Ct.App. 2005) 821 N.E.2d 15.) These courts, often by a one-vote margin (see, *post*, at p. 853, fn. 70), have ruled upon the validity of statutory schemes that contrast with that of California, which in recent years has enacted comprehensive domestic partnership legislation under which a same-sex couple may enter into a legal relationship that affords the couple virtually all of the same substantive legal benefits and privileges, and imposes upon the couple virtually all of the same legal obligations and duties, that California law affords to and imposes upon a married couple.[2] Past California cases explain that the constitutional validity of a challenged statute or statutes must be evaluated by taking into consideration all of the relevant statutory provisions that bear upon how the state treats the affected persons with regard to the subject at issue. (See, e.g., *Brown v. Merlo* (1973) 8 Cal.3d 855, 862 [106 Cal.Rptr. 388, 506 P.2d 212].) Accordingly, the legal issue we must resolve is not whether it would be constitutionally permissible under the California Constitution for the state to limit marriage only to opposite-sex couples while denying same-sex couples any opportunity to enter into an official relationship with all or virtually all of the same substantive attributes, but rather whether our state Constitution prohibits the state from establishing a statutory scheme in which both opposite-sex and same-sex couples are granted the right to enter into an officially recognized family relationship that affords all of the significant legal rights and obligations traditionally associated under state law with the institution of marriage, but under which the union of an opposite-sex couple is officially designated a "marriage" whereas

---

[2] We note that although much of the academic literature discussing the legal recognition of same-sex relationships frequently uses the term "domestic partnership" to describe a legal status that accords only comparatively few legal rights or obligations to same-sex couples, the current California statutes grant same-sex couples who choose to become domestic partners virtually all of the legal rights and responsibilities accorded married couples under California law. (The few relatively minor differences that remain are described below (*post*, at pp. 805–806, fn. 24).) In light of the comprehensive nature of the rights afforded by California's domestic partnership legislation, the status of such partnership in California is comparable to the status designated as a "civil union" in statutes enacted in recent years in Connecticut, New Hampshire, New Jersey, and Vermont. (See, e.g., Conn. Gen. Stat., § 46b-38nn (2006); N.H. Rev. Stat. Ann., § 457-A (2007); N.J. Stat. Ann., § 37:1-29 (2006); Vt. Stat. Ann., tit. 15, § 1201 (1999).) We note that recently Oregon also enacted domestic partnership legislation under which same-sex couples may obtain rights comparable to those conferred upon married couples (2007 Or. Laws, ch. 99). The District of Columbia, Hawaii, Maine, and Washington have adopted domestic partnership or reciprocal beneficiaries legislation that affords same-sex couples the opportunity to obtain some of the benefits available to married opposite-sex couples. (See 2006 D.C. Law 16-79 (Act 16-265) [Domestic Partnership Equality Amendment Act of 2006]; Haw. Rev. Stat., § 572C-2; 2004 Me. Legis. Serv., ch. 672 (H.P. 1152; L.D. 1579) [financial security of families and children]; 2001 Me. Legis. Serv., ch. 347 (H.P. 1256; L.D. 1703) [access to health insurance]; Wash. Rev. Code, ch. 26.60.)

the union of a same-sex couple is officially designated a "domestic partnership." The question we must address is whether, under these circumstances, the failure to designate the official relationship of same-sex couples as marriage violates the California Constitution.[3]

It also is important to understand at the outset that our task in this proceeding is not to decide whether we believe, *as a matter of policy*, that the officially recognized relationship of a same-sex couple *should* be designated a marriage rather than a domestic partnership (or some other term), but instead only to determine whether the difference in the official names of the relationships *violates the California Constitution.* We are aware, of course, that very strongly held differences of opinion exist on the matter of policy, with those persons who support the inclusion of same-sex unions within the definition of marriage maintaining that it is unfair to same-sex couples and potentially detrimental to the fiscal interests of the state and its economic institutions to reserve the designation of marriage solely for opposite-sex couples, and others asserting that it is vitally important to preserve the long-standing and traditional definition of marriage as a union between a man and a woman, even as the state extends comparable rights and responsibilities to committed same-sex couples. Whatever our views as individuals with regard to this question as a matter of policy, we recognize as judges and as a court our responsibility to limit our consideration of the question to a determination of the constitutional validity of the current legislative provisions.

As explained hereafter, the determination whether the current California statutory scheme relating to marriage and to registered domestic partnership

---

[3] The only out-of-state high court decision to address a comparable issue is the decision in *Opinions of the Justices to the Senate* (2004) 440 Mass. 1201 [802 N.E.2d 565]. In that proceeding, brought under a provision of the Massachusetts Constitution that permits a branch of the state legislature to seek an advisory opinion on an important question of law, the Massachusetts Senate asked that state's high court to render an opinion as to the constitutionality of a then pending bill, introduced in response to the court's earlier decision in *Goodridge v. Department of Public Health, supra,* 798 N.E.2d 941, that proposed to establish the institution of "civil union" under which "spouses in a civil union" would have all of the rights and responsibilities afforded by that state's marriage laws. In its decision in *Opinions of the Justices to the Senate,* the Supreme Judicial Court of Massachusetts, by a closely divided (four-to-three) vote, declared that the proposed legislation would violate the equal protection and due process clauses of the Massachusetts Constitution. (802 N.E.2d at pp. 569–572.)

A similar issue also is currently pending before the Connecticut Supreme Court in *Kerrigan v. Commissioner of Public Health* (No. SC17716, argued May 14, 2007). In *Kerrigan,* the court is expected to determine whether a Connecticut statute that limits marriage to opposite-sex couples is unconstitutional under the Connecticut Constitution, notwithstanding the existence of a recently enacted Connecticut statute that permits same-sex couples to enter into a civil union, a status that, under the applicable legislation, affords same-sex couples the same legal benefits and obligations possessed by married couples under Connecticut law.

is constitutionally valid implicates a number of distinct and significant issues under the California Constitution.

First, we must determine the nature and scope of the "right to marry"—a right that past cases establish as one of the fundamental constitutional rights embodied in the California Constitution. Although, as an historical matter, civil marriage and the rights associated with it traditionally have been afforded only to opposite-sex couples, this court's landmark decision 60 years ago in *Perez v. Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17][4]—which found that California's statutory provisions prohibiting interracial marriages were inconsistent with the fundamental constitutional right to marry, notwithstanding the circumstance that statutory prohibitions on interracial marriage had existed since the founding of the state—makes clear that history alone is not invariably an appropriate guide for determining the meaning and scope of this fundamental constitutional guarantee. The decision in *Perez*, although rendered by a deeply divided court, is a judicial opinion whose legitimacy and constitutional soundness are by now universally recognized.

As discussed below, upon review of the numerous California decisions that have examined the underlying bases and significance of the constitutional right to marry (and that illuminate *why* this right has been recognized as one of the basic, inalienable civil rights guaranteed to an individual by the California Constitution), we conclude that, under this state's Constitution, the constitutionally based right to marry properly must be understood to encompass the core set of basic *substantive* legal rights and attributes traditionally associated with marriage that are so integral to an individual's liberty and personal autonomy that they may not be eliminated or abrogated by the Legislature or by the electorate through the statutory initiative process. These core substantive rights include, most fundamentally, the opportunity of an individual to establish—with the person with whom the individual has chosen to share his or her life—an *officially recognized and protected family* possessing mutual rights and responsibilities and entitled to the same respect and dignity accorded a union traditionally designated as marriage. As past cases establish, the substantive right of two adults who share a loving relationship to join together to establish an officially recognized family of their own—and, if the couple chooses, to raise children within that family—constitutes a vitally important attribute of the fundamental interest in liberty and personal autonomy that the California Constitution secures to all persons for the benefit of both the individual and society.

---

[4] To avoid possible confusion, we note that the decision in *Perez v. Sharp* was reported in the unofficial regional reporter as *Perez v. Lippold* (1948) 198 P.2d 17, and judicial decisions in other states sometimes have referred to the decision by that title. We shall refer to the decision under its correct official title of *Perez v. Sharp*.

Furthermore, in contrast to earlier times, our state now recognizes that an individual's capacity to establish a loving and long-term committed relationship with another person and responsibly to care for and raise children does not depend upon the individual's sexual orientation, and, more generally, that an individual's sexual orientation—like a person's race or gender—does not constitute a legitimate basis upon which to deny or withhold legal rights. We therefore conclude that in view of the substance and significance of the fundamental constitutional right to form a family relationship, the California Constitution properly must be interpreted to guarantee this basic civil right to all Californians, whether gay or heterosexual, and to same-sex couples as well as to opposite-sex couples.[5]

In defending the constitutionality of the current statutory scheme, the Attorney General of California maintains that even if the constitutional right to marry under the California Constitution applies to same-sex couples as well as to opposite-sex couples, this right should not be understood as requiring the Legislature to designate a couple's official family relationship by the term "marriage," as opposed to some other nomenclature. The Attorney General, observing that fundamental constitutional rights generally are defined by *substance* rather than by *form*, reasons that so long as the state affords a couple all of the constitutionally protected *substantive* incidents of marriage, the state does not violate the couple's constitutional right to marry simply by assigning their official relationship a *name* other than "marriage." Because the Attorney General maintains that California's current domestic partnership legislation affords same-sex couples all of the core substantive rights that plausibly may be guaranteed to an individual or couple as elements of the fundamental state constitutional right to marry, the Attorney General concludes that the current California statutory scheme relating to marriage and domestic partnership does not violate the fundamental constitutional right to marry embodied in the California Constitution.

We need not decide in this case whether the name "marriage" is *invariably* a core element of the state constitutional right to marry so that the state would violate a couple's constitutional right even if—perhaps in order to emphasize and clarify that this civil institution is distinct from the religious institution of marriage—the state were to assign a name other than marriage as the official designation of the formal family relationship for *all* couples. Under the current statutes, the state has not revised the name of the official family relationship for *all* couples, but rather has drawn a distinction between the name for the official family relationship of opposite-sex couples (marriage) and that for same-sex couples (domestic partnership). One of the core

---

[5] For convenience and economy of language, in this opinion we shall use the term "gay," with reference to an individual, to relate either to a lesbian or to a gay man, and the term "gay couple" to refer to a couple consisting of either two women or two men.

elements of the right to establish an officially recognized family that is embodied in the California constitutional right to marry is a couple's right to have their family relationship accorded dignity and respect equal to that accorded other officially recognized families, and assigning a different designation for the family relationship of same-sex couples while reserving the historic designation of "marriage" exclusively for opposite-sex couples poses at least a serious risk of denying the family relationship of same-sex couples such equal dignity and respect. We therefore conclude that although the provisions of the current domestic partnership legislation afford same-sex couples most of the substantive elements embodied in the constitutional right to marry, the current California statutes nonetheless must be viewed as potentially impinging upon a same-sex couple's constitutional right to marry under the California Constitution.

Furthermore, the circumstance that the current California statutes assign a different name for the official family relationship of same-sex couples as contrasted with the name for the official family relationship of opposite-sex couples raises constitutional concerns not only under the state constitutional right to marry, but also under the state constitutional equal protection clause. In analyzing the validity of this differential treatment under the latter clause, we first must determine which standard of review should be applied to the statutory classification here at issue. Although in most instances the deferential "rational basis" standard of review is applicable in determining whether different treatment accorded by a statutory provision violates the state equal protection clause, a more exacting and rigorous standard of review—"strict scrutiny"—is applied when the distinction drawn by a statute rests upon a so-called "suspect classification" or impinges upon a fundamental right. As we shall explain, although we do not agree with the claim advanced by the parties challenging the validity of the current statutory scheme[6] that the applicable statutes properly should be viewed as an instance of discrimination on the basis of the suspect characteristic of sex or gender and should be subjected to strict scrutiny on that ground, we conclude that strict scrutiny nonetheless is applicable here because (1) the statutes in question properly

---

[6] As noted below (*post*, at pp. 786–787), four of the six actions in this coordination proceeding were filed by parties (the City and County of San Francisco and same-sex couples, and organizations supporting these parties) who challenge the constitutional validity of the current California marriage statutes, and two of the actions were filed by parties (the Proposition 22 Legal Defense and Education Fund (hereafter Fund or Proposition 22 Legal Defense Fund) and the Campaign for California Families (Campaign)) who maintain that the current statutes are constitutional. For convenience and ease of reference, in this opinion we shall refer collectively to the parties who are challenging the constitutionality of the marriage statutes as plaintiffs. Because the various parties defending the marriage statutes (the state, represented by the Attorney General, the Governor, the Fund, and the Campaign) have advanced differing legal arguments in support of the statutes, this opinion generally will refer to such parties individually. In those instances in which the opinion refers to the parties defending the marriage statutes collectively, those parties will be referred to as defendants.

must be understood as classifying or discriminating on the basis of sexual orientation, a characteristic that we conclude represents—like gender, race, and religion—a constitutionally suspect basis upon which to impose differential treatment, and (2) the differential treatment at issue impinges upon a same-sex couple's fundamental interest in having their family relationship accorded the same respect and dignity enjoyed by an opposite-sex couple.

Under the strict scrutiny standard, unlike the rational basis standard, in order to demonstrate the constitutional validity of a challenged statutory classification the state must establish (1) that the state interest intended to be served by the differential treatment not only is a constitutionally legitimate interest, but is a *compelling* state interest, and (2) that the differential treatment not only is reasonably related to but is *necessary* to serve that compelling state interest. Applying this standard to the statutory classification here at issue, we conclude that the purpose underlying differential treatment of opposite-sex and same-sex couples embodied in California's current marriage statutes—the interest in retaining the traditional and well-established definition of marriage—cannot properly be viewed as a *compelling* state interest for purposes of the equal protection clause, or as *necessary* to serve such an interest.

A number of factors lead us to this conclusion. First, the exclusion of same-sex couples from the designation of marriage clearly is not *necessary* in order to afford full protection to all of the rights and benefits that currently are enjoyed by married opposite-sex couples; permitting same-sex couples access to the designation of marriage will not deprive opposite-sex couples of any rights and will not alter the legal framework of the institution of marriage, because same-sex couples who choose to marry will be subject to the same obligations and duties that currently are imposed on married opposite-sex couples. Second, retaining the traditional definition of marriage and affording same-sex couples only a separate and differently named family relationship will, as a realistic matter, impose appreciable harm on same-sex couples and their children, because denying such couples access to the familiar and highly favored designation of marriage is likely to cast doubt on whether the official family relationship of same-sex couples enjoys dignity equal to that of opposite-sex couples. Third, because of the widespread disparagement that gay individuals historically have faced, it is all the more probable that excluding same-sex couples from the legal institution of marriage is likely to be viewed as reflecting an official view that their committed relationships are of lesser stature than the comparable relationships of opposite-sex couples. Finally, retaining the designation of marriage exclusively for opposite-sex couples and providing only a separate and distinct designation for same-sex couples may well have the effect of perpetuating a more general premise—now emphatically rejected by this state—that gay individuals and same-sex couples are in some respects

"second-class citizens" who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples. Under these circumstances, we cannot find that retention of the traditional definition of marriage constitutes a *compelling* state interest. Accordingly, we conclude that to the extent the current California statutory provisions limit marriage to opposite-sex couples, these statutes are unconstitutional.

# I

On February 10, 2004, the Mayor of the City and County of San Francisco (City) sent a letter to the county clerk, directing that official to determine what changes should be made to the forms and documents used to apply for and issue marriage licenses, so that licenses could be provided to couples without regard to their gender or sexual orientation. In response, the county clerk designed revised forms for the marriage license application and for the license and certificate of marriage, and on February 12, 2004, the City began issuing marriage licenses to same-sex couples.

The following day, two separate actions were filed in San Francisco Superior Court seeking an immediate stay as well as writ relief, to prohibit the City's issuance of marriage licenses to same-sex couples. (*Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco* (Super. Ct. S.F. City & County, No. CPF-04-503943) (hereafter *Proposition 22 Legal Defense Fund*); *Thomasson v. Newsom* (Super. Ct. S.F. City & County, No. CGC-04-428794) (subsequently retitled as *Campaign for California Families v. Newsom,* and hereafter referred to as *Campaign*).) As noted, the *Proposition 22 Legal Defense Fund* and the *Campaign* actions are two of the six cases whose consolidated appeals are before us in the present proceeding. (*Ante,* at p. 778, fn. 1.)

After the superior court declined to grant an immediate stay in the *Proposition 22 Legal Defense Fund* and the *Campaign* actions and the City continued to issue marriage licenses to, and solemnize and register marriages of, numerous same-sex couples, the California Attorney General and a number of taxpayers filed two separate petitions seeking to have this court issue an original writ of mandate, asserting that the City's actions were unlawful and warranted our immediate intervention. (*Lockyer v. City and County of San Francisco,* S122923; *Lewis v. Alfaro,* S122865.) On March 11, 2004, we issued an order to show cause in those original writ proceedings, and, pending our determination of both matters, directed City officials to enforce the existing marriage statutes and to refrain from issuing marriage licenses not authorized by such provisions. In addition, our March 11 order stayed all proceedings in the two cases then pending in San Francisco Superior Court (the *Proposition 22 Legal Defense Fund* and the *Campaign*

actions), but at the same time indicated that the stay did not preclude the filing of a separate action in superior court raising a direct challenge to the constitutionality of California's current marriage statutes. (*Lockyer, supra,* 33 Cal.4th 1055, 1073–1074.)

Shortly after our March 11, 2004, order was issued, and while the consolidated *Lockyer* cases still were pending in this court, the City filed a writ petition and complaint for declaratory relief in superior court, seeking a declaration that (1) Family Code section 308.5—an initiative statute proposed by Proposition 22 and enacted by the voters—does not apply to marriages solemnized in the State of California, and that (2) in any event, all California statutory provisions limiting marriage to unions between a man and a woman violate the California Constitution. (*City and County of San Francisco v. State of California* (Super. Ct. S.F. City & County, No. CGC-04-429539 (*CCSF*).) Thereafter, two similar actions challenging the constitutionality of California's current marriage statutes were filed by a number of same-sex couples who maintain either that they are involved in committed relationships but are not permitted to marry in California, or that their out-of-state marriages are not recognized under California law. Several statewide organizations representing many thousands of same-sex couples joined as plaintiffs in these actions. (*Woo v. Lockyer* (Super. Ct. S.F. City & County, No. CPF-04-504038) (*Woo*); *Tyler v. County of Los Angeles* (Super. Ct. L.A. County, No. BS-088506) (*Tyler*).)

According to declarations filed in the trial court, the named same-sex couples who are parties to these actions embody a diverse group of individuals who range from 30 years of age to more than 80 years of age, who come from various racial and ethnic backgrounds, and who are employed in (or have retired from) a wide variety of occupations, including pharmacist, military serviceman, teacher, hospital administrator, and transportation manager. Many of the couples have been together for well over a decade and one couple, Phyllis Lyon and Del Martin, who are in their 80's, have resided together as a couple for more than 50 years. Many of the couples are raising children together.

Subsequently, the *CCSF, Woo,* and *Tyler* actions, along with the previously filed *Proposition 22 Legal Defense Fund* and *Campaign* actions, were coordinated, by order of a judge appointed by the Chair of the Judicial Council, into a single proceeding entitled *In re Marriage Cases* (JCCP No. 4365; hereafter referred to as the *Marriage Cases*). (Code Civ. Proc., § 404 et seq.) That coordination proceeding was assigned to San Francisco Superior Court Judge Richard A. Kramer. A sixth action (*Clinton v. State of California* (Super. Ct. S.F. City & County, No. CGC-04-429548) (*Clinton*)), filed by a separate group of same-sex couples who similarly challenged the

constitutionality of the current marriage statutes, later was added to the *Marriage Cases* coordination proceeding.

On August 12, 2004, while the *Marriage Cases* coordination proceeding was pending in the superior court, our court rendered its decision in *Lockyer*, *supra*, 33 Cal.4th 1055, concluding that the City officials had exceeded their authority in issuing marriage licenses to same-sex couples in the absence of a judicial determination that the statutory provisions limiting marriage to the union of a man and a woman are unconstitutional, and further concluding that the approximately 4,000 same-sex marriages performed in San Francisco prior to our March 11, 2004, order were void and of no legal effect. In light of these conclusions, we issued a writ of mandate compelling the City officials to comply with the requirements and limitations of the current marriage statutes in performing their duties under these statutes, and directing the officials to notify all same-sex couples to whom the officials had issued marriage licenses or registered marriage certificates that these same-sex marriages were void from their inception and a legal nullity. (*Lockyer*, *supra*, 33 Cal.4th at p. 1120.) Although we concluded in *Lockyer* that the City officials had acted unlawfully and that the same-sex marriages they had authorized were void, as already noted our opinion made clear that the substantive question of the constitutionality of California's statutory provisions limiting marriage to a man and a woman was not before us in the *Lockyer* proceeding and that we were expressing no opinion on this issue. (*Id.* at p. 1069; see also *id.* at p. 1125 (conc. opn. of Moreno, J.); *id.* at pp. 1132–1133 (conc. & dis. opn. of Kennard, J.); *id.* at p. 1133 (conc. & dis. opn. of Werdegar, J.).)

After the issuance of our decision in *Lockyer*, *supra*, 33 Cal.4th 1055, the superior court in the coordination matter proceeded expeditiously to solicit briefing and conduct a hearing on the validity, under the California Constitution, of California's statutes limiting marriage to a man and a woman. On April 13, 2005, the superior court issued its decision on this substantive constitutional question. Although plaintiffs argued that the statutes limiting marriage to a union of a man and a woman violated a number of provisions of the California Constitution—including the fundamental right to marry protected by the due process and privacy provisions of the California Constitution and the equal protection clause of that Constitution—the superior court confined its decision to the challenge that was based upon the equal protection clause. In analyzing the equal protection claim, the superior court determined that the statutes limiting marriage in California to opposite-sex couples properly must be evaluated under the strict scrutiny equal protection standard, because those statutory enactments rest upon a suspect classification (sex) and impinge upon a fundamental constitutional right (the right to marry). The court considered the various state interests and justifications proffered in support of those enactments, ultimately concluding that the

statutory limitation of marriage to the union of a man and a woman not only does not satisfy the strict scrutiny standard, but also does not meet the more deferential rational basis test because, in the superior court's view, the differential treatment mandated by the statute does not further any legitimate state interest. In light of this conclusion, the court held that California's current marriage statutes are unconstitutional under the state Constitution insofar as they limit marriage to opposite-sex couples. The superior court entered judgment in favor of plaintiffs in each of the coordinated cases.

On appeal, the Court of Appeal, in a two-to-one decision, reversed the superior court's ruling on the substantive constitutional issue, disagreeing in a number of significant respects with the lower court's analysis of the equal protection issue. (Maj. opn. of McGuiness, P. J., joined by Parrilli, J.) First, the majority opinion in the Court of Appeal concluded the superior court erred in finding that the statutory provisions at issue impinge upon the fundamental constitutional right to marry, determining that this right properly should be interpreted to encompass only the right to marry a person of the opposite sex and that the constitutional right that plaintiffs actually sought to enforce is a right to same-sex marriage—a right that the Court of Appeal majority found lacking in any historical or precedential support. Second, the Court of Appeal majority rejected the superior court's conclusion that the California marriage statutes discriminate on the suspect basis of sex and for this reason are subject to strict scrutiny review, relying upon the circumstance that the statutes do not discriminate against either men or women or treat either of the genders differently from the other, but rather permit members of either gender to marry only a person of the opposite gender. Third, although the Court of Appeal majority found that California's marriage statutes realistically must be viewed as providing differential treatment on the basis of sexual orientation, the majority went on to hold that sexual orientation does not constitute a suspect classification for purposes of the state equal protection clause. The majority thus concluded that, contrary to the superior court's determination, the marriage statutes are not subject to strict scrutiny review but rather must be evaluated only under the deferential rational basis standard. Finally, applying that standard, the majority disagreed with the superior court and found that the marriage statutes' limitation of marriage to opposite-sex couples survives rational basis review, reasoning that the state has a legitimate interest in preserving the traditional definition of marriage and that the statute's classifications are rationally related to that interest. Accordingly, the Court of Appeal majority concluded that the superior court erred in finding the marriage statutes unconstitutional.

One of the appellate justices who joined the majority opinion also wrote a concurring opinion, addressing what her opinion described as "more philosophical questions presented by the challenging legal issues before us." (Conc. opn. of Parrilli, J.) The concurring justice observed that in her view,

the domestic partnership legislation "seems to recognize that at this stage, we do not know whether the state must name and privilege same-sex unions in exactly the same way traditional marriages are supported. The nuance at this moment in history is that the institution (marriage) and emerging institution (same-sex partnerships) are distinct and, we *hope*, equal. We hope they are equal because of the great consequences attached to each. Childrearing and passing on culture and traditions are potential consequences of each. To the degree that any committed relationship provides love and security, encourages fidelity, and creates a supportive environment for children it is entitled to respect. Whether it must be called the same, or supported by the state as equal to the traditional model, only time and patient attention to the models at issue will tell." Agreeing with the majority opinion, the concurring justice concluded that "[i]t is the legitimate business of the Legislature to attempt to close the distance between the parallel institutions (marriage and same-sex committed domestic partnerships) as they develop, and to address such concerns."

The third appellate court justice dissented from the majority's determination that the marriage statutes do not violate the California Constitution. (Conc. & dis. opn. of Kline, J.) The dissenting justice (1) disagreed with the majority's conclusion that the same-sex couples challenging the marriage statutes are seeking recognition of a novel constitutional right to "same-sex marriage" rather than simply the application of an established fundamental constitutional right to marry a person of one's choice, (2) explained why, in his view, sexual orientation should be considered a suspect classification for purposes of equal protection principles, and (3) finally concluded that the challenged statutory restriction limiting marriage to opposite-sex couples "has no rational basis, let alone a compelling justification."

In light of the importance of the substantive constitutional issues presented, we granted review.

## II

Before beginning our discussion of the significant constitutional issues presented by this case, we briefly address a much more limited procedural point relating only to the *Proposition 22 Legal Defense Fund* and the *Campaign* proceedings—the two actions that were filed immediately after San Francisco officials began issuing marriage licenses to same-sex couples and that were stayed by our court during the pendency of the *Lockyer* proceeding. The Court of Appeal concluded that although these two cases presented justiciable actions when they were initially filed, once this court issued its decision in *Lockyer, supra,* 33 Cal.4th 1055, these actions no longer presented justiciable controversies, because this court's decision in *Lockyer*

effectively granted all of the relief to which the parties in those actions were entitled (including the prohibition of any continued illegal expenditure of public funds). Accordingly, the Court of Appeal determined that the superior court erred in failing, at that juncture, to dismiss these two actions as moot. Although the Fund and the Campaign take issue with the Court of Appeal's conclusion on this point, we agree with that determination.

█ In challenging this aspect of the Court of Appeal's ruling, the Fund maintains that notwithstanding this court's decision in *Lockyer*, the superior court properly could find that, because there is a continuing dispute between the Fund and the City over the scope and constitutionality of Family Code section 308.5 (the initiative statute adopted by the voters' approval of Proposition 22 in March 2000), the *Proposition 22 Legal Defense Fund* action constitutes a permissible vehicle by which under Code of Civil Procedure section 1060 the Fund can seek and obtain a declaratory judgment against the City with regard to that legal question.[7] Past California decisions establish, however, that notwithstanding an advocacy group's strong political or ideological support of a statute or ordinance—and its disagreement with those who question or challenge the validity of the legislation—such a disagreement does not in itself afford the group the right to intervene formally in an action challenging the validity of the measure. (See, e.g., *Socialist Workers etc. Committee v. Brown* (1975) 53 Cal.App.3d 879, 891–892 [125 Cal.Rptr. 915] [holding trial court did not err in rejecting Common Cause's request to intervene in action challenging statutes requiring disclosure of campaign contributions]; *People ex rel. Rominger v. County of Trinity* (1983) 147 Cal.App.3d 655, 662 [195 Cal.Rptr. 186] [rejecting Sierra Club's claim that its strong interest in the enforcement of county's environmental laws was itself sufficient to afford it standing to intervene in action challenging the validity of an ordinance prohibiting the spraying of a specified chemical].) For similar reasons, we agree with the Court of Appeal that, absent a showing by the Fund that it possesses a direct legal interest that will be injured or adversely affected (which the Fund acknowledges has not been established here),[8] the Fund's strong ideological disagreement with the City's views regarding the scope or constitutionality of Proposition 22 is not

[7] Code of Civil Procedure section 1060 provides in relevant part that "[a]ny person . . . may, *in cases of actual controversy relating to the legal rights and duties of the respective parties*, bring an original action . . . for a declaration of his or her rights and duties in the premises . . . ." (Italics added.)

[8] At an earlier stage of the action filed by the City (the *CCSF* action)—before the coordination proceeding was established—the Fund filed a motion seeking to intervene formally in the *CCSF* action, but the trial court denied the motion. The Fund appealed from that ruling, but the Court of Appeal affirmed the trial court, holding that the Fund and its members "do not . . . have a sufficiently direct and immediate interest to support intervention." (*City and County of San Francisco v. State of California* (2005) 128 Cal.App.4th 1030, 1038 [27 Cal.Rptr.3d 722].)

sufficient to afford standing to the Fund to maintain a lawsuit to obtain a declaratory judgment regarding these legal issues. (See, e.g., *Newland v. Kizer* (1989) 209 Cal.App.3d 647, 657 [257 Cal.Rptr. 450]; *Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 662–663 [118 Cal.Rptr. 100].) In this respect, the Fund is in a position no different from that of any other member of the public having a strong ideological or philosophical disagreement with a legal position advanced by a public entity that, through judicial compulsion or otherwise, continues to comply with a contested measure.[9]

The Campaign argues alternatively that the superior court, in permitting these two actions to go forward notwithstanding this court's opinion in *Lockyer*, properly could view that decision as providing only *interim* mandamus relief against the City, leaving the question whether the City should be *permanently* enjoined from granting marriage licenses to same-sex couples for resolution in the *Proposition 22 Legal Defense Fund* and the *Campaign* actions. Our decision in *Lockyer*, however, does not support such an interpretation. We did not purport to afford only interim relief, but rather granted to the petitioners before us the same full and final mandamus relief to which the Fund and the Campaign would have been entitled in the mandamus actions filed in superior court against City officials by each of those parties. (*Lockyer, supra*, 33 Cal.4th at p. 1120.) Although our decision recognized that the constitutionality of the marriage statutes remained open for judicial resolution in the future, we clearly indicated that the relief ordered constituted a final resolution of the mandamus action rather than simply an interim order. (*Id.* at p. 1112.) Thus, the decision of the superior court cannot be supported on the basis of the interim-remedy theory advanced by the Campaign.

Accordingly, on this initial procedural point, we agree with the Court of Appeal's conclusion that once this court's decision in *Lockyer* granted the mandamus relief sought by the Fund and the Campaign in their previously filed lawsuits against the City and its officials, the superior court should have dismissed those actions as moot.[10]

---

[9] The amicus curiae brief filed in this court by the Pacific Justice Institute questions the right of the City to maintain a declaratory judgment action challenging the validity of the state's marriage statutes. That issue, however, was not raised in either the trial court or the Court of Appeal, and its resolution would not affect the validity of this proceeding or the substantive issue before us, because the numerous same-sex couples who have been parties to this coordination action from its inception unquestionably are authorized to bring and maintain the present challenge to the marriage statutes. We therefore do not consider it necessary or advisable for us to address, at the present juncture, this issue raised by amicus curiae for the first time in these proceedings.

[10] This conclusion, of course, does not mean that the superior court should have denied these organizations the opportunity to participate in the coordination proceeding as amici curiae. Although, as noted above (*ante*, at p. 790, fn. 8), the Fund was denied the right to intervene formally in the *CCSF* action that thereafter became part of this coordination

## III

We now turn to the significant substantive constitutional issues before us. We begin by examining the relevant California statutory provisions relating to marriage and domestic partnership that lie at the heart of this controversy.

### A

From the beginning of California statehood, the legal institution of civil marriage[11] has been understood to refer to a relationship between a man and a woman. Article XI, section 14 of the California Constitution of 1849—California's first Constitution—provided explicit constitutional protection for a *"wife's* separate property" (italics added),[12] and the marriage statute adopted by the California Legislature during its first session clearly assumed that the marriage relationship necessarily involved persons of the opposite sex. (See Stats. 1850, ch. 140, § 2, p. 424 [listing, as marriages that would be considered "incestuous, and absolutely void," marriages "between brothers and sisters of the one half as well as the whole blood" and "between uncles and nieces, [or] aunts and nephews"]; *id.,* § 7, p. 424 ["No Judge . . . , or

proceeding (see *City and County of San Francisco v. State of California, supra,* 128 Cal.App.4th 1030), the Court of Appeal's decision in that matter made clear that the Fund preserved its ability to present its views through amicus curiae status (*id.* at p. 1044). Moreover, the superior court, in exercising its traditional broad discretion over the conduct of pending litigation, retained the authority to determine the manner and extent of these entities' participation as amici curiae that would be of most assistance to the court. As we observed in *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 405, footnote 14 [11 Cal.Rptr.2d 51, 834 P.2d 745]: "Amicus curiae presentations assist the court by broadening its perspective on the issues raised by the parties. Among other services, they facilitate informed judicial consideration of a wide variety of information and points of view that may bear on important legal questions."

In this regard we note that in the present proceeding, this court has received 45 extensively researched and well-written amicus curiae briefs, some of which have been filed on behalf of many of California's largest cities, numerous members of the state Legislature, and scores of organizations, including a variety of commercial, religious, and mental health groups, bar associations, and law professors. The religious groups, like some of the others, are divided in their support of the respective parties in this proceeding. The court has benefited from the considerable assistance provided by these amicus curiae briefs in analyzing the significant issues presented by this case.

[11] From the state's inception, California law has treated the legal institution of *civil* marriage as distinct from *religious* marriage. Article XI, section 12 of the California Constitution of 1849 provided in this regard: "No contract of marriage, if otherwise duly made, shall be invalidated for want of conformity to the requirements of any religious sect." This provision is now set forth, in identical language, in Family Code section 420, subdivision (c).

[12] Article XI, section 14 of the 1849 Constitution provided in full: "All property, both real and personal, of the wife, owned or claimed by marriage, and that acquired afterwards by gift, devise, or descent, shall be her separate property; and laws shall be passed more clearly defining the rights of the wife, in relation as well to her separate property, as to that held in common with her husband. Laws shall also be passed providing for the registration of the wife's separate property."

other person, shall join in marriage any male under the age of twenty-one years, or female under the age of eighteen years, without the consent of the parent or guardian . . . ."].)

California's current marriage statutes derive in part from this state's Civil Code, enacted in 1872, which was based in large part upon Field's New York Draft Civil Code. As adopted in 1872, former section 55 of the Civil Code provided that marriage is "a personal relation arising out of a civil contract, to which the consent of the parties capable of making it is necessary,"[13] and former section 56 of that code, in turn, provided that "[a]ny unmarried male of the age of eighteen years or upwards, and any unmarried female of the age of fifteen years or upwards, and not otherwise disqualified, are capable of consenting to and consummating marriage." Although these statutory provisions did not expressly state that marriage could be entered into only by a man and a woman, the statutes clearly were intended to have that meaning and were so understood. (See Code commrs. note foll. 1 Ann. Civ. Code, § 55 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 28.) Thus, this court's decisions of that era declared that the marriage relationship "is one 'by which a man and woman reciprocally engage to live with each other during their joint lives, and to discharge toward each other the duties imposed by law on the relation of husband and wife' " (*Mott v. Mott* (1890) 82 Cal. 413, 416 [22 P. 1140]), and that the marriage contract is one " 'by which a man and woman capable of entering into such a contract mutually engage with each other to live their whole lives together in the state of union which ought to exist between a husband and his wife.' " (*Kilburn v. Kilburn* (1891) 89 Cal. 46, 50 [26 P. 636].)

Although the California statutes governing marriage and family relations have undergone very significant changes in a host of areas since the late 19th century, the statutory designation of marriage as a relationship between a man and a woman has remained unchanged.

In 1969, the Legislature adopted the Family Law Act (Stats. 1969, ch. 1608, § 8, pp. 3314–3344) which, among other matters, substantially revised the

---

[13] As enacted in 1872, former section 55 of the Civil Code further provided: "Consent alone will not constitute marriage; it must be followed by solemnization, *or by a mutual assumption of marital rights, duties, or obligations.*" (Italics added.) In 1895, that statute was amended to delete the italicized language and to add "authorized by this code," so that the concluding clause of the statute read: "[consent] must be followed by a solemnization authorized by this code." (Stats. 1895, ch. 129, § 1, p. 121.) In *Norman v. Thomson* (1898) 121 Cal. 620, 627–629 [54 P. 143], this court concluded that this statutory change operated to abolish common law marriage in California and to require, for a valid marriage, that solemnization be performed as authorized by the applicable California statutes. (See, e.g., *Elden v. Sheldon* (1988) 46 Cal.3d 267, 275 [250 Cal.Rptr. 254, 758 P.2d 582].)

statutory provisions governing the dissolution of marriage, but retained and recodified former sections 55 and 56 of the Civil Code as Civil Code former sections 4100 and 4101.[14]

In 1971, following the adoption of the 26th Amendment to the federal Constitution, which lowered the voting age in federal elections to 18 years of age, our state Legislature passed a bill lowering most statutory minimum ages in California law to that age. (Stats. 1971, ch. 1748, § 1, p. 3736 ["Except for [limited, specified exceptions], whenever, in any provision of law, the term '21 years of age' or any similar phrase regarding such age appears, it shall be deemed to mean '18 years of age.' "].) As part of this legislation, the provisions of Civil Code former section 4101, subdivision (a), which previously had set the age of consent for marriage for men at 21 years of age and for women at 18 years of age, were modified to provide a uniform age of consent of 18 years of age for both genders. In revising the language of section 4101 to equalize the minimum age for men and women, the 1971 legislation eliminated references to "male" and "female," so that section 4101, subdivision (a), as amended in 1971, stated simply that "[a]ny unmarried person of the age of 18 years or upwards, and not otherwise disqualified, is capable of consenting to and consummating marriage." (Stats. 1971, ch. 1748, § 26, p. 3747.) There is no indication in the legislative history of the 1971 enactment, however, that the change in section 4101 was intended to authorize marriage of two persons of the same sex, and numerous other marriage statutes, reflecting the long-standing understanding that marriage under California law refers to a union between a man and a woman, remained unchanged. (See, e.g., Civ. Code, former § 4213 (now Fam. Code, § 500) [when unmarried persons, not minors, have been living together "as man and wife," they may, without a license, be married by any clergymember]; Civ. Code, former § 4400 (now Fam. Code, § 2200) ["Marriages between . . . brothers and sisters . . . and between uncles and nieces or aunts and nephews, are incestuous, and void from the beginning . . ."]; Civ. Code, former § 4425 (now Fam. Code, § 2210) [a marriage is voidable if "[e]ither party was of unsound mind, unless such party, after coming to reason, freely cohabited with the other as husband and wife"].)

In the mid-1970's, several same-sex couples sought marriage licenses from county clerks in a number of California counties, relying in part upon the 1971 change in the language of Civil Code former section 4101, subdivision (a), noted above. All of the county clerks who were approached by these

---

[14] In 1921, the age limits set forth in former section 56 of the Civil Code (18 years of age for males, 15 years of age for females) were revised upward to authorize marriage by any unmarried male 21 years or older and any unmarried female 18 years or older (Stats. 1921, ch. 233, § 1, pp. 333–334), and in 1969 these higher age limits were carried over to Civil Code former section 4101.

same-sex couples denied the applications, but in order to eliminate any uncertainty as to whether the then existing California statutes authorized marriage between two persons of the same sex, legislation was introduced in 1977 at the request of the County Clerks' Association of California to amend the provisions of former sections 4100 and 4101 to clarify that the applicable California statutes authorized marriage only between a man and a woman. (Stats. 1977, ch. 339, § 1, p. 1295, introduced as Assem. Bill No. 607 (1977–1978 Reg. Sess.); see Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977–1978 Reg. Sess.) as amended May 23, 1977, p. 1; Governor's Legal Affairs Off., Enrolled Bill Rep. on Assem. Bill No. 607 (1977–1978 Reg. Sess.) Aug. 18, 1977, p. 1.)

The 1977 legislation added the phrase "between a man and a woman" to the first sentence of former section 4100, so that the sentence read: "Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary." The measure also revised the language of former section 4101 to reintroduce the references to gender that had been eliminated in 1971. As we explained in *Lockyer, supra,* 33 Cal.4th 1055, 1076, footnote 11: "The legislative history of the [1977] measure makes its objective clear. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977–1978 Reg. Sess.) as amended May 23, 1977, p. 1 ['The purpose of the bill is to prohibit persons of the same sex from entering lawful marriage'].)" In 1992, when the Family Code was enacted, the provisions of former sections 4100 and 4101 of the Civil Code, as amended in 1977, were reenacted without change as Family Code sections 300 and 301, respectively. (Stats. 1992, ch. 162, § 10, pp. 464, 474.)

Accordingly, Family Code section 300 currently provides in relevant part: "Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary."[15] In light of its language and legislative history, all parties before us agree that section 300 limits marriages that lawfully may be performed in California to marriages of opposite-sex couples.

There is no similar agreement between the parties, however, as to the meaning and scope of a second provision of the Family Code—section 308.5—that also contains language limiting marriage to a union between a

---

[15] Family Code section 300, subdivision (a), provides in full: "Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary. Consent alone does not constitute marriage. Consent must be followed by the issuance of a license and solemnization as authorized by this division, except as provided by Section 425 and Part 4 (commencing with Section 500)."

Hereafter, unless otherwise specified, all statutory references are to the Family Code.

man and a woman. Section 308.5, an initiative statute submitted to the voters of California as Proposition 22 at the March 7, 2000, primary election and approved by the voters at that election, provides in full: "Only marriage between a man and a woman is valid or recognized in California." Plaintiffs maintain that section 308.5 should not be interpreted to apply to or to limit marriages *entered into in California*, but instead to apply only to marriages *entered into in another jurisdiction*; plaintiffs take the position that although this provision prohibits California from recognizing *out-of-state* marriages of same-sex couples, it should not be interpreted to speak to or control the question of the validity of marriages *performed in California*. The Proposition 22 Legal Defense Fund and the Campaign contest plaintiffs' proposed interpretation of section 308.5, maintaining that the statute properly must be interpreted to apply to and to limit both out-of-state marriages and marriages performed in California.

As already noted, it is clear that section 300 in itself limits marriages performed in California to opposite-sex couples, but the proper interpretation of section 308.5 nonetheless is quite significant because, unlike section 300, section 308.5 is an initiative statute—a measure that, under the provisions of article II, section 10, subdivision (c) of the California Constitution, cannot be modified by the Legislature without submitting the proposed modification to a vote of the people.[16] Accordingly, if section 308.5 applies to marriages performed in California as well as to out-of-state marriages, any measure passed by the Legislature that purports to authorize marriages of same-sex couples in California would have to be submitted to and approved by the voters before it could become effective.

Although the Court of Appeal thought it unnecessary to determine the proper scope of section 308.5 in the present proceeding, in our view it is both appropriate and prudent to address the meaning of that statute at this juncture, both to ensure that our resolution of the constitutional issue before us is rendered with a full and accurate understanding of the source of California's current limitation of marriage to a union between a man and a woman, and to eliminate any uncertainty and confusion regarding the Legislature's ability or inability to authorize the marriage of same-sex couples in California without a confirming vote of the electorate, as the Legislature recently has attempted to do.[17]

---

[16] California Constitution, article II, section 10, subdivision (c) provides in relevant part: "The Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." Nothing in Proposition 22 permits amendment or repeal of section 308.5 without the voters' approval.

[17] In 2005 and 2007, the Legislature passed bills that would have amended section 300 to permit marriage of same-sex couples and that purported not to affect the provisions of section

For the reasons discussed below, we conclude that in light of both the language and the purpose of section 308.5, this provision reasonably must be interpreted to apply both to marriages performed in California and those performed in other jurisdictions.

First, as already noted, section 308.5 provides in full: "Only marriage between a man and a woman is valid or recognized in California." This statutory language does not purport to limit the statute's application to out-of-state marriages or to draw any distinction between in-state and out-of-state marriages. On the contrary, the language of the statute—at least on its face—suggests that the statute was intended to apply not only to the *recognition* of out-of-state marriages, but also to specify more broadly that only marriage between a man and a woman is *valid* in California.

Although plaintiffs acknowledge the wording of section 308.5 could be interpreted to apply to both in-state and out-of-state marriages, they maintain this language is ambiguous when one takes into account the location of the provision in the Family Code—its sequence in immediately following section 308, which relates specifically to out-of-state marriages.[18] Plaintiffs point out that section 308 employs the term "valid" with specific reference to out-of-state marriages, and they maintain that, as a consequence, the use of the word "valid" (along with the word "recognized") in section 308.5 is not inconsistent with an interpretation of the statute that limits its application to out-of-state marriages.

308.5, which the Legislature viewed as applicable only to marriages performed outside of California. (Assem. Bill No. 849 (2005–2006 Reg. Sess.) §§ 3, subd. (k), 4; Assem. Bill No. 43 (2007–2008 Reg. Sess.) §§ 3, subd. (m), 4.) The Governor vetoed both measures.

In returning the 2005 bill to the Assembly without his signature, the Governor stated he believed that Proposition 22 required such legislation to be submitted to a vote of the people—a condition that the 2005 bill did not fulfill—and the Governor further noted that "[t]he ultimate issue regarding the constitutionality of section 308.5 and its prohibition against same-sex marriage is currently before the Court of Appeal in San Francisco and will likely be decided by the Supreme Court. [¶] This bill simply adds confusion to a constitutional issue. If the ban of same-sex marriage is unconstitutional, this bill is not necessary. If the ban is constitutional, this bill is ineffective." (Governor's veto message to Assem. on Assem. Bill No. 849 (Sept. 29, 2005) Recess J. No. 4 (2005–2006 Reg. Sess.) pp. 3737–3738.) Similarly, in returning the 2007 bill to the Assembly without his signature, the Governor noted that a challenge to Proposition 22 currently was pending before this court, and reiterated his position "that the appropriate resolution to this issue is to allow the Court to rule on Proposition 22." (Governor's veto message to Assem. on Assem. Bill No. 43 (Oct. 12, 2007) Recess J. No. 9 (2007–2008 Reg. Sess.) pp. 3497–3498.)

In light of this ongoing controversy, it is appropriate to resolve the question of the scope of section 308.5 at this time.

[18] Section 308 provides in full: "A marriage contracted outside this state that would be valid by the laws of the jurisdiction in which the marriage was contracted is valid in this state."

In view of the asserted ambiguity of the statute, plaintiffs urge this court to consider the measure's purpose as reflected in the initiative's "legislative history." In this regard, plaintiffs maintain that the arguments relating to Proposition 22 set forth in the voter information guide indicate that this initiative measure was prompted by the proponents' concern that other states and nations might authorize marriages of same-sex couples, and by the proponents' desire to ensure that California would not recognize such marriages. (See Voter Information Guide, Primary Elec. (Mar. 7, 2000) arguments in favor of and against Prop. 22, pp. 52–53; see also *Armijo v. Miles* (2005) 127 Cal.App.4th 1405, 1422–1424 [26 Cal.Rptr.3d 623].) Plaintiffs assert that in light of this objective, and the circumstance that when Proposition 22 was submitted to the electorate the provisions of section 308.5 were not needed to establish a limitation on marriages performed in California because section 300 already specified that marriage in California is limited to opposite-sex couples, section 308.5 should be interpreted to apply only to out-of-state marriages and not to marriages solemnized in California.

Although we agree with plaintiffs that the principal motivating factor underlying Proposition 22 appears to have been to ensure that California would not recognize marriages of same-sex couples that might be validly entered into in another jurisdiction, we conclude the statutory provision proposed by this initiative measure and adopted by the voters—which, we note again, provides in full that "[o]nly marriage between a man and a woman is valid or recognized in California"—cannot properly be interpreted to apply only to marriages performed outside of California. Unlike section 308, section 308.5 itself contains no language indicating that the statute is directed at and applies only to marriages performed outside of California. Further, because section 308.5 states both that only a marriage between a man and a woman is "recognized" in California and also that only a marriage between a man and a woman is "valid" in California, the average voter is likely to have understood the proposed statute to apply to marriages performed in California as well as to out-of-state marriages.[19]

Nothing in the ballot materials or other background of the initiative indicates that its proponents intended to limit its scope to out-of-state marriages of same-sex couples and leave the California Legislature free to

---

[19] The City argues that in employing both the terms "valid" and "recognized," section 308.5 could be interpreted to mean that an out-of-state marriage involving a same-sex couple not only will not be considered a "valid" marriage in California, but that, in addition, an out-of-state marriage of a same-sex couple will not be "recognized" in California in *any* capacity—even as, for example, a domestic partnership. In our view, the interpretation proposed by the City is not a reasonable interpretation of section 308.5's language, because the statute contains no reference to domestic partnership or to any comparable status and there is no indication that the measure was intended to affect or restrict the recognition of such a status. (See *Knight v. Superior Court* (2005) 128 Cal.App.4th 14, 23–25 [26 Cal.Rptr.3d 687].)

adopt a different rule validating the marriages of same-sex couples in California. Indeed, in view of the thrust of the measure as explained in the ballot arguments supporting the proposed initiative and rebutting the argument against it, it would be unreasonable to conclude that the measure was intended (and should be interpreted) to leave the Legislature free to revise California law to authorize the marriage of same-sex couples. (See Voter Information Guide, Primary Elec. (Mar. 7, 2000) argument in favor of Prop. 22, p. 52 ["Proposition 22 is exactly 14 words long: '*Only marriage between a man and a woman is valid or recognized in California.*' [¶] That's it! No legal doubletalk, no hidden agenda. Just common sense: Marriage should be between a man and a woman. [¶] . . . [¶] It's tough enough for families to stay together these days. Why make it harder by telling children that marriage is just a word anyone can re-define again and again until it no longer has any meaning?" (original italics)]; *id.*, rebuttal to argument against Prop. 22, p. 53 ["Opponents say anybody supporting traditional marriage is guilty of extremism, bigotry, hatred and discrimination towards gays, lesbians and their families. [¶] That's unfair and divisive nonsense. [¶] THE TRUTH IS, we respect EVERYONE'S freedom to make lifestyle choices, but draw the line at re-defining marriage for the rest of society. [¶] . . . [¶] . . . 'YES' on 22 sends a clear, positive message to children that marriage between a man and a woman is a valuable and respected institution, now and forever." (Original capitalization.)].) Accordingly, we agree with the conclusion of the Court of Appeal in *Knight v. Superior Court, supra,* 128 Cal.App.4th 14, 23–24, that section 308.5 was intended to ensure "that California will not legitimize or recognize same-sex marriages from other jurisdictions . . . *and that California will not permit same-sex partners to validly marry within the state.*" (Italics added.)[20]

■ Second, not only does this appear to be the most reasonable interpretation of section 308.5 in light of the statute's language and purpose, but serious constitutional problems under the privileges and immunities clause and

---

[20] Proposition 22 was one of a number of similar measures (commonly denominated "little DOMA's" [defense of marriage acts]) that were proposed and adopted in many states in the 1990's and early 2000's in the wake of the decision of the Hawaii Supreme Court in *Baehr v. Lewin* (1993) 74 Haw. 530 [852 P.2d 44] and of Congress' enactment of the federal Defense of Marriage Act (Pub.L. No. 104-199 (Sept. 21, 1996) 110 Stat. 2419, codified at 1 U.S.C. § 7, 28 U.S.C. § 1738C). (See Duncan, *Revisiting State Marriage Recognition Provisions* (2005) 38 Creighton L.Rev. 233, 237–238; see also Coolidge & Duncan, *Definition or Discrimination? State Marriage Recognition Statutes in the "Same-Sex Marriage" Debate* (1998) 32 Creighton L.Rev. 3.) Like Proposition 22, a number of these measures provided that only a marriage between a man and a woman would be "valid" or "recognized" in the adopting state, and a law review commentary on these measures concluded that the use of the term "valid" (accompanying the term "recognized") in these measures was intended to signify that, with respect to marriages performed within the enacting state, only marriages between opposite-sex couples would be considered legally valid. (See Duncan, *Revisiting State Marriage Recognition Provisions, supra,* 38 Creighton L.Rev. 233, 261.)

the full faith and credit clause of the federal Constitution would be presented were section 308.5 to be interpreted as creating a distinct rule for out-of-state marriages as contrasted with in-state marriages. Under plaintiffs' proposed interpretation, section 308.5 would prohibit the state from recognizing the marriages of same-sex couples lawfully solemnized in other states without resubmitting the question to the voters and obtaining a confirming vote of the electorate, but would permit the state to recognize the validity of marriages of same-sex couples performed in California by legislative action alone without a vote of the electorate, raising the very real possibility that the state could approve the validity of marriages of same-sex couples that are performed in California while continuing to deny recognition to marriages of same-sex couples that are lawfully performed in another state. (See, *ante*, at pp. 796–797, fn. 17.) Imposing such discriminatory treatment against out-of-state marriages of same-sex couples, as contrasted with marriages of same-sex couples performed within the state, would be difficult to square with governing federal constitutional precedents. (See, e.g., *Hicklin v. Orbeck* (1978) 437 U.S. 518, 523–526 [57 L.Ed.2d 397, 98 S.Ct. 2482]; *Toomer v. Witsell* (1948) 334 U.S. 385, 398–399 [92 L.Ed. 1460, 68 S.Ct. 1156].) Accordingly, it is appropriate to interpret the limitations imposed by section 308.5 as applicable to marriages performed in California as well as to out-of-state marriages, in order to avoid the serious federal constitutional questions that would be posed by a contrary interpretation. (Accord, *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1216 [86 Cal.Rptr.2d 778, 980 P.2d 337].)[21]

In sum, we conclude that California's current statutory restriction of marriage to a couple consisting of a man and a woman rests upon the provisions of both section 300 and section 308.5. Plaintiffs' constitutional

---

[21] Plaintiffs contend that because section 308.5 currently does not prescribe a rule for out-of-state marriages different from the rule California applies to in-state marriages, no constitutional problems are presented even if the statute is interpreted to apply only to out-of-state marriages, and that it is improper, in interpreting the statute, to rely upon potential constitutional problems that would arise only in the event the state in the future were to adopt a different rule for in-state marriages. As explained above, however, because section 308.5 is an initiative statute, under plaintiffs' proposed interpretation of section 308.5, California law, at the present time, would make it more difficult to obtain recognition of out-of-state marriages of same-sex couples than to obtain recognition of in-state marriages of such couples. Moreover, in assessing the merits of alternative interpretations of a statutory provision, it is appropriate to consider the potential constitutional problems that would be posed by each alternative construction of the statute, and to favor an interpretation that avoids such problems. (See, e.g., *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628] [" 'If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable.' "].)

challenge thus must be viewed as relating to the limitation embodied in each of these statutory provisions.

## B

Although California statutes always have limited and continue to limit marriage to opposite-sex couples, as noted at the outset of this opinion California recently has enacted comprehensive domestic partnership legislation that affords same-sex couples the opportunity, by entering into a domestic partnership, to obtain virtually all of the legal benefits, privileges, responsibilities, and duties that California law affords to and imposes upon married couples. The recent comprehensive domestic partnership legislation constitutes the culmination of a gradual expansion of rights that have been made available in this state to same-sex couples who choose to register as domestic partners. We briefly review the history of domestic partnership legislation in California.

In 1999, the Legislature enacted the initial legislation creating a statewide domestic partnership registry. (Stats. 1999, ch. 588, § 2 [adding Fam. Code, §§ 297–299.6].) In adopting this legislation, "California became one of the first states to allow cohabiting adults of the same sex to establish a 'domestic partnership' in lieu of the right to marry." (*Holguin v. Flores* (2004) 122 Cal.App.4th 428, 433 [18 Cal.Rptr.3d 749].) The 1999 legislation defined "domestic partners" as "two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring." (§ 297, subd. (a).) In addition to other requirements for registration as domestic partners, the legislation provided that a couple must share a common residence and agree to be jointly responsible for each other's basic living expenses incurred during the domestic partnership, be at least 18 years of age and unrelated by blood in a way that would prevent them from being married to each other, not be married or a member of another domestic partnership, and either be persons of the same sex or at least one of the persons must be more than 62 years of age. (§ 297, subd. (b).) The 1999 legislation, however, afforded those couples who register as domestic partners only limited substantive benefits, granting domestic partners specified hospital visitation privileges (Stats. 1999, ch. 588, § 4 [adding Health & Saf. Code, § 1261]), and authorizing the state to provide health benefits to the domestic partners of some state employees (Stats. 1999, ch. 588, § 3 [adding Gov. Code, §§ 22867–22877]). The following year, the Legislature included domestic partners within the category of persons granted access to specially designed housing reserved for senior citizens. (Stats. 2000, ch. 1004, §§ 3, 3.5 [amending Civ. Code, § 51.3].)

In 2001, the Legislature expanded the scope of the benefits afforded to couples who register as domestic partners, providing a number of additional

significant rights, including the right to sue for wrongful death, to use employee sick leave to care for an ill partner or an ill child of one's partner, to make medical decisions on behalf of an incapacitated partner, to receive unemployment benefits if forced to relocate because of a partner's job, and to employ stepparent adoption procedures to adopt a partner's child. (Stats. 2001, ch. 893, §§ 1–60.) In 2002, the Legislature equalized the treatment of registered domestic partners and married spouses in a few additional areas. (See Stats. 2002, ch. 447, §§ 1–3 [amending Prob. Code, § 6401 to provide automatic inheritance of a portion of a deceased partner's separate property]; Stats. 2002, ch. 412, § 1 [amending Prob. Code; § 21351 to add domestic partners to the list of relationships exempted from the prohibition against being a beneficiary of a will that the beneficiary helped draft]; Stats. 2002, ch. 901, §§ 1–6 [amending various provisions of the Unemp. Ins. Code to provide employees six weeks of paid family leave to care for a sick spouse or domestic partner].)

Thereafter, in 2003, the Legislature dramatically expanded the scope of the rights of domestic partners in California by enacting *comprehensive* domestic partnership legislation: the California Domestic Partner Rights and Responsibilities Act of 2003 (hereafter Domestic Partner Act). (Stats. 2003, ch. 421, introduced as Assem. Bill No. 205 (2003–2004 Reg. Sess.).) The Legislature set forth the purpose of this act in section 1 (an uncodified provision) of the legislation, declaring: "This act is intended to help California move closer to fulfilling the promises of inalienable rights, liberty, and equality contained in Sections 1 and 7 of Article 1 of the California Constitution by providing all caring and committed couples, regardless of their gender or sexual orientation, the opportunity to obtain essential rights, protections, and benefits and to assume corresponding responsibilities, obligations, and duties and to further the state's interests in promoting stable and lasting family relationships, and protecting Californians from the economic and social consequences of abandonment, separation, the death of loved ones, and other life crises." (Stats. 2003, ch. 421, § 1, subd. (a).) Finding that "many lesbian, gay, and bisexual Californians have formed lasting, committed, and caring relationships with persons of the same sex," the Legislature concluded that "[e]xpanding the rights and creating responsibilities of registered domestic partners would further California's interests in promoting family relationships and protecting family members during life crises, and would reduce discrimination on the bases of sex and sexual orientation in a manner consistent with the requirements of the California Constitution." (Stats. 2003, ch. 421, § 1, subd. (b).) The Legislature further specified that the provisions of the Domestic Partner Act "shall be construed liberally in order to secure to eligible couples who register as domestic partners *the full range of legal rights, protections and benefits, as well as all of the responsibilities, obligations, and duties to each other, to their children, to third parties and to the*

*state, as the laws of California extend to and impose upon spouses.*" (Italics added.) (Stats. 2003, ch. 421, § 15.)

To effectuate this legislative purpose, the Domestic Partner Act amended the existing statutory provisions relating to domestic partnership by adding several entirely new provisions to the Family Code, most significantly section 297.5, which the legislation provided would become operative on January 1, 2005. (Stats. 2003, ch. 421, § 14.) Section 297.5, subdivision (a), provides in broad and sweeping terms: "*Registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon spouses.*" (Italics added.)[22]

Further, as we noted in *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 838–839 [31 Cal.Rptr.3d 565, 115 P.3d 1212] (*Koebke*), other subdivisions of section 297.5 similarly effectuate the Legislature's intent "by using the broadest terms possible to grant to, and impose upon, registered domestic partners the same rights and responsibilities as spouses in specified areas of laws whether they are current, former or surviving domestic partners. For example, pursuant to section 297.5, subdivision (c), a 'surviving registered domestic partner, [upon] the death of the other partner,' is granted all the same rights and is subject to all the same responsibilities, from whatever source in the law, as those 'granted to and imposed upon a widow or a widower.' Similarly, section 297.5, subdivision (d) states: 'The rights and obligations of registered domestic partners with respect to a child of either of them shall be the same as those of spouses. The rights and obligations of former or surviving registered domestic partners with respect to a child of either of them shall be the same as those of former or surviving spouses.' Subdivision (e) requires that, '[t]o the extent that provisions of California law adopt, refer to, or rely upon . . . federal law' and that this reliance on federal law would require domestic partners to be treated differently than spouses, 'registered domestic partners shall be treated by California law as if federal law recognized a domestic partnership in the same manner as California law.' (§ 297.5, subd. (e).)"

---

[22] Section 297.5, subdivision (b), contains comparable expansive language equalizing the rights and responsibilities of former registered domestic partners and of former spouses. The provision declares: "Former registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon former spouses."

We concluded in *Koebke, supra,* 36 Cal.4th 824, 839, that "[i]t is clear from both the language of section 297.5 and the Legislature's explicit statements of intent that a chief goal of the Domestic Partner Act is to equalize the status of registered domestic partners and married couples."

Although the Domestic Partner Act generally equalized the treatment under California law of registered domestic partners and married couples, there was one significant area—state income taxes—in which the 2003 enactment did not provide for equal treatment. Section 297.5, former subdivision (g)—a part of the 2003 act—provided in this regard: "Notwithstanding this section, in filing their state income tax returns, domestic partners shall use the same filing status as is used on their federal income tax returns, or that would have been used had they filed federal income tax returns. Earned income may not be treated as community property for state income tax purposes."

In 2006, the Legislature eliminated this disparity in the treatment of registered domestic partners and married couples with regard to state income taxes by amending section 297.5 to delete the provisions of former subdivision (g) (and to renumber the subsequent subdivisions of § 297.5). (Stats. 2006, ch. 802, § 2.) The 2006 legislation specifically declared that "[i]t is the intent of the Legislature in enacting this bill that the inconsistency between registered domestic partners and spouses with respect to state income taxation be removed, registered domestic partners be permitted to file their income tax returns jointly or separately on terms similar to those governing spouses, and the earned income of registered domestic partners be recognized appropriately as community property. As a result of this bill, registered domestic partners who file separate income tax returns each shall report one-half of the combined income earned by both domestic partners, as spouses do, rather than their respective individual incomes for the taxable year." (Stats. 2006, ch. 802, § 1, subd. (d).)

Most recently, the Legislature passed and the Governor signed into law a bill requiring the Declaration of Domestic Partnership form to contain a section affording either party or both parties the option of a change of name as part of the registration process. (Stats. 2007, ch. 567, introduced as Assem. Bill No. 102 (2007–2008 Reg. Sess.) signed Oct. 12, 2007.)

Although the preamble to the Domestic Partner Act suggests that the proponents of this legislation did not view the enactment as the final or ultimate legislative step with regard to the official status available to same-sex couples (see Stats. 2003, ch. 421, § 1, subd. (a) ["This act is intended to help California *move closer* to fulfilling the promises of inalienable rights, liberty, and equality contained in Sections 1 and 7 of Article 1 of the California

Constitution . . ." (italics added)]),[23] nonetheless (by virtue of the explicit provisions of the Domestic Partner Act) under the current governing California statute, registered domestic partners generally "have the same rights, protections, and benefits, and [are] subject to the same responsibilities, obligations, and duties under law . . . as are granted to and imposed upon spouses." (§ 297.5, subd. (a).)[24]

---

[23] As noted above (*ante*, at pp. 796–797, fn. 17), in 2005 and 2007 the Legislature passed bills that would have amended section 300 to permit marriage of same-sex couples (but that purported not to affect the provisions of § 308.5, which the legislation viewed as applicable only to marriages performed outside of California). The Governor vetoed both measures.

[24] Although the governing statutes provide that registered domestic partners have the same substantive legal rights and are subject to the same obligations as married spouses, in response to a request for supplemental briefing by this court the parties have identified various differences (nine in number) that exist in the corresponding provisions of the domestic partnership and marriage statutes and in a few other statutory and constitutional provisions.

First, although the domestic partnership provisions require that both partners have a common residence at the time a domestic partnership is established (§ 297, subd. (b)(1)), there is no similar requirement for marriage. Second, although the domestic partnership legislation requires that both persons be at least 18 years of age when the partnership is established (§ 297, subd. (b)(4)), the marriage statutes permit a person under the age of 18 to marry with the consent of a parent or guardian or a court order (§§ 302, 303). Third, to establish a domestic partnership, the two persons desiring to become domestic partners must complete and file a Declaration of Domestic Partnership with the Secretary of State, who registers the declaration in a statewide registry for such partnerships (§ 298.5, subds. (a), (b)); to marry, a couple must obtain a marriage license and certificate of registry of marriage from the county clerk, have the marriage solemnized by an authorized individual, and return the marriage license and certificate of registry to the county recorder of the county in which the license was issued, who keeps a copy of the certificate of registry of marriage and transmits the original certificate to the State Registrar of Vital Statistics (§§ 306, 359; Health & Saf. Code, §§ 102285, 102330, 102355). Fourth, although the marriage statutes establish a procedure under which an unmarried man and unmarried woman who have been residing together as husband and wife may enter into a "confidential marriage" in which the marriage certificate and date of the marriage are not made available to the public (§ 500 et seq.), the domestic partnership law contains no similar provisions for "confidential domestic partnership." Fifth, although both the domestic partnership and marriage statutes provide a procedure for summary dissolution of the domestic partnership or marriage under the same limited circumstances, a summary dissolution of a domestic partnership is initiated by the partners' joint filing of a Notice of Termination of Domestic Partnership with the Secretary of State and may become effective without any court action, whereas a summary dissolution of a marriage is initiated by the spouses' joint filing of a petition in superior court and becomes effective only upon entry of a court judgment; in both instances, the dissolution does not take effect for at least six months from the date dissolution is sought, and during that period either party may terminate the summary dissolution. (§§ 299, subds. (a)–(c), 2400 et seq.) Sixth, although a proceeding to dissolve a domestic partnership may be filed in superior court "even if neither domestic partner is a resident of, or maintains a domicile in, the state at the time the proceedings are filed" (§ 299, subd. (d)), a judgment of dissolution of marriage may not be obtained unless one of the parties has been a resident of California for six months and a resident of the county in which the proceeding is filed for three months prior to the filing of the petition for dissolution (§ 2320). Seventh, in order to protect the federal tax-qualified status of the CalPERS (California Public Employees' Retirement System) long-term care insurance program (see Sen. Com. on Appropriations, fiscal summary

Of course, although the Domestic Partner Act generally affords registered domestic partners the same substantive benefits and privileges and imposes upon them the same responsibilities and duties that *California law* affords to and imposes upon married spouses, the act does not purport to (and lawfully could not) modify the applicable provisions of *federal law*, which currently do not provide for domestic partnerships and which define marriage, for purposes of federal law, as the union of a man and a woman. (See 1 U.S.C. § 7.)[25] In light of the current provisions of federal law, the many federal benefits (and the amount of those benefits) granted to a married person or to a married couple on the basis of their married status are not available to registered domestic partners. Included within this category are significant benefits such as those relating to Social Security, Medicare, federal housing, food stamps, federal military and veterans' programs, federal employment programs, and filing status for federal income tax purposes. All of these

of Assem. Bill No. 205 (2003–2004 Reg. Sess.) as amended Aug. 21, 2003; 26 U.S.C. § 7702B(f)(2)(C)), the domestic partnership statute provides that "nothing in this section applies to modify eligibility for [such] long-term care plans" (§ 297.5, subd. (g)), which means that although such a plan may provide coverage for a state employee's spouse, it may not provide coverage for an employee's domestic partner; this same disparity, however, would exist even if same-sex couples were permitted to marry under California law, because for federal law purposes the nonemployee partner would not be considered a spouse. (See 1 U.S.C. § 7.) Eighth, an additional difference stems from the provisions of California Constitution, article XIII, section 3, subdivisions (*o*) and (p), granting a $1,000 property tax exemption to an "unmarried spouse of a deceased veteran" who owns property valued at less than $10,000; however, as the Legislative Analyst explained when this constitutional provision last was amended in 1988 (see Ballot Pamp., Gen. Elec. (Nov. 8, 1988) analysis of Prop. 93 by Legis. Analyst, p. 60), few persons claim this exemption, because a homeowner may not claim both this exemption and the more generous homeowner's exemption on the same property (Rev. & Tax. Code, § 205.5, subd. (f)), and the homeowner's exemption is available to both married persons and domestic partners. (See § 297.5, subd. (a).) Ninth, one appellate decision has held that the putative spouse doctrine (codified in § 2251) does not apply to an asserted putative domestic partner. (*Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1172–1174 [48 Cal.Rptr.3d 642].)

Plaintiffs also have brought to the court's attention a statement of decision in a recent superior court ruling that declares, in part, that "[a] Registered Domestic Partnership is not the equivalent of a marriage. It is the functional equivalent of cohabitation." (*Garber v. Garber* (Super. Ct. Orange County, 2007, No. 04D006519).) That trial court ruling is currently on appeal and has no precedential effect.

[25] Title 1, section 7, of the United States Code provides in full: "In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."

The Domestic Partner Act attempts to ameliorate the disparity in treatment caused by federal law by providing in section 297.5, subdivision (e) that "[t]o the extent that provisions of California law adopt, refer to, or rely upon, provisions of federal law in a way that otherwise would cause registered domestic partners to be treated differently than spouses, registered domestic partners shall be treated by California law as if federal law recognized a domestic partnership in the same manner as California law."

important federal benefits, however, also would be denied to same-sex couples even if California designated the official union of such couples a marriage rather than a domestic partnership, because, as noted, federal law defines marriage for purposes of federal law as "only a legal union between one man and one woman." (1 U.S.C. § 7.)[26]

Thus, in sum, the current California statutory provisions generally afford same-sex couples the opportunity to enter into a domestic partnership and thereby obtain virtually all of the benefits and responsibilities afforded by California law to married opposite-sex couples.

While acknowledging that the Domestic Partner Act affords substantial benefits to same-sex couples, plaintiffs repeatedly characterize that legislation as granting same-sex couples only the "material" or "tangible" benefits of marriage. At least in some respects, this characterization inaccurately minimizes the scope and nature of the benefits and responsibilities afforded by California's domestic partnership law. The broad reach of this legislation extends to the extremely wide network of statutory provisions, common law rules, and administrative practices that give substance to the legal institution of civil marriage, including, among many others, various rules and policies concerning parental rights and responsibilities affecting the raising of children, mutual duties of respect, fidelity and support, the fiduciary relationship between partners, the privileged nature of confidential communications between partners, and a partner's authority to make health care decisions when his or her partner is unable to act for himself or herself. These legal rights and responsibilities embody more than merely the "material" or "tangible" financial benefits that are extended by government to married couples. As we explained in *Koebke, supra,* 36 Cal.4th 824, 843: "[T]he decision . . . to enter into a domestic partnership is more than a change in the legal status of individuals . . . . [T]he consequence[] of the decision is the creation of a new

---

[26] In addition to the differences in the provisions of the Domestic Partner Act and the marriage statute set forth above (*ante,* at pp. 805–806, fn. 24), plaintiffs point out that California's designation of the union of same-sex couples as a domestic partnership rather than a marriage has led at least one federal court to conclude that same-sex couples lack standing to maintain a constitutional challenge to the federal Defense of Marriage Act. (See *Smelt v. County of Orange* (9th Cir. 2006) 447 F.3d 673.) The federal decision in question, however, does not suggest that a same-sex couple would lack standing to mount a direct federal constitutional challenge to the California marriage statutes or alternatively to mount a direct federal equal protection challenge to the denial to domestic partners of federal benefits that are made available to a married couple, on the theory that such differential treatment is impermissible when state law affords domestic partners legal rights and benefits equal to those afforded married spouses. The court in *Smelt* instead simply held that the trial court properly concluded that abstention was warranted in light of the pending state litigation that is the subject of the present appeal. (*Id.* at pp. 681–682.) As explained below (*post,* at p. 809, fn. 28), in this case plaintiffs' challenge is based solely upon the provisions of the California Constitution, and plaintiffs have not advanced any claim under the federal Constitution.

family unit with all of its implications in terms of personal commitment as well as legal rights and obligations."

■ The nature and breadth of the rights afforded same-sex couples under the Domestic Partner Act is significant, because under California law the scope of that enactment is directly relevant to the question of the constitutional validity of the provisions in California's marriage statutes limiting marriage to opposite-sex couples. As this court explained in *Brown v. Merlo, supra*, 8 Cal.3d 855, 862: "In determining the scope of the class singled out for special burdens or benefits, a court cannot confine its view to the terms of the specific statute under attack, but must judge the enactment's operation against the background of other legislative, administrative and judicial directives which govern the legal rights of similarly situated persons. As the United States Supreme Court recognized long ago: 'The question of constitutional validity is not to be determined by artificial standards [confining review "within the four corners" of a statute]. What is required is that state action, whether through one agency or another, or through one enactment or more than one, shall be consistent with the restrictions of the Federal Constitution.' [Citations.]"

Accordingly, the provisions of both the current marriage statutes and the current domestic partnership statutes must be considered in determining whether the challenged provisions of the marriage statutes violate the constitutional rights of same-sex couples guaranteed by the California Constitution.[27]

---

[27] To avoid any potential misunderstanding, we note that the circumstance that the constitutional challenge to the provisions of California's marriage statutes must be evaluated in light of both the marriage statutes and the domestic partnership legislation does not in any sense signify that plaintiffs are in a worse position, as a constitutional matter, by virtue of the Legislature's enactment of the Domestic Partner Act.

If a comprehensive domestic partnership law had not been enacted in California, and if plaintiffs had brought a constitutional challenge to the California marriage statutes and our court had concluded that those statutes were unconstitutional because they did not afford same-sex couples rights and benefits equal to those available to opposite-sex couples under the marriage statutes, we might well have further concluded—as other state courts have determined in similar situations—that the appropriate disposition would be to direct the Legislature to provide equal treatment to same-sex couples, leaving to the Legislature, in the first instance, the decision whether to provide such treatment by a revision of the marriage statutes or by the enactment of a comprehensive domestic partnership or civil union law. (See *Baker v. State, supra*, 744 A.2d 864, 886–889; *Lewis v. Harris, supra*, 908 A.2d 196, 221–223.)

Because the California Legislature already has enacted a comprehensive domestic partnership law which broadly grants to same-sex couples virtually all of the substantive legal rights and benefits enjoyed by opposite-sex married couples, plaintiffs have been relieved of the burden of successfully prosecuting a constitutional challenge to obtain those substantive rights and benefits. Thus, in this proceeding, we are faced only with the narrower question that logically ensues: whether, *in light of the enactment of California's domestic partnership legislation*, the current California statutory scheme is constitutional.

We note that in *Baker v. State, supra*, 744 A.2d 864, 886, and *Lewis v. Harris, supra*, 908 A.2d 196, 221–222, the Vermont Supreme Court and the New Jersey Supreme Court

## IV

Plaintiffs contend that by limiting marriage to opposite-sex couples, California's marriage statutes violate a number of provisions of the California Constitution.[28] In particular, plaintiffs contend that the challenged statutes violate a same-sex couple's fundamental "right to marry" as guaranteed by the privacy, free speech, and due process clauses of the California Constitution (Cal. Const., art. I, §§ 1, 2, 7), and additionally violate the equal protection clause of the California Constitution (Cal. Const., art. I, § 7).[29] Because the question whether the challenged aspect of the marriage statutes violates or impinges upon the fundamental right to marry may be determinative in deciding the appropriate standard of review to be applied in evaluating plaintiffs' equal protection challenge, we first address the question whether the challenged statutes independently infringe a fundamental constitutional right guaranteed by the California Constitution.

## A

■ Although our state Constitution does not contain any explicit reference to a "right to marry," past California cases establish beyond question that the right to marry is a fundamental right whose protection is guaranteed to all persons by the California Constitution. (See, e.g., *Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 161 [219 Cal.Rptr. 387, 707 P.2d 760] (*Valerie N.*) ["The right to marriage and procreation are now recognized as fundamental, constitutionally protected interests. [Citations.] . . . These rights are aspects of the right of privacy which . . . is express in section 1 of article I of the California Constitution which includes among the inalienable rights

specifically reserved judgment on the analogous state constitutional question that would be presented should the legislature decide to extend to same-sex couples the substantive benefits, but not the official designation, of marriage. To date, neither of these courts has addressed this issue.

[28] Plaintiffs base their constitutional challenge in this case solely upon the provisions of the California Constitution and do not advance any claim under the federal Constitution. (See Cal. Const., art. I, § 24 ["Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."].)

[29] California Constitution, article I, section 1 provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and *liberty*, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*." (Italics added.)

California Constitution, article I, section 2, subdivision (a), provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge *liberty of speech* or press." (Italics added.)

California Constitution, article I, section 7, subdivision (a), provides in relevant part: "A person may not be deprived of life, *liberty*, or property *without due process of law* or denied *equal protection of the laws* . . . ." (Italics added.)

possessed by all persons in this state, that of 'privacy.' "]; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 577 [20 Cal.Rptr.2d 341, 853 P.2d 507] ["we have . . . recognized that '[t]he concept of personal liberties and fundamental human rights entitled to protection against overbroad intrusion or regulation by government . . . extends to . . . such basic civil liberties and rights not explicitly listed in the Constitution [as] the right "to marry, establish a home and bring up children" . . .' "]; *Ortiz v. Los Angeles Police Relief Assn.* (2002) 98 Cal.App.4th 1288, 1303 [120 Cal.Rptr.2d 670] ["under the state Constitution, the right to marry and the right of intimate association are virtually synonymous. . . . [W]e will refer to the privacy right in this case as the right to marry."]; *In re Carrafa* (1978) 77 Cal.App.3d 788, 791 [143 Cal.Rptr. 848] ["[t]he right to marry is a fundamental constitutional right . . ." (citations omitted)].) The United States Supreme Court initially discussed the constitutional right to marry as an aspect of the fundamental substantive "liberty" protected by the due process clause of the federal Constitution (see *Meyer v. Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 43 S.Ct. 625]), but thereafter in *Griswold v. Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678] (*Griswold*), the federal high court additionally identified the right to marry as a component of a "right of privacy" protected by the federal Constitution. (*Griswold*, at p. 486.) With California's adoption in 1972 of a constitutional amendment explicitly adding "privacy" to the "inalienable rights" of all Californians protected by article I, section 1 of the California Constitution—an amendment whose history demonstrates that it was intended, among other purposes, to encompass the federal constitutional right of privacy, "particularly as it developed beginning with *Griswold* v. *Connecticut*[, *supra*,] 381 U.S. 479 . . ." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 28 [26 Cal.Rptr.2d 834, 865 P.2d 633])—the state constitutional right to marry, while presumably still embodied as a component of the liberty protected by the state due process clause,[30] now also clearly falls within the reach of the constitutional protection afforded to an individual's interest in personal autonomy by California's explicit state constitutional privacy clause. (See, e.g., *Hill v. National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at p. 34 [the interest in personal autonomy protected by the state constitutional privacy clause includes "the freedom to pursue consensual familial relationships"]; *Valerie N.*, *supra*, 40 Cal.3d 143, 161.)[31]

---

[30] See *People v. Belous* (1969) 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194] ("[t]he fundamental right of the woman to choose whether to bear children follows from the Supreme Court's and this court's repeated acknowledgment of a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex").

[31] As we recognized in *Hill v. National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th 1, 35, the privacy interests protected under California Constitution, article I, section 1, fall into two categories: autonomy privacy and informational privacy. The right to marry constitutes an

Although all parties in this proceeding agree that the right to marry constitutes a fundamental right protected by the state Constitution, there is considerable disagreement as to the scope and content of this fundamental state constitutional right. The Court of Appeal concluded that because marriage in California (and elsewhere) historically has been limited to opposite-sex couples, the constitutional right to marry under the California Constitution properly should be interpreted to afford only a right to marry a person of the opposite sex, and that the constitutional right that plaintiffs actually are asking the court to recognize is a constitutional "right to same-sex marriage." In the absence of any historical or precedential support for such a right in this state, the Court of Appeal determined that plaintiffs' claim of the denial of a fundamental right under the California Constitution must be rejected.

Plaintiffs challenge the Court of Appeal's characterization of the constitutional right they seek to invoke as the right to same-sex marriage, and on this point we agree with plaintiffs' position. In *Perez v. Sharp, supra,* 32 Cal.2d 711—this court's 1948 decision holding that the California statutory provisions prohibiting interracial marriage were unconstitutional—the court did not characterize the constitutional right that the plaintiffs in that case sought to obtain as "a right to interracial marriage" and did not dismiss the plaintiffs' constitutional challenge on the ground that such marriages never had been permitted in California.[32] Instead, the *Perez* decision focused on the *substance* of the constitutional right at issue—that is, the importance to an individual of the freedom "to join in marriage *with the person of one's choice*"—in determining whether the statute impinged upon the plaintiffs' fundamental constitutional right. (32 Cal.2d at pp. 715, 717, italics added.) Similarly, in *Valerie N., supra,* 40 Cal.3d 143—which involved a challenge to a statute limiting the reproductive freedom of a developmentally disabled woman—our court did not analyze the scope of the constitutional right at issue by examining whether developmentally disabled women *historically* had enjoyed a constitutional right of reproductive freedom, but rather considered the substance of that constitutional right in determining whether the right was one that properly should be interpreted as extending to a developmentally disabled woman. (40 Cal.3d at pp. 160–164.) And, in addressing a somewhat analogous point, the United States Supreme Court in *Lawrence v. Texas* (2003) 539 U.S. 558 [156 L.Ed.2d 508, 123 S.Ct. 2472] concluded that its prior decision in *Bowers v. Hardwick* (1986) 478 U.S. 186 [92 L.Ed.2d 140, 106 S.Ct. 2841] had erred in narrowly characterizing the constitutional right

aspect of autonomy privacy. (See *Hill,* at p. 34 [describing "the freedom to pursue consensual familial relationships" as an "interest fundamental to personal autonomy"].)

[32] The marriage statute enacted in California's first legislative session contained an explicit provision declaring that "[a]ll marriages of white persons with negroes or mulattoes are declared to be illegal and void." (Stats. 1850, ch. 140, § 3, p. 424.)

sought to be invoked in that case as the right to engage in intimate *homosexual* conduct, determining instead that the constitutional right there at issue properly should be understood in a broader and more neutral fashion so as to focus upon the substance of the interests that the constitutional right is intended to protect. (*Lawrence, supra,* 539 U.S. at pp. 565–577.)[33]

The flaw in characterizing the constitutional right at issue as the right to same-sex marriage rather than the right to marry goes beyond mere semantics. It is important both analytically and from the standpoint of fairness to plaintiffs' argument that we recognize they are not seeking to create a new constitutional right—the right to "same-sex marriage"—or to change, modify, or (as some have suggested) "deinstitutionalize" the existing institution of marriage. Instead, plaintiffs contend that, properly interpreted, the state constitutional right to marry affords same-sex couples the same rights and benefits—accompanied by the same mutual responsibilities and obligations—as this constitutional right affords to opposite-sex couples.[34] For this reason, in evaluating the constitutional issue before us, we consider it appropriate to direct our focus to the meaning and substance of the constitutional right to marry, and to avoid the potentially misleading implications inherent in analyzing the issue in terms of "same-sex marriage."

Accordingly, in deciding whether the constitutional right to marry protected by the California Constitution applies to same-sex couples as well as to opposite-sex couples and, further, whether the current California marriage and domestic partnership statutes deny same-sex couples this fundamental constitutional right, we shall examine the nature and substance of the interests protected by the constitutional right to marry. In undertaking this inquiry, we put to the side for the moment the question whether the substantive rights embodied within the constitutional right to marry include the right to have the couple's official relationship designated by the name "marriage" rather than by some other term, such as "domestic partnership." The latter issue is addressed below. (See, *post,* at pp. 830–831.)

---

[33] Similarly, in addressing under the federal Constitution the validity of a prison rule that permitted a prisoner to marry only if the superintendent of the prison found there were compelling reasons to permit the marriage, the high court did not characterize the constitutional right at issue as "the right to inmate marriage," but rather considered whether the purposes and attributes of the general fundamental right to marry were applicable in the prison context. (*Turner v. Safley* (1987) 482 U.S. 78, 95–96 [96 L.Ed.2d 64, 107 S.Ct. 2254].)

[34] Because the right to marry refers to the right of an individual to enter into a *consensual relationship with another person,* we find it appropriate and useful to refer to the right to marry as a right possessed both by each individual member of the couple and by the couple as a whole. (Cf. *N. A. A. C. P. v. Alabama* (1958) 357 U.S. 449, 458–460 [2 L.Ed.2d 1488, 78 S.Ct. 1163] [holding that nonprofit association may assert the right of privacy of its members under the federal constitutional right of association].)

In discussing the constitutional right to marry in *Perez v. Sharp, supra,* 32 Cal.2d 711 (*Perez*), then Justice Traynor in the lead opinion quoted the seminal passage from the United States Supreme Court's decision in *Meyer v. Nebraska, supra,* 262 U.S. 390. There the high court, in describing the scope of the "liberty" protected by the due process clause of the federal Constitution, stated that " '[w]ithout doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, *to marry, establish a home and bring up children,* to worship God according to the dictates of [one's] own conscience, *and, generally, to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.*' " (*Perez, supra,* 32 Cal.2d at p. 714, italics added ["to marry" italicized by *Perez*], quoting *Meyer, supra,* 262 U.S. 390, 399.) The *Perez* decision continued: "*Marriage is thus something more than a civil contract subject to regulation by the state; it is a fundamental right of free men.*" (*Perez, supra,* 32 Cal.2d at p. 714, italics added.)

Like *Perez,* subsequent California decisions discussing the nature of marriage and the right to marry have recognized repeatedly the linkage between marriage, establishing a home, and raising children in identifying civil marriage as the means available to an individual to establish, with a loved one of his or her choice, an officially recognized *family* relationship. In *De Burgh v. De Burgh* (1952) 39 Cal.2d 858 [250 P.2d 598], for example, in explaining "the public interest in the institution of marriage" (*id.* at p. 863), this court stated: "The family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people. Since the family is the core of our society, the law seeks to foster and preserve marriage." (*Id.* at pp. 863–864.)

In *Elden v. Sheldon, supra,* 46 Cal.3d 267, in rejecting the claim that persons in an unmarried cohabitant relationship that allegedly was akin to a marital relationship should be treated similarly to married persons for purposes of bringing an action for negligent infliction of emotional distress, this court explained that " '[m]arriage is accorded [a special] degree of dignity in recognition that "[t]he joining of the man and woman in marriage is at once *the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime.*" ' " (46 Cal.3d at pp. 274–275, italics added, quoting *Nieto v. City of Los Angeles* (1982) 138 Cal.App.3d 464 [188 Cal.Rptr. 31], quoting *Marvin v. Marvin* (1976) 18 Cal.3d 660, 684 [134 Cal.Rptr. 815, 557 P.2d 106].) The court in *Elden v. Sheldon* further explained: "Our emphasis on the state's interest in promoting the marriage relationship is not based on anachronistic notions of morality. *The policy*

*favoring marriage is 'rooted in the necessity of providing an institutional basis for defining the fundamental relational rights and responsibilities . . . in organized society.'* [Citation.] Formally married couples are granted significant rights and bear important responsibilities toward one another which are not shared by those who cohabit without marriage. . . . Plaintiff does not suggest a convincing reason why cohabiting unmarried couples, who do not bear such legal obligations toward one another, should be permitted to recover for injuries to their partners to the same extent as those who undertake these responsibilities." (46 Cal.3d at p. 275, italics added.)

In *Williams v. Garcetti, supra,* 5 Cal.4th 561, a case in which a criminal statute that prohibited contributing to the delinquency of a minor was challenged on the ground the statute was unconstitutionally vague, this court stated: "Plaintiffs emphasize the fundamental nature of the rights at stake in matters of child rearing. We need no convincing of their significance; we have already recognized that '[t]he concept of personal liberties and fundamental human rights entitled to protection against overbroad intrusion or regulation by government . . . extends to . . . such basic liberties and rights not explicitly listed in the Constitution [as] the right "to marry, establish a home and bring up children" . . . ; the right to educate one's children as one chooses . . . ; . . . and the right to privacy and to be let alone by the government in "the private realm of family life." ' " (5 Cal.4th at p. 577.)

And in *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594 [42 Cal.Rptr.2d 50, 896 P.2d 776], in discussing the types of relationships that fall within the scope of the constitutionally protected right of intimate association (one component of our state constitutional right of privacy (*id.* at pp. 629–630)), we explained that "the highly personal relationships that are sheltered by this constitutional guaranty are exemplified by *'those that attend the creation and sustenance of a family—marriage* . . . , childbirth . . . , the raising and education of children . . . and cohabitation with one's relatives . . . .' . . . 'Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life.' " (10 Cal.4th at p. 624, italics added, citation omitted, quoting *Roberts v. United States Jaycees* (1984) 468 U.S. 609, 619–620 [82 L.Ed.2d 462, 104 S.Ct. 3244].) The constitutional right to marry thus may be understood as constituting a subset of the right of intimate association—a subset possessing its own substantive content and affording a distinct set of constitutional protections and guarantees.

█ As these and many other California decisions make clear, the right to marry represents the right of an individual to establish a legally recognized

family with the person of one's choice, and, as such, is of fundamental significance both to society and to the individual.[35]

Society is served by the institution of civil marriage in many ways. Society, of course, has an overriding interest in the welfare of children, and the role marriage plays in facilitating a stable family setting in which children may be raised by two loving parents unquestionably furthers the welfare of children and society. In addition, the role of the family in educating and socializing children serves society's interest by perpetuating the social and political culture and providing continuing support for society over generations.[36] It is these features that the California authorities have in mind in describing marriage as the "basic unit" or "building block" of society. (See, e.g., *De Burgh v. De Burgh, supra*, 39 Cal.2d 858, 863 ["[t]he family is the basic unit of our society . . ."]; *Baker v. Baker* (1859) 13 Cal. 87, 94 ["[t]he public is interested in the marriage relation and the maintenance of its integrity, as it is the foundation of the social system . . ."]; *Elden v. Sheldon, supra*, 46 Cal.3d 267, 281, fn. 1 (dis. opn. of Broussard, J.) [referring to "the well-accepted maxim that marriage serves as the building block of society"]; *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 968 [72 Cal.Rptr.2d 871, 952 P.2d 1139] (dis. opn. of Chin, J.) [" 'the family provides the foundation upon which our society is built and through which its most cherished values are best transmitted' "].) Furthermore, the legal obligations of support that are an integral part of marital and family relationships relieve society of the

---

[35] Numerous decisions of the United States Supreme Court, in discussing marriage and the federal constitutional right to marry, similarly recognize that the significance of this right lies in its relationship to the establishment of a family. (See, e.g., *Zablocki v. Redhail* (1978) 434 U.S. 374, 386 [54 L.Ed.2d 618, 98 S.Ct. 673] ["It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. . . . [I]t would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society."]; *Maynard v. Hill* (1888) 125 U.S. 190, 211 [31 L.Ed. 654, 8 S.Ct. 723] ["[Marriage] is the foundation of the family and of society, without which there would be neither civilization nor progress."]; *Smith v. Organization of Foster Families* (1977) 431 U.S. 816, 843 [53 L.Ed.2d 14, 97 S.Ct. 2094] [describing marriage as "[t]he basic foundation of the family in our society"].)

[36] "Through the commitments of marriage and kinship both children and parents experience the need for and the value of authority, responsibility, and duty in their most pristine forms. [¶] . . . [¶] . . . American society has 'relied to a considerable extent on the family not only to nurture the young but also to instill the habits required for citizenship in a self-governing community. We have relied on the family to teach us to care for others, [and] to moderate . . . self-interest . . . .' . . . With this perspective, the family in a democratic society not only provides emotional companionship, but is also a principal source of moral and civic duty. . . . [¶] Something about the combined permanence, authority, and love that characterize the formal family uniquely makes possible the performance of this teaching enterprise . . . ." (Hafen, *The Constitutional Status of Marriage, Kinship and Sexual Privacy—Balancing the Individual and Social Interests* (1983) 81 Mich. L.Rev. 463, 476–477, fns. omitted (hereafter *Constitutional Status of Marriage*).)

obligation of caring for individuals who may become incapacitated or who are otherwise unable to support themselves. (See, e.g., *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 123 [33 Cal.Rptr.3d 46, 117 P.3d 660].)[37] In view of the public's significant interest in marriage, California decisions have recognized that the Legislature has broad authority in seeking to protect and regulate this relationship by creating incentives to marry and adopting measures to protect the marital relationship. (See, e.g., *McClure v. Donovan* (1949) 33 Cal.2d 717, 728 [205 P.2d 17] ["the Legislature has full control of the subject of marriage and may fix the conditions under which the marital status may be created or terminated . . ."].)

Although past California cases emphasize that marriage is an institution in which society as a whole has a vital interest, our decisions at the same time recognize that the legal right and opportunity to enter into such an officially recognized relationship also is of overriding importance to the individual and to the affected couple. As noted above, past California decisions have described marriage as "the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime." (*Marvin v. Marvin, supra*, 18 Cal.3d 660, 684; accord, *Maynard v. Hill, supra*, 125 U.S. 190, 205 [describing marriage as "the most important relation in life"].) The ability of an individual to join in a committed, long-term, officially recognized family relationship with the person of his or her choice is often of crucial significance to the individual's happiness and well-being. The legal commitment to long-term mutual emotional and economic support that is an integral part of an officially recognized marriage relationship provides an individual with the ability to invest in and rely upon a loving relationship with another adult in a way that may be crucial to the individual's development as a person and achievement of his or her full potential.[38]

---

[37] "Although the legal system has shifted its focus from families to individuals, society still relies on families to play a crucial role in caring for the young, the aged, the sick, the severely disabled, and the needy. Even in advanced welfare states, families at all levels are a major resource for government, sharing the burdens of dependency with public agencies in various ways and to greater and lesser degrees." (Glendon, The Transformation of Family Law (1989) p. 306.)

[38] "The formal commitment of marriage is . . . the basis of stable expectations in personal relationships. The willingness to marry permits important legal and personal assumptions to arise about one's intentions. Marriage . . . carries with it a commitment toward permanence that places it in a different category of relational interests than if it were temporary. A 'justifiable expectation . . . that [the] relationship will continue indefinitely' permits parties to invest themselves in the relationship with a reasonable belief that the likelihood of future benefits warrants the attendant risks and inconvenience." (*Constitutional Status of Marriage, supra*, 81 Mich. L.Rev. 463, 485–486, fns. omitted; see also *id.* at pp. 479–480 ["Mediating structures are 'the value-generating and value-maintaining agencies in society.' . . . [¶] A recent analysis of the concept of mediating structures identifies the family as 'the major institution within the private sphere, and thus for many people the most valuable thing in their lives. Here they make their moral commitments, invest their emotions, [and] plan for the future . . . .' The

Further, entry into a formal, officially recognized family relationship provides an individual with the opportunity to become a part of one's partner's family, providing a wider and often critical network of economic and emotional security. (Accord, e.g., *Moore v. East Cleveland* (1977) 431 U.S. 494, 504–505 [52 L.Ed.2d 531, 97 S.Ct. 1932] ["Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. . . . Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home. . . . Especially in times of adversity . . . the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life."].) The opportunity of a couple to establish an officially recognized family of their own not only grants access to an extended family but also permits the couple to join the broader family social structure that is a significant feature of community life.[39] Moreover, the opportunity to publicly and officially express one's love for and long-term commitment to another person by establishing a family together with that person also is an important element of self-expression that can give special meaning to one's life. Finally, of course, the ability to have children and raise them with a loved one who can share the joys and challenges of that endeavor is without doubt a most valuable component of one's liberty and personal autonomy. Although persons can have children and raise them outside of marriage, the institution of civil marriage affords official governmental sanction and sanctuary to the family unit, granting a parent the ability to afford his or her children the substantial benefits that flow from a stable two-parent family environment,[40] a ready and public means of establishing to others the legal basis of one's parental relationship to one's

---

family's role in providing emotional and spiritual comfort, as well as human fulfillment, has long been a dominant theme in sociological literature." (Fns. omitted)].)

[39] As one scholarly article reported, sociological researchers in an updated "Middletown project" (involving a representative American city) found that " 'the single most important fact about the nuclear family in contemporary Middletown is that it is *not* isolated' from kinship networks. From the standpoint of social structuring, [¶] 'the kin groups organized on the basis of marriage and descent provide the substance which integrates people into the larger social structure. . . . The moral sentiments established in the interaction of parents and their children are extended and elaborated to produce consensus and loyalties which bind social groups (and possibly societies) into a cohesive whole.' " (*Constitutional Status of Marriage, supra,* 81 Mich. L.Rev. 463, 482, fns. omitted.)

[40] "[T]he conditions that optimize 'a home environment which enables [a child] to develop into a mature and responsible adult' are clearly encouraged by cultural patterns and reinforced by legal expectations that create a sense of permanency and stable expectations in child-parent relations. By giving priority to permanent, relational interests within families, the Supreme Court has reinforced the law's insistence on the conditions that maximize stability." (*Constitutional Status of Marriage, supra,* 81 Mich. L.Rev. 463, 473, fn. omitted.) The quoted article acknowledges that "[n]ot all formal families are stable, nor do all necessarily provide wholesome continuity for their children, as the prevailing levels of child abuse and divorce amply demonstrate." (*Id.* at p. 475.) Nonetheless, the article indicates that "the commitments inherent in formal families do increase the likelihood of stability and continuity for children.

children (cf. *Koebke, supra*, 36 Cal.4th 824, 844–845; *Elden v. Sheldon, supra*, 46 Cal.3d 267, 275), and the additional security that comes from the knowledge that his or her parental relationship with a child will be afforded protection by the government against the adverse actions or claims of others. (Cf., e.g., *Dawn D. v. Superior Court, supra*, 17 Cal.4th 932 [when biological mother was married at the time of a child's conception and birth, husband is the presumed father of the child, and another man who claims to be the child's biological father has no constitutional right to bring an action to establish a legal relationship with the child].)

There are, of course, many persons and couples who choose not to enter into such a relationship and who prefer to live their lives without the formal, officially recognized and sanctioned, long-term legal commitment to another person signified by marriage or an equivalent relationship. Nonetheless, our cases recognize that the *opportunity* to establish an officially recognized family with a loved one and to obtain the substantial benefits such a relationship may offer is of the deepest and utmost importance to any individual and couple who wish to make such a choice.

█ If civil marriage were an institution whose *only* role was to serve the interests of society, it reasonably could be asserted that the state should have full authority to decide whether to establish or abolish the institution of marriage (and any similar institution, such as domestic partnership). In recognizing, however, that the right to marry is a basic, *constitutionally protected* civil right—"a fundamental right of free men [and women]" (*Perez, supra*, 32 Cal.2d 711, 714)—the governing California cases establish that this right embodies fundamental interests of an individual that are protected from abrogation or elimination by the state.[41] Because our cases make clear that the right to marry is an integral component of an individual's interest in *personal autonomy* protected by the privacy provision of article I, section 1,

---

Those factors are so essential to child development that they alone may justify the legal incentives and preferences traditionally given to permanent kinship units based on marriage." (*Id.* at pp. 475–476.)

[41] It is noteworthy that the California and federal Constitutions are not alone in recognizing that the right to marry is not properly viewed as simply a benefit or privilege that a government may establish or abolish as it sees fit, but rather that the right constitutes *a basic civil or human right of all people*. Article 16 of the Universal Declaration of Human Rights, adopted by the United Nations General Assembly in 1948, provides: "Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. . . . [¶] . . . [¶] . . . The family is the natural and fundamental group unit of society and is entitled to protection by society and the State." Numerous other international human rights treaties similarly recognize the right "to marry and to found a family" as a basic human right (Internat. Covenant on Civil and Political Rights, Mar. 23, 1976, art. 23; see European Convention for the Protection of Human Rights and Fundamental Freedoms, Mar. 9, 1953, art. 12; American Convention on Human Rights, July 18, 1978, art. 17), and the constitutions of many nations throughout the world explicitly link marriage and family and

and of the *liberty* interest protected by the due process clause of article I, section 7, it is apparent under the California Constitution that the right to marry—like the right to establish a home and raise children—has independent *substantive* content, and cannot properly be understood as simply the right to enter into such a relationship *if* (*but only if*) the Legislature chooses to establish and retain it. (Accord, *Poe v. Ullman* (1961) 367 U.S. 497, 553 [6 L.Ed.2d 989, 81 S.Ct. 1752] (dis. opn. of Harlan, J.) ["the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, *an institution which the State not only must allow*, but which always and in every age it has fostered and protected" (italics added)].)[42]

One very important aspect of the substantive protection afforded by the California constitutional right to marry is, of course, an individual's right to be free from undue governmental intrusion into (or interference with) integral features of this relationship—that is, the right of marital or familial privacy. (See, e.g., *In re Marriage of Wellman* (1980) 104 Cal.App.3d 992, 996 [164 Cal.Rptr. 148] [manner of raising one's child]; accord, e.g., *Griswold, supra,* 381 U.S. 479 [use of contraception]; *Moore v. East Cleveland, supra,* 431 U.S. 494 [cohabitation with extended family].) The substantive protection embodied in the constitutional right to marry, however, goes beyond what is sometimes characterized as simply a "negative" right insulating the couple's relationship from overreaching governmental intrusion or interference, and includes a "positive" right to have the state take at least some affirmative action to acknowledge and support the family unit.

Although the constitutional right to marry clearly does not obligate the state to afford specific tax or other governmental benefits on the basis of a couple's family relationship, the right to marry does obligate the state to take

provide special protections to these institutions. (See Wardle, *Federal Constitutional Protection for Marriage: Why and How* (2006) 20 BYU J. Pub.L. 439, 453–461 [describing constitutional provisions of other nations].)

[42] One legal commentator has suggested that the federal constitutional right to marry simply "comprises a right of access to the expressive and material benefits that the state affords to the institution of marriage . . . [and that] states may abolish marriage without offending the Constitution." (Sunstein, *The Right to Marry* (2005) 26 Cardozo L.Rev. 2081, 2083–2084, italics omitted.) The article in question concedes, however, that its suggested view of the right to marry is inconsistent with the governing federal cases that identify the right to marry as an integral feature of the liberty interest protected by the due process clause (26 Cardozo L.Rev. at pp. 2096–2097), and further acknowledges that even "[i]f official marriage was abolished, the Due Process Clause might give people a right to some of the benefits and arrangements to which married people are ordinarily entitled under existing state law" (*id.* at p. 2093). As explained above, in light of the governing cases identifying the source and explaining the significance of the state constitutional right to marry, we conclude that under the California Constitution this constitutional right properly must be viewed as having substantive content.

affirmative action to grant official, public recognition to the couple's relationship as a family (*Perez, supra*, 32 Cal.2d 711; *In re Carrafa, supra*, 77 Cal.App.3d 788, 791),[43] as well as to protect the core elements of the family relationship from at least some types of improper interference by others. (Cf. *Sesler v. Montgomery* (1889) 78 Cal. 486, 488–489 [21 P. 185] [in holding that a confidential conversation between husband and wife, allegedly overheard by an eavesdropper, "does not constitute a publication within the meaning of the law of slander," the court explained that "every sound consideration of public policy, every just regard for the integrity and inviolability of the marriage relation . . . —the most confidential relation known to the law"—dictated that conclusion].) This constitutional right also has the additional affirmative substantive effect of providing assurance to each member of the relationship that the government will enforce the mutual obligations between the partners (and to their children) that are an important aspect of the commitments upon which the relationship rests. (Cf. *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 27–29 [99 Cal.Rptr.2d 252, 5 P.3d 815] [contrasting fiduciary relationship during marriage with relationship prior to marriage].)

■ In light of the fundamental nature of the substantive rights embodied in the right to marry—and their central importance to an individual's opportunity to live a happy, meaningful, and satisfying life as a full member of society—the California Constitution properly must be interpreted to guarantee this basic civil right to *all* individuals and couples, without regard to their sexual orientation.[44]

■ It is true, of course, that as an historical matter in this state marriage always has been limited to a union between a man and a woman. Tradition alone, however, generally has not been viewed as a sufficient justification for

---

[43] Three of the four decisions of the United States Supreme Court that have found state statutes invalid as violative of the right to marry, as that right is embodied in the federal Constitution, involved circumstances in which an individual was prohibited under state law from entering into an officially sanctioned family relationship. (See *Loving v. Virginia* (1967) 388 U.S. 1 [18 L.Ed.2d 1010, 87 S.Ct. 1817]; *Zablocki v. Redhail, supra*, 434 U.S. 374; *Turner v. Safley, supra*, 482 U.S. 78.) In the fourth decision—*Griswold, supra*, 381 U.S. 479—the court found that a state statute prohibiting married couples from using contraceptives violated the constitutional right of marital privacy inherent in the constitutional right to marry.

A number of law review articles support the view that the constitutional right to marry encompasses a positive right to have the state publicly and officially recognize a couple's family relationship. (See Ball, *The Positive in the Fundamental Right to Marry: Same-Sex Marriage in the Aftermath of* Lawrence v. Texas (2004) 88 Minn. L.Rev. 1184; Meyer, *A Privacy Right to Public Recognition of Family Relationships? The Cases of Marriage and Adoption* (2006) 51 Vill. L.Rev. 891.)

[44] As this court observed in *Valerie N., supra*, 40 Cal.3d 143, 163, "[a]rticle I, section 1, confirms the right not only to privacy, but to pursue happiness and enjoy liberty." (See also Grodin, *Rediscovering the State Constitutional Right to Happiness and Safety* (1997) 25 Hastings Const. L.Q. 1.)

perpetuating, without examination, the restriction or denial of a fundamental *constitutional* right. (Cf. *Perez, supra,* 32 Cal.2d 711, 727; *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 17–19 [95 Cal.Rptr. 329, 485 P.2d 529] (*Sail'er Inn*).)[45] As this court observed in *People v. Belous, supra,* 71 Cal.2d 954, 967, "[c]onstitutional concepts are not static. . . ." " 'In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights.' " (See, e.g., *In re Antazo* (1970) 3 Cal.3d 100, 109 [89 Cal.Rptr. 255, 473 P.2d 999] ["the long-standing recognition of this practice does not foreclose its reassessment in the light of the continued evolution of fundamental precepts of our constitutional system . . ."].)

There can be no question but that, in recent decades, there has been a fundamental and dramatic transformation in this state's understanding and legal treatment of gay individuals and gay couples. California has repudiated past practices and policies that were based on a once common viewpoint that denigrated the general character and morals of gay individuals, and at one time even characterized homosexuality as a mental illness rather than as simply one of the numerous variables of our common and diverse humanity. This state's current policies and conduct regarding homosexuality recognize that gay individuals are entitled to the same legal rights and the same respect

---

[45] In *Perez, supra,* 32 Cal.2d 711, the lead opinion, in describing the historical basis of California's antimiscegenation statute, quoted from a California judicial decision of an earlier era (*People v. Hall* (1854) 4 Cal. 399, 404), which set forth, as an assertedly established and uncontrovertible proposition, the alleged inferior nature of all non-Caucasian persons. (*Perez, supra,* 32 Cal.2d at p. 720.) The court in *Perez* rejected that demeaning and unsubstantiated characterization, and found there was no justification for the racially discriminatory restriction on the right to marry. (*Id.* at pp. 722–727.)

Similarly, in *Sail'er Inn, supra,* 5 Cal.3d 1, this court, in holding unconstitutional a statutory provision that generally prohibited women from being employed as bartenders, took note of the significant evolution that had occurred in society's views of the appropriate role of women in society and of the relative abilities and capacities of men and women. Pointing to the United States Supreme Court's early-20th-century decision in *Muller v. Oregon* (1908) 208 U.S. 412 [52 L.Ed. 551, 28 S.Ct. 324], the court in *Sail'er Inn* observed: "No judge today would justify classification based on sex by resort to such openly biased and wholly chauvinistic statements as this one made by Justice Brewer in *Muller* [at pp. 421–422]: '[H]istory discloses the fact that woman has always been dependent upon man. He established his control at the outset by superior physical strength, and this control in various forms, with diminishing intensity, has continued to the present. . . . Though limitations upon personal and contractual rights may be removed by legislation, there is that in her disposition and habits of life which will operate against a full assertion of those rights. . . . Doubtless there are individual exceptions . . . but looking at it from the viewpoint of the effort to maintain an independent position in life, she is not upon an equality.' " (5 Cal.3d at p. 17, fn. 15.)

and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation,[46] and, more specifically, recognize that gay individuals are fully capable of entering into the kind of loving and enduring committed relationships that may serve as the foundation of a family and of responsibly caring for and raising children.[47]

■ Contrary to the assertions in Justice Baxter's concurring and dissenting opinion (see *post*, at pp. 861, 864, 867–869), our reference to numerous statutes demonstrating California's current recognition that gay individuals are entitled to equal and nondiscriminatory legal treatment (*ante,* fns. 46, 47) does not suggest that an individual's entitlement to equal treatment under the law—regardless of his or her sexual orientation—is grounded upon the Legislature's recent enactment of the Domestic Partner Act or any other legislative measure. The capability of gay individuals to enter into loving and enduring relationships comparable to those entered into by heterosexuals is in no way dependent upon the enactment of the Domestic Partner Act; the adoption of that legislation simply constitutes an explicit official recognition of that capacity. Similarly, the numerous recent legislative enactments prohibiting discrimination on the basis of sexual orientation were not required in order to confer upon gay individuals a legal status equal to that enjoyed by heterosexuals; these measures simply provide explicit official recognition of, and affirmative support for, that equal legal status. Indeed, the change in this state's past treatment of gay individuals and homosexual conduct is reflected in scores of legislative, administrative, and judicial actions that have occurred over the past 30 or more years. (See, e.g., Stats. 1975, ch. 71, §§ 7, 10, pp. 133, 134 [revising statutes criminalizing consensual sodomy and oral copulation]; Governor's Exec. Order No. B-54-79 (Apr. 4, 1979) [barring sexual-orientation discrimination against state employees]; *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375] [homosexual conduct does not in itself necessarily constitute immoral conduct or demonstrate unfitness to teach].) Thus, just as this court recognized in *Perez* that it was not constitutionally permissible to continue to treat racial or ethnic minorities as inferior (*Perez, supra,* 32 Cal.2d at pp. 720–727), and in *Sail'er Inn* that it was not constitutionally acceptable to continue to treat

---

[46] See, for example, Civil Code section 51 (barring sexual orientation discrimination in the provision of services by any business establishment); Government Code sections 12920 (barring sexual orientation discrimination in employment), 12955 (barring sexual orientation discrimination in housing), 11135, subdivision (a) (barring sexual orientation discrimination in any program operated by, or that receives any financial assistance from, the state); *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 466–475 [156 Cal.Rptr. 14, 595 P.2d 592] (*Gay Law Students*) (Cal. Const. prohibits sexual orientation discrimination by public utility).

[47] See, for example, sections 297 et seq., 9000, subdivisions (b), (g); Welfare & Institutions Code section 16013, subdivision (a); *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417 [2 Cal.Rptr.3d 699, 73 P.3d 554]; *Elisa B. v. Superior Court, supra,* 37 Cal.4th 108.

women as less capable than and unequal to men (*Sail'er Inn, supra,* 5 Cal.3d at pp. 17–20 & fn. 15), we now similarly recognize that an individual's homosexual orientation is not a constitutionally legitimate basis for withholding or restricting the individual's legal rights.

In light of this recognition, sections 1 and 7 of article I of the California Constitution cannot properly be interpreted to withhold from gay individuals the same basic civil right of personal autonomy and liberty (including the right to establish, with the person of one's choice, an officially recognized and sanctioned family) that the California Constitution affords to heterosexual individuals. The privacy and due process provisions of our state Constitution—in declaring that "[a]ll people . . . have [the] inalienable right[] [of] privacy" (art. I, § 1) and that no person may be deprived of "liberty" without due process of law (art. I, § 7)—do not purport to reserve to persons of a particular sexual orientation the substantive protection afforded by those provisions. In light of the evolution of our state's understanding concerning the equal dignity and respect to which all persons are entitled without regard to their sexual orientation, it is not appropriate to interpret these provisions in a way that, as a practical matter, excludes gay individuals from the protective reach of such basic civil rights. (Cf. *Valerie N., supra,* 40 Cal.3d 143, 154, 160–165 [holding that the state constitutional right of personal autonomy in matters of reproductive choice must be interpreted to afford incompetent developmentally disabled women the benefits accorded by that constitutional right].)

In reaching the contrary conclusion that the right to marry guaranteed by the California Constitution should be understood as protecting only an individual's right to enter into an officially recognized family relationship with a person of the opposite sex, the Court of Appeal relied upon a number of decisions that have cautioned against defining at too high a level of generality those constitutional rights that are protected as part of the substantive due process doctrine. (See, e.g., *Washington v. Glucksberg* (1997) 521 U.S. 702, 722, 723 [138 L.Ed.2d 772, 117 S.Ct. 2258] [holding, in case challenging constitutional validity of statute forbidding assisted suicide, that liberty interest at issue should not be defined as an interest in choosing "how to die" or " 'the time and manner of one's death' "; instead the issue was whether the liberty interest protected by the due process clause "includes a right to commit suicide which itself includes a right to assistance in doing so"]; *Reno v. Flores* (1993) 507 U.S. 292, 302 [123 L.Ed.2d 1, 113 S.Ct. 1439] [holding, in case challenging federal policy of placing deportable juveniles in custodial child care rather than releasing them to unrelated adults, that the right at issue should not be viewed as " 'freedom from physical restraint' " but rather "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a

government-operated or government-selected child-care institution"]; *Dawn D. v. Superior Court, supra,* 17 Cal.4th 932, 941 [holding, in case in which an alleged biological father sought an opportunity to establish a relationship with a child whose biological mother was married to another man at the time of the child's conception and birth, that the appropriate question was not whether a biological father generally has a liberty interest in establishing a relationship with his biological child but rather whether the federal Constitution protects a biological father's "interest in establishing a relationship with his child born to a woman married to another man at the time of the child's conception and birth"].)

None of the foregoing decisions—in emphasizing the importance of undertaking a " 'careful description' of the asserted fundamental liberty interest" (*Washington v. Glucksberg, supra,* 521 U.S. 702, 721)—suggests, however, that it is appropriate to define a fundamental constitutional right or interest in so narrow a fashion that the basic protections afforded by the right are withheld from a class of persons—composed of individuals sharing a personal characteristic such as a particular sexual orientation—who historically have been denied the benefit of such rights. As noted above, our decision in *Perez, supra,* 32 Cal.2d 711, declining to define narrowly the right to marry, did not consider the fact that discrimination against interracial marriage was "sanctioned by the state for many years" to be a reason to reject the plaintiffs' claim in that case. (*Id.* at p. 727.) Instead the court looked to the essence and substance of the right to marry, a right itself deeply rooted in the history and tradition of our state and nation, to determine whether the challenged statute impinged upon the plaintiffs' constitutional right. For similar reasons, it is apparent that history alone does not provide a justification for interpreting the constitutional right to marry as protecting only one's ability to enter into an officially recognized family relationship with a person of the opposite sex. In this regard, we agree with the view expressed by Chief Judge Kaye of the New York Court of Appeals in her dissenting opinion in *Hernandez v. Robles, supra,* 855 N.E.2d 1, 23: "[F]undamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights." (Cf. *Taylor v. Louisiana* (1975) 419 U.S. 522, 537 [42 L.Ed.2d 690, 95 S.Ct. 692] ["it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequence is that criminal jury venires are almost totally male. . . . If it was ever the case that women were unqualified to sit on juries or were so situated that none of them should be required to perform jury service, that time has long since passed"].)

Furthermore, unlike the situation presented in several prior decisions of this court in which recognition of a party's claim of a constitutional right necessarily and invariably would have had the effect of reducing or diminishing the rights of other persons (see, e.g., *Johnson v. Calvert* (1993) 5 Cal.4th

84, 92, fn. 8, 100 [19 Cal.Rptr.2d 494, 851 P.2d 776] [noting, in rejecting surrogate mother's claim of a liberty interest in the companionship of a child, that recognition of such an interest would impinge upon the liberty interests of the child's legal parents]; *Dawn D. v. Superior Court, supra,* 17 Cal.4th 932 [rejecting asserted biological father's claim of a liberty interest in establishing relationship with a child whose biological mother was married to another man when the child was conceived and born]), in the present context our recognition that the constitutional right to marry applies to same-sex couples as well as to opposite-sex couples does not diminish any other person's constitutional rights. Opposite-sex couples will continue to enjoy precisely the same constitutional rights they traditionally have possessed, unimpaired by our recognition that this basic civil right is applicable, as well, to gay individuals and same-sex couples.

The Proposition 22 Legal Defense Fund and the Campaign agree that the constitutional right to marry is integrally related to the right of two persons to join together to establish an officially recognized family, but they contend that the only family that possibly can be encompassed by the constitutional right to marry is a family headed by a man and a woman. Pointing out that past cases often have linked marriage and procreation, these parties argue that because only a man and a woman can produce children biologically with one another, the constitutional right to marry necessarily is limited to opposite-sex couples.

■■■ This contention is fundamentally flawed for a number of reasons. To begin with, although the legal institution of civil marriage may well have originated in large part to promote a stable relationship for the procreation and raising of children (see, e.g., *Baker v. Baker, supra,* 13 Cal. 87, 103 ["the first purpose of matrimony, by the laws of nature and society, is procreation"]; see generally Blankenhorn, The Future of Marriage (2007) pp. 23–125), and although the right to marry and to procreate often are treated as closely related aspects of the privacy and liberty interests protected by the state and federal Constitutions (see, e.g., *Valerie N., supra,* 40 Cal.3d 143, 161; *Skinner v. Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 62 S.Ct. 1110]), the constitutional right to marry never has been viewed as the sole preserve of individuals who are physically capable of having children. Men and women who desire to raise children with a loved one in a recognized family but who are physically unable to conceive a child with their loved one never have been excluded from the right to marry. Although the Proposition 22 Legal Defense Fund and the Campaign assert that the circumstance that marriage has not been limited to those who can bear children can be explained and justified by reference to the state's reluctance to intrude upon the privacy of individuals by inquiring into their fertility, if that were an accurate and adequate explanation for the absence of such a limitation it would follow that in instances in which the state is able to make

a determination of an individual's fertility without such an inquiry, it would be constitutionally permissible for the state to preclude an individual who is incapable of bearing children from entering into marriage. There is, however, no authority whatsoever to support the proposition that an individual who is physically incapable of bearing children does not possess a fundamental constitutional right to marry. Such a proposition clearly is untenable. A person who is physically incapable of bearing children still has the potential to become a parent and raise a child through adoption or through means of assisted reproduction, and the constitutional right to marry ensures the individual the opportunity to raise children in an officially recognized family with the person with whom the individual has chosen to share his or her life. Thus, although an important purpose underlying marriage may be to channel procreation into a stable family relationship, that purpose cannot be viewed as limiting the constitutional right to marry to couples who are capable of biologically producing a child together.[48]

A variant of the contention that the right to marry is limited to couples who are capable of procreation is that the purpose of marriage is to promote "responsible procreation" and that a restriction limiting this right exclusively to opposite-sex couples follows from this purpose. A number of recent state court decisions, applying the rational basis equal protection standard, have relied upon this purpose as a reasonably conceivable justification for a statutory limitation of marriage to opposite-sex couples. These decisions have explained that although same-sex couples can have or obtain children through assisted reproduction or adoption, resort to such methods demonstrates, in the case of a same-sex couple, that parenthood necessarily is an *intended* consequence because each of these two methods requires considerable planning and expense, whereas in the case of an opposite-sex couple a child often is the *unintended* consequence of the couple's sexual intercourse. These courts reason that a state plausibly could conclude that although affording the benefits of marriage to opposite-sex couples is an incentive needed to ensure that *accidental* procreation is channeled into a stable family relationship, a similar incentive is not required for same-sex couples because they cannot produce children accidentally. (See, e.g., *Morrison v. Sadler, supra,* 821 N.E.2d 15, 23–29; *Hernandez v. Robles, supra,* 855 N.E.2d 1, 7.)

Whether or not the state's interest in encouraging responsible procreation properly can be viewed as a reasonably conceivable justification for the

---

[48] Although California cases hold that one of the types of misrepresentation or concealment that will justify a judgment of nullity of marriage is the intentional misrepresentation or concealment of an individual's inability to have children (see, e.g., *Vileta v. Vileta* (1942) 53 Cal.App.2d 794, 796 [128 P.2d 376]; *Aufort v. Aufort* (1935) 9 Cal.App.2d 310, 311 [49 P.2d 620]), no case has suggested that an inability to have children—when disclosed to a prospective partner—would constitute a basis for denying a marriage license or nullifying a marriage.

statutory limitation of marriage to a man and a woman for purposes of the rational basis equal protection standard, this interest clearly does not provide an appropriate basis for defining or limiting the scope of the constitutional right to marry. None of the past cases discussing the right to marry—and identifying this right as one of the fundamental elements of personal autonomy and liberty protected by our Constitution—contains any suggestion that the constitutional right to marry is possessed only by individuals who are at risk of producing children accidentally, or implies that this constitutional right is not equally important for and guaranteed to responsible individuals who can be counted upon to take appropriate precautions in planning for parenthood. Thus, although the state undeniably has a legitimate interest in promoting "responsible procreation," that interest cannot be viewed as a valid basis for defining or limiting the class of persons who may claim the protection of the fundamental constitutional right to marry.

Furthermore, although promoting and facilitating a stable environment for the procreation and raising of children is unquestionably one of the vitally important purposes underlying the institution of marriage and the constitutional right to marry, past cases make clear that this right is not confined to, or restrictively defined by, that purpose alone. (See, e.g., *Baker v. Baker, supra*, 13 Cal. 87, 103 ["[t]he second purpose of matrimony is the promotion of the happiness of the parties by the society of each other . . ."].) As noted above, our past cases have recognized that the right to marry is the right to enter into a relationship that is "the center of the personal affections that ennoble and enrich human life" (*De Burgh v. De Burgh, supra*, 39 Cal.2d 858, 863–864)—a relationship that is "at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime." (*Marvin v. Marvin, supra*, 18 Cal.3d 660, 684; see also *Elden v. Sheldon, supra*, 46 Cal.3d 267, 274.) The personal enrichment afforded by the right to marry may be obtained by a couple whether or not they choose to have children, and the right to marry never has been limited to those who plan or desire to have children. Indeed, in *Griswold v. Connecticut, supra*, 381 U.S. 479—one of the seminal federal cases striking down a state law as violative of the federal constitutional right of privacy—the high court upheld a married couple's right to use contraception *to prevent procreation*, demonstrating quite clearly that the promotion of procreation is not the sole or defining purpose of marriage. Similarly, in *Turner v. Safley, supra*, 482 U.S. 78, the court held that the constitutional right to marry extends to an individual confined in state prison—even a prisoner who has no right to conjugal visits with his would-be spouse—emphasizing that "[m]any important attributes of marriage remain . . . after taking into account the limitations imposed by prison life . . . [including the] expressions of emotional support and public commitment [that] are an important and significant aspect of the marital relationship." (482 U.S. at pp. 95–96.) Although *Griswold* and *Turner*

relate to the right to marry under the federal Constitution, they accurately reflect the scope of the state constitutional right to marry as well. Accordingly, this right cannot properly be defined by or limited to the state's interest in fostering a favorable environment for the procreation and raising of children.

The Proposition 22 Legal Defense Fund and the Campaign also rely upon several academic commentators who maintain that the constitutional right to marry should be viewed as inapplicable to same-sex couples because a contrary interpretation assertedly would sever the link that marriage provides between procreation and child rearing and would "send a message" to the public that it is immaterial to the state whether children are raised by their biological mother and father. (See, e.g., Blankenhorn, The Future of Marriage, *supra*, at pp. 201–212; Wardle, *"Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation* (2001) 24 Harv. J.L. & Pub. Pol'y 771, 797–799; Gallagher, *What Is Marriage For? The Public Purposes of Marriage Law* (2002) 62 La. L.Rev. 773, 779–780, 790–791.) Although we appreciate the genuine concern for the well-being of children underlying that position, we conclude this claim lacks merit. Our recognition that the core substantive rights encompassed by the constitutional right to marry apply to same-sex as well as opposite-sex couples does not imply in any way that it is unimportant or immaterial to the state whether a child is raised by his or her biological mother and father. By recognizing this circumstance we do not alter or diminish either the legal responsibilities that biological parents owe to their children or the substantial incentives that the state provides to a child's biological parents to enter into and raise their child in a stable, long-term committed relationship.[49] Instead, such an interpretation of the constitutional right to marry simply confirms that a stable two-parent family relationship, supported by the state's official recognition and protection, is equally as important for the numerous children in California who are being raised by same-sex couples as for those children being raised by opposite-sex couples (whether they are biological parents or adoptive parents).[50] This interpretation

---

[49] As noted in our earlier discussion of the relationship between procreation and marriage, many opposite-sex married couples choose not to have children and many other opposite-sex married couples become parents through adoption or through a variety of assisted-reproduction techniques. If societal acceptance of these marriages (whose numbers surely exceed the number of potential same-sex unions) does not "send a message" that it is immaterial to the state whether children are raised by their biological mother and father—and we conclude there clearly is no such message—it is difficult to understand why the message would be sent by our recognition that same-sex couples possess a constitutional right to marry. (See, e.g., *Baker v. State, supra,* 744 A.2d 864, 882.)

[50] According to a report based upon a review of data from the 2000 census, at the time of that census same-sex couples in California were raising more than 70,000 children. (See Badgett & Sears, *Same-Sex Couples And Same-Sex Couples Raising Children In California:*

also guarantees individuals who are in a same-sex relationship, and who are raising children, the opportunity to obtain from the state the official recognition and support accorded a family by agreeing to take on the substantial and long-term mutual obligations and responsibilities that are an essential and inseparable part of a family relationship.[51]

 Accordingly, we conclude that the right to marry, as embodied in article I, sections 1 and 7 of the California Constitution, guarantees same-sex couples the same substantive constitutional rights as opposite-sex couples to choose one's life partner and enter with that person into a committed, officially recognized, and protected family relationship that enjoys all of the constitutionally based incidents of marriage.[52]

---

*data from census 2000* (May 2004) p. 2 <http://www.law.ucla.edu/williamsproj/publications/CaliforniaCouplesReport.pdf> [as of May 15, 2008].) The report also states that the 2000 census data indicates that, as of that date, 33 percent of female same-sex couples and 28.4 percent of all same-sex couples in California were raising children, and further notes that those figures do not include foster children being raised by same-sex couples. (*Id.* at p. 10.)

[51] In support of the argument that recognizing that the constitutional right to marry applies to same-sex couples "will eventually devalue the institution [of marriage] to the detriment of children," one amicus curiae brief (brief of the American Center for Law & Justice) relies upon a passage attributed to the philosopher John Rawls with respect to the institutions of marriage and family, in which Rawls states that one of the essential functions of the family "is to establish the orderly production and reproduction of society and of its culture from one generation to the next" and that "[r]eproductive labor is socially necessary labor." (Rawls, Justice as Fairness: A Restatement (2001) p. 162.) In the cited work, however, after explaining that "essential to the role of the family is the arrangement in a reasonable and effective way of the raising and caring for children, ensuring their moral development and education into the wider culture," Rawls proceeds to observe that in his view, "no particular form of the family (monogamous, heterosexual, or otherwise) is so far required by a political conception of justice so long as it is arranged to fulfill these tasks effectively and does not run afoul of other political values." (*Id.* at pp. 162–163.) Rawls then adds that "this observation sets the way in which justice as fairness deals with the question of gay and lesbian rights and duties, and how they affect the family. If these rights and duties are consistent with orderly family life and the education of children, they are, ceteris paribus [all other things being equal], fully admissible." (*Id.* at p. 163, fn. 42.)

[52] We emphasize that our conclusion that the constitutional right to marry properly must be interpreted to apply to gay individuals and gay couples does not mean that this constitutional right similarly must be understood to extend to polygamous or incestuous relationships. Past judicial decisions explain why our nation's culture has considered the latter types of relationships inimical to the mutually supportive and healthy family relationships promoted by the constitutional right to marry. (See, e.g., *Reynolds v. United States* (1878) 98 U.S. 145, 165–166 [25 L.Ed. 244]; *Davis v. Beason* (1890) 133 U.S. 333, 341 [33 L.Ed. 637, 10 S.Ct. 299]; *People v. Scott* (2007) 157 Cal.App.4th 189, 192–194 [68 Cal.Rptr.3d 592]; *State v. Freeman* (2003) 155 Ohio App.3d 492 [2003 Ohio 6730, 801 N.E.2d 906, 909]; *Smith v. State* (Tenn.Crim.App. 1999) 6 S.W.3d 512, 518–520.) Although the historic disparagement of and discrimination against gay individuals and gay couples clearly is no longer constitutionally permissible, the state continues to have a strong and adequate justification for refusing to officially sanction polygamous or incestuous relationships because of their potentially detrimental effect on a sound family environment. (Accord, e.g., *Potter v. Murray City* (C.D. Utah

**B**

The Attorney General, in briefing before this court, argues that even if, as we have concluded, the state constitutional right to marry extends to same-sex couples as well as to opposite-sex couples, the current California statutes do not violate the fundamental rights of same-sex couples, "because all of the personal and dignity interests that have traditionally informed the right to marry have been given to same-sex couples through the Domestic Partner Act." Maintaining that "under the domestic partnership system, the word 'marriage' is all that the state is denying to registered domestic partners," the Attorney General asserts that "[t]he fundamental right to marry can no more be the basis for same-sex couples to compel the state to denominate their committed relationships 'marriage' than it could be the basis for anyone to prevent the state legislature from changing the name of the marital institution itself to 'civil unions.'" Accordingly, the Attorney General argues that in light of the rights afforded to same-sex couples by the Domestic Partner Act, the current California statutes cannot be found to violate the right of same-sex couples to marry.

We have no occasion in this case to determine whether the state constitutional right to marry necessarily affords all couples the constitutional right to require the state to designate their official family relationship a "marriage," or whether, as the Attorney General suggests, the Legislature would not violate a couple's constitutional right to marry if—perhaps in order to emphasize and clarify that this civil institution is distinct from the religious institution of marriage—it were to assign a name other than marriage as the official designation of the family relationship for *all* couples. The current California statutes, of course, do not assign a name other than marriage for *all* couples, but instead reserve exclusively to opposite-sex couples the traditional designation of marriage, and assign a different designation—domestic partnership—to the only official family relationship available to same-sex couples.

Whether or not the name "marriage," in the abstract, is considered a core element of the state constitutional right to marry, one of the core elements of this fundamental right is the right of same-sex couples to have their official family relationship accorded the same dignity, respect, and stature as that accorded to all other officially recognized family relationships. The current statutes—by drawing a distinction between the name assigned to

---

1984) 585 F.Supp. 1126, 1137–1140, affd. (10th Cir. 1985) 760 F.2d 1065, 1068–1071, cert. den. (1985) 474 U.S. 849 [88 L.Ed.2d 120, 106 S.Ct. 145]; *People v. Scott, supra,* 157 Cal.App.4th 189, 193–194.) Thus, our conclusion that it is improper to interpret the state constitutional right to marry as inapplicable to gay individuals or couples does not affect the constitutional validity of the existing legal prohibitions against polygamy and the marriage of close relatives.

the family relationship available to opposite-sex couples and the name assigned to the family relationship available to same-sex couples, and by reserving the historic and highly respected designation of marriage exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of domestic partnership—pose a serious risk of denying the official family relationship of same-sex couples the equal dignity and respect that is a core element of the constitutional right to marry. As observed by the City at oral argument, this court's conclusion in *Perez, supra,* 32 Cal.2d 711, that the statutory provision barring interracial marriage was unconstitutional, undoubtedly would have been the same even if alternative nomenclature, such as "transracial union," had been made available to interracial couples.

Accordingly, although we agree with the Attorney General that the provisions of the Domestic Partner Act afford same-sex couples most of the substantive attributes to which they are constitutionally entitled under the state constitutional right to marry, we conclude that the current statutory assignment of different designations to the official family relationship of opposite-sex couples and of same-sex couples properly must be viewed as potentially impinging upon the state constitutional right of same-sex couples to marry.

## V

The current statutory assignment of different names for the official family relationships of opposite-sex couples on the one hand, and of same-sex couples on the other, raises constitutional concerns not only in the context of the state constitutional right to marry, but also under the state constitutional equal protection clause. Plaintiffs contend that by permitting only opposite-sex couples to enter into a relationship designated as a "marriage," and by designating as a "domestic partnership" the parallel relationship into which same-sex couples may enter,[53] the statutory scheme impermissibly denies same-sex couples the equal protection of the laws, guaranteed by article I, section 7, of the California Constitution. The relevant California statutes clearly treat opposite-sex and same-sex couples differently in this respect, and the initial question we must consider in addressing the equal protection issue is the standard of review that should be applied in evaluating this distinction.[54]

---

[53] Although the Domestic Partner Act also makes domestic partnership available to opposite-sex couples if at least one of the partners is over the age of 62 years (§ 297, subd. (b)(5)(B)), under sections 300 and 308.5 the relationship designated "marriage" is available only to opposite-sex couples and thus only the relationship designated "domestic partnership" is available to same-sex couples.

[54] One defendant, the Proposition 22 Legal Defense Fund, advances a threshold argument that same-sex couples and opposite-sex couples are not "similarly situated" with regard to the

■ There are two different standards traditionally applied by California courts in evaluating challenges made to legislation under the equal protection clause. As we recently explained in *Hernandez v. City of Hanford* (2007) 41 Cal.4th 279 [59 Cal.Rptr.3d 442, 159 P.3d 33] (*Hernandez*), " ' "[t]he first is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a 'discrimination' or differentiation of treatment between classes or individuals. . . . [That standard] invests legislation involving such differentiated treatment with a presumption of constitutionality and 'requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose.' . . . [T]he burden of demonstrating the invalidity of a classification under this standard rests squarely upon *the party who assails it*." ' [Citation.] This first basic equal protection standard generally is referred to as the 'rational relationship' or 'rational basis' standard." (41 Cal.4th at pp. 298–299.)

Our decision in *Hernandez, supra,* 41 Cal.4th 279, further explained: "[T]he second equal protection standard is ' "[a] more stringent test [that] is applied . . . in cases involving 'suspect classifications' or touching on 'fundamental interests.' Here the courts adopt 'an attitude of active and critical analysis, subjecting the classifications to strict scrutiny. . . . Under the strict standard applied in such cases, *the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' [Citation.]" ' . . . This second standard generally is referred to as the 'strict scrutiny' standard." (41 Cal.4th at p. 299, citation omitted.)[55]

---

challenged statute's legitimate purpose (*Purdy & Fitzpatrick v. State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645]), assertedly obviating any need for this court even to consider which standard of review applies to plaintiffs' equal protection claim. Although the separate opinions of Justice Baxter (conc. & dis. opn., *post,* at pp. 872–874) and Justice Corrigan (conc. & dis. opn., *post,* at pp. 881–882) embrace this argument, which in reality would insulate the challenged marriage statutes from *any* meaningful equal protection review, we conclude this contention clearly lacks merit. Both groups at issue consist of pairs of individuals who wish to enter into a formal, legally binding and officially recognized, long-term family relationship that affords the same rights and privileges and imposes the same obligations and responsibilities. Under these circumstances, there is no question but that these two categories of individuals are sufficiently similar to bring into play equal protection principles that require a court to determine " 'whether distinctions between the two groups justify the unequal treatment.' " (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200 [39 Cal.Rptr.3d 821, 129 P.3d 29].)

[55] As we noted in *Hernandez, supra,* 41 Cal.4th 279, 299, footnote 12: "In applying the federal equal protection clause, the United States Supreme Court has applied a third standard— 'intermediate scrutiny'—'to discriminatory classifications based on sex or illegitimacy.' (*Clark v. Jeter* (1988) 486 U.S. 456, 461 [100 L.Ed.2d 465, 108 S.Ct. 1910].)" Past California decisions, by contrast, have applied the strict scrutiny standard when evaluating discriminatory classifications based on sex (see, e.g., *Sail'er Inn, supra,* 5 Cal.3d 1, 15–20; *Arp v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 400 [138 Cal.Rptr. 293, 563 P.2d 849]; *Michael M. v. Superior Court* (1979) 25 Cal.3d 608, 610–611 [159 Cal.Rptr. 340, 601 P.2d 572]; *Catholic*

Plaintiffs maintain, on three separate grounds, that strict scrutiny is the standard that should be applied in this case, contending the distinctions drawn by the statutes between opposite-sex and same-sex couples (1) discriminate on the basis of sex (that is, gender), (2) discriminate on the basis of sexual orientation, and (3) impinge upon a fundamental right. We discuss each of these three claims in turn.

## A

Plaintiffs initially contend that the relevant California statutes, by drawing a distinction between couples consisting of a man and a woman and couples consisting of two persons of the same sex or gender, discriminate on the basis of sex and for that reason should be subjected to strict scrutiny under the state equal protection clause. Although the governing California cases long have established that statutes that discriminate on the basis of sex or gender are subject to strict scrutiny under the California Constitution (see, e.g., *Catholic Charities of Sacramento, Inc. v. Superior Court, supra*, 32 Cal.4th 527, 564; *Sail'er Inn, supra*, 5 Cal.3d 1, 17–20), we conclude that the challenged statutes cannot properly be viewed as discriminating on the basis of sex or gender for purposes of the California equal protection clause.

In drawing a distinction between opposite-sex couples and same-sex couples, the challenged marriage statutes do not treat men and women differently. Persons of either gender are treated equally and are permitted to marry only a person of the opposite gender. In light of the equality of treatment between genders, the distinction prescribed by the relevant statutes plainly does not constitute discrimination on the basis of sex as that concept is commonly understood.

Plaintiffs contend, however, that the statutory distinction nonetheless should be viewed as sex or gender discrimination because the statutory limitation upon marriage in a particular case is dependent upon an individual person's sex or gender. Plaintiffs argue that because a woman who wishes to marry another woman would be permitted to do so if she were a man rather than a woman, and a man who wishes to marry another man would be permitted to do so if he were a woman rather than a man, the statutes must be seen as embodying discrimination on the basis of sex. Plaintiffs rely on the decisions in *Perez, supra*, 32 Cal.2d 711, and *Loving v. Virginia, supra*, 388 U.S. 1, in which this court and subsequently the United States Supreme Court found that the antimiscegenation statutes at issue in those cases

*Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 564 [10 Cal.Rptr.3d 283, 85 P.3d 67]), and have not applied an intermediate scrutiny standard under equal protection principles in any case involving a suspect (or quasi-suspect) classification.

discriminated on the basis of race, even though the statutes prohibited White persons from marrying Black persons and Black persons from marrying White persons.

The decisions in *Perez, supra*, 32 Cal.2d 711, and *Loving v. Virginia, supra*, 388 U.S. 1, however, are clearly distinguishable from this case, because the antimiscegenation statutes at issue in those cases plainly treated members of minority races differently from White persons, prohibiting only intermarriage that involved White persons in order to prevent (in the undisguised words of the defenders of the statute in *Perez*) "the Caucasian race from being contaminated by races whose members are by nature physically and mentally inferior to Caucasians." (*Perez, supra*, 32 Cal.2d at p. 722; see also *Loving, supra*, 388 U.S. at p. 11 ["The fact that Virginia prohibits only interracial marriages involving white persons demonstrates that the racial classifications must stand on their own justification, as measures designed to maintain White Supremacy"].) Under these circumstances, there can be no doubt that the reference to race in the statutes at issue in *Perez* and *Loving* unquestionably reflected the kind of racial discrimination that always has been recognized as calling for strict scrutiny under equal protection analysis.

In *Perez, Loving*, and a number of other decisions (see, e.g., *McLaughlin v. Florida* (1964) 379 U.S. 184, 192 [13 L.Ed.2d 222, 85 S.Ct. 283]), courts have recognized that a statute that treats a couple differently based upon whether the couple consists of persons of the same race or of different races generally reflects a policy disapproving of the integration or close relationship of individuals of different races in the setting in question, and as such properly is viewed as embodying an instance of *racial discrimination* with respect to the interracial couple and both of its members. By contrast, past judicial decisions, in California and elsewhere, virtually uniformly hold that a statute or policy that treats men and women equally but that accords differential treatment either to a couple based upon whether it consists of persons of the same sex rather than opposite sexes, or to an individual based upon whether he or she generally is sexually attracted to persons of the same gender rather than the opposite gender, is more accurately characterized as involving differential treatment on the basis of *sexual orientation* rather than an instance of *sex discrimination*, and properly should be analyzed on the *former* ground. These cases recognize that, in realistic terms, a statute or policy that treats same-sex couples differently from opposite-sex couples, or that treats individuals who are sexually attracted to persons of the same gender differently from individuals who are sexually attracted to persons of the opposite gender, does not treat an individual man or an individual woman differently *because of* his or her *gender* but rather accords differential treatment *because of* the individual's *sexual orientation*.

In *Gay Law Students, supra,* 24 Cal.3d 458, 490–491, for example, the plaintiffs contended that an employer's alleged policy of discriminating against homosexuals constituted discrimination on the basis of "sex" within the meaning of California's fair employment practice statute.[56] In support of this contention, the plaintiffs argued that "discrimination against homosexuals is in effect discrimination based on the gender of the homosexual's partner . . ." (24 Cal.3d at p. 490), and "analogizing to a series of racial discrimination cases" including *Loving v. Virginia, supra,* 388 U.S. 1 (*Gay Law Students, supra,* 24 Cal.3d at p. 490 & fn. 18), the plaintiffs asserted that "such discrimination is discrimination on the basis of sex" (*id.* at p. 490). Although this court recognized in *Gay Law Students* that "as a semantic argument" the plaintiffs' contention might have some appeal (*ibid.*), we nonetheless squarely rejected the claim, explaining that the statute proscribing "discrimination on the basis of 'sex,' did not contemplate discrimination against homosexuals." (*Ibid.*) In reaching this conclusion, we relied not only on the circumstance that the identical statutory prohibition against sex discrimination in employment set forth in title VII of the 1964 federal Civil Rights Act uniformly had been interpreted as not encompassing discrimination on the basis of sexual orientation or homosexuality, but also on the circumstance that the agency charged with administering the California statute consistently had interpreted the prohibition of sex discrimination as inapplicable to claims of discrimination based upon sexual orientation. (*Gay Law Students, supra,* at pp. 490–491; accord, e.g., *In re Maki* (1943) 56 Cal.App.2d 635, 639–640 [133 P.2d 64] [ordinance forbidding administration of massage to a person of the opposite sex did not violate state constitutional provision mandating that no person shall be disqualified from pursuing any lawful vocation " 'on account of sex' "].)

 In the three decades that have elapsed since our decision in *Gay Law Students, supra,* 24 Cal.3d 458, judicial decisions in a variety of contexts similarly have concluded that statutes, policies, or public or private actions that treat the genders equally but that accord differential treatment either to a couple based upon whether they are persons of the same sex or of opposite sexes, or to a person based upon whether he or she generally is sexually attracted to persons of the same gender rather than the opposite gender, do not constitute instances of sex discrimination (either within the meaning of statutory prohibitions on sex discrimination or for purposes of the equal protection clauses or equal rights amendments contained within the federal

---

[56] At the time the *Gay Law Students* decision was rendered, the applicable California statute prohibited employment discrimination on the basis of sex, but did not explicitly prohibit discrimination on the basis of homosexuality or sexual orientation. (See *Gay Law Students, supra,* 24 Cal.3d 458, 489.) California's current employment discrimination statute explicitly prohibits discrimination either on the basis of sex or on the basis of sexual orientation. (Gov. Code, § 12940, subds. (a)–(d), (j).)

and various state constitutions), but rather are more properly viewed as instances of differential treatment on the basis of sexual orientation and accordingly should be evaluated on that ground. (See, e.g., *Medina v. Income Support Div., New Mexico* (10th Cir. 2005) 413 F.3d 1131, 1134–1135 [workplace harassment]; *DeSantis v. Pacific Tel. & Tel. Co., Inc.* (9th Cir. 1979) 608 F.2d 327, 329–330 [termination of employment]; *Com. v. Wasson* (Ky. 1992) 842 S.W.2d 487, 499–502, 507 [statute prohibiting "deviate sexual intercourse with another person of the same sex"]; *State v. Walsh* (Mo. 1986) 713 S.W.2d 508, 510–511 [same]; *Conaway v. Deane, supra*, 932 A.2d 571, 585–602, 605–616 [marriage]; *Lewis v. Harris, supra*, 908 A.2d 196, 212–215 [marriage]; *Hernandez v. Robles, supra*, 855 N.E.2d 1, 10–11 [marriage]; *Baker v. State, supra*, 744 A.2d 864, 880, fn. 13 [marriage]; *Andersen v. King County, supra*, 138 P.3d 963, 974–976, 988–990 (lead opn. of Madsen, J.); *id.* at pp. 997–998, 1010 (conc. opn. of Johnson (J.M.), J.) [marriage]; *In re Kandu* (Bankr. W.D.Wn. 2004) 315 B.R. 123, 142–144 [marriage]; accord, *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 80 [140 L.Ed.2d 201, 118 S.Ct. 998] [in determining whether same-sex harassment in the workplace constitutes "discrimination because of sex" within the meaning of title VII of the 1964 federal Civil Rights Act, " '[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed' "]; *Lawrence v. Texas, supra*, 539 U.S. 558, 581 (conc. opn. of O'Connor, J.) [statute that makes sodomy a crime only if a person engages in such conduct " 'with another individual of the same sex' " treats persons differently on the basis of their "same-sex sexual orientation" and, for equal protection purposes, is appropriately analyzed on that ground]; see also C-249/96, *Grant v. South-West Trains* (Eur. Ct. of Justice) 1998 E.C.R. I-261, pars. 24–28, 37–47 ["discrimination based on sex" prohibited by art. 119 of the Treaty establishing the European Economic Community "does not cover discrimination based on sexual orientation"].)[57]

---

[57] As illustrated by the numerous authorities cited in the text, virtually all of the decisions that have addressed this issue have rejected the contention that a statute that treats same-sex couples differently from opposite-sex couples constitutes sex discrimination, although we are aware that one state court decision and a number of separate concurring and/or dissenting opinions filed in other recent state court marriage decisions have found such differential treatment to constitute sex discrimination for purposes of the equal protection clause or equal rights amendment contained in the applicable state constitution. (See, e.g., *Baehr v. Lewin, supra*, 852 P.2d 44, 60 (plur. opn. of Levinson, J.), endorsed by a majority of justices on motion for reconsideration or clarification, and further explicated in *Baehr v. Miike* (Haw., Dec. 9, 1999, No. 20371) 1999 Haw. Lexis 391, p. *6, fn. 1 [explaining that the history of Hawaii's state equal protection clause indicates the framers of that provision "expressly declared their intention that a proscription against discrimination based on sexual orientation be subsumed within the clause's prohibition against discrimination based on sex"]; *Conaway v. Deane, supra*, 932 A.2d 571, 677–686 (dis. opn. of Battaglia, J.); *Goodridge v. Department of Public Health, supra*, 798 N.E.2d 941, 971–972 (conc. opn. of Greaney, J.); *Hernandez v. Robles, supra*, 855 N.E.2d 1, 29–30 (dis. opn. of Kaye, C. J.); *Baker v. State, supra*, 744 A.2d

Although plaintiffs further contend that the difference in treatment prescribed by the relevant statutes should be treated as sex discrimination for equal protection purposes because the differential treatment reflects illegitimate gender-related stereotyping based on the view that men are attracted to women and women are attracted to men, this argument again improperly conflates two concepts—discrimination on the basis of sex, and discrimination on the basis of sexual orientation—that traditionally have been viewed as distinct phenomena. (See, e.g., Gov. Code, § 12940, subds. (a)–(d), (j) [prohibiting, separately, employment discrimination (or harassment) on the basis of "sex" and on the basis of "sexual orientation"]; Civ. Code, § 51, subd. (b) [guaranteeing "[a]ll persons . . . no matter what their sex . . . or sexual orientation . . . the full and equal accommodations . . . in all business establishments"].) Under plaintiffs' argument, discrimination on the basis of sexual orientation always would constitute a subset of discrimination on the basis of sex.

For purposes of determining the applicable standard of judicial review under the California equal protection clause, we conclude that discrimination on the basis of sexual orientation cannot appropriately be viewed as a subset of, or subsumed within, discrimination on the basis of sex. The seminal California decisions that address the question of which equal protection standard should apply to statutory classifications that discriminate on the basis of sex or gender, and that explain why under the California Constitution the strict scrutiny standard is applicable to such classifications, look to (1) whether a person's *gender* (rather than sexual orientation) does or does not bear a relation to one's ability to perform or contribute to society, and (2) the long history of societal and legal discrimination against *women* (rather than against gay individuals). (See, e.g., *Sail'er Inn, supra,* 5 Cal.3d 1, 18–20; *Arp v. Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 395, 404–405.) Each of these seminal California decisions addressed instances in which the applicable statutes favored one gender over another, or prescribed different treatment for one gender as compared to the other based upon a stereotype

864, 904–912 (conc. & dis. opn. of Johnson, J.); *Andersen v. King County, supra,* 138 P.3d 963, 1037–1039 (dis. opn. of Bridge, J.).) At the same time, a number of these separate opinions also have concluded that the distinction in treatment before the court should be viewed, as well, as discrimination on the basis of sexual orientation. (See, e.g., *Hernandez v. Robles, supra,* 855 N.E.2d 1, 27–29 (dis. opn. of Kaye, C. J.); *Andersen v. King County, supra,* 138 P.3d 963, 1029–1032 (dis. opn. of Bridge, J.).)

For the reasons explained below (*post,* at pp. 837–838), we conclude that, for purposes of determining the applicable standard of review under the California equal protection clause, the distinction drawn by the marriage statutes between opposite-sex couples and same-sex couples is more appropriately analyzed as a difference in treatment on the basis of sexual orientation rather than as sex discrimination. Accordingly, the pertinent question is which standard of review applies under the California equal protection clause to statutory provisions that discriminate between individuals or couples on the basis of sexual orientation. We address that issue in the next part of this opinion. (*Post,* at pp. 839–844.)

relating to one particular gender, rather than instances in which a statute treated the genders equally but imposed differential treatment based upon whether or not an individual was of the same gender as his or her sexual partner. (See, e.g., *Sail'er Inn, supra*, 5 Cal.3d 1, 21 [statute restricting women's access to the occupation of bartender "appears to be based upon notions of what is a 'ladylike' or proper pursuit for a woman in our society rather than any ascertainable evil effects of permitting women to labor behind . . . bars"]; *Arp, supra*, 19 Cal.3d 395, 405–406 [conclusive statutory presumption that all widows were totally economically dependent upon their deceased husbands "was the product of . . . 'archaic and overbroad' role stereotypes" and "clearly . . . is outmoded in a society where more often than not a family's standard of living depends upon the financial contributions of both marital partners"].) In light of the reasoning underlying these rulings, we conclude that the type of discrimination or differential treatment between same-sex and opposite-sex couples reflected in the challenged marriage statutes cannot fairly be viewed as embodying the same type of discrimination at issue in the California decisions establishing that the strict scrutiny standard applies to statutes that discriminate on the basis of sex.[58]

Accordingly, we conclude that in the context of California's equal protection clause, the differential treatment prescribed by the relevant statutes cannot properly be found to constitute discrimination on the basis of sex, and thus that the statutory classification embodied in the marriage statutes is not subject to strict scrutiny on that ground.

---

[58] Relying upon a statement appearing in the legislative history of the 1977 statute that added the phrase "between a man and a woman" to section 300 (see Assem. Com. on Judiciary, Dig., Assem. Bill No. 607 (1977–1978 Reg. Sess.) Apr. 14, 1977, pp. 1–2), plaintiffs and a number of amici curiae additionally contend that the statutory limitation of marriage to opposite-sex couples is based upon the outdated stereotype of a marriage comprised of a stay-at-home mother and a breadwinner father, and for that reason should be viewed as reflective of sex discrimination. Neither the 1977 legislation nor any other provision of California law, however, purports to limit the role of either partner in a marriage, and the bulk of the legislative history of the 1977 enactment—a measure that, as noted above (*ante*, at p. 794), was introduced at the behest of the County Clerks' Association of California—indicates that the legislation primarily was intended simply to clarify that the existing California marriage statutes retained the historic definition of marriage as the union of a man and a woman. Furthermore, the ballot arguments pertaining to Proposition 22 indicate that section 308.5, which independently limits marriage to the union of a man and a woman, was intended to ensure that the traditional definition of marriage would be retained, and these arguments do not contain any suggestion that the initiative measure was grounded in an outdated stereotypical view of the appropriate roles of men and women in a marriage. Under these circumstances, we cannot agree with plaintiffs' contention that under the theory they advance, the relevant provisions of sections 300 and 308.5 properly should be viewed as embodying sex discrimination.

## B

Plaintiffs next maintain that even if the applicable California statutes do not discriminate on the basis of sex or gender, they do so on the basis of sexual orientation, and that statutes that discriminate on the basis of sexual orientation should be subject to strict scrutiny under the California Constitution. In response, defendants assert the marriage statutes do not discriminate on the basis of sexual orientation, and, even if they do, discrimination on the basis of sexual orientation should not trigger strict scrutiny.

In arguing that the marriage statutes do not discriminate on the basis of sexual orientation, defendants rely upon the circumstance that these statutes, on their face, do not refer explicitly to sexual orientation and do not prohibit gay individuals from marrying a person of the opposite sex. Defendants contend that under these circumstances, the marriage statutes should not be viewed as directly classifying or discriminating on the basis of sexual orientation but at most should be viewed as having a "disparate impact" on gay persons.

In our view, the statutory provisions restricting marriage to a man and a woman cannot be understood as having merely a disparate impact on gay persons, but instead properly must be viewed as directly classifying and prescribing distinct treatment on the basis of sexual orientation. By limiting marriage to opposite-sex couples, the marriage statutes, realistically viewed, operate clearly and directly to impose different treatment on gay individuals because of their sexual orientation. By definition, gay individuals are persons who are sexually attracted to persons of the same sex and thus, if inclined to enter into a marriage relationship, would choose to marry a person of their own sex or gender.[59] A statute that limits marriage to a union of persons of

---

[59] As explained in the amicus curiae brief filed by a number of leading mental health organizations, including the American Psychological Association and the American Psychiatric Association: "Sexual orientation is commonly discussed as a characteristic of the *individual*, like biological sex, gender identity, or age. This perspective is incomplete because sexual orientation is always defined in relational terms and necessarily involves relationships with other individuals. Sexual acts and romantic attractions are categorized as homosexual or heterosexual according to the biological sex of the individuals involved in them, relative to each other. Indeed, it is by acting—or desiring to act—with another person that individuals express their heterosexuality, homosexuality, or bisexuality. . . . Thus, sexual orientation is integrally linked to the intimate personal relationships that human beings form with others to meet their deeply felt needs for love, attachment, and intimacy. In addition to sexual behavior, these bonds encompass nonsexual physical affection between partners, shared goals and values, mutual support, and ongoing commitment. [¶] Consequently, sexual orientation is not merely a personal characteristic that can be defined in isolation. Rather, one's sexual orientation defines the universe of persons with whom one is likely to find the satisfying and fulfilling relationships that, for many individuals, comprise an essential component of personal identity."

opposite sexes, thereby placing marriage outside the reach of couples of the same sex, unquestionably imposes different treatment on the basis of sexual orientation. In our view, it is sophistic to suggest that this conclusion is avoidable by reason of the circumstance that the marriage statutes permit a gay man or a lesbian to marry someone of the opposite sex, because making such a choice would require the negation of the person's sexual orientation. Just as a statute that restricted marriage only to couples of the same sex would discriminate against heterosexual persons on the basis of their heterosexual orientation, the current California statutes realistically must be viewed as discriminating against gay persons on the basis of their homosexual orientation. (Accord, *Johnson Controls, Inc. v. Fair Employment & Housing Com.* (1990) 218 Cal.App.3d 517, 533, 541, fn. 7 [267 Cal.Rptr. 158].)

 Having concluded that the California marriage statutes treat persons differently on the basis of sexual orientation, we must determine whether sexual orientation should be considered a "suspect classification" under the California equal protection clause, so that statutes drawing a distinction on this basis are subject to strict scrutiny. As pointed out by the parties defending the marriage statutes, the great majority of out-of-state decisions that have addressed this issue have concluded that, unlike statutes that impose differential treatment on the basis of an individual's race, sex, religion, or national origin, statutes that treat persons differently because of their sexual orientation should not be viewed as constitutionally suspect and thus should not be subjected to strict scrutiny.[60] The issue is one of first impression in California,[61] however, and for the reasons discussed below we conclude that sexual orientation should be viewed as a suspect classification for purposes of

---

[60] See, for example, *Baker v. State, supra,* 744 A.2d 864, 878, footnote 10, and cases cited therein; see also *Standhardt v. Superior Court, supra,* 77 P.3d 451, 456–457; *Hernandez v. Robles, supra,* 855 N.E.2d 1, 9–10; *Andersen v. King County, supra,* 138 P.3d 963, 975–976. One intermediate appellate court in Oregon held that sexual orientation constitutes a suspect classification for the purpose of that state's equal protection clause (see *Tanner v. OHSU* (1998) 157 Ore.App. 502 [971 P.2d 435, 446–447]), and, as noted above, a number of justices of other state supreme courts recently have similarly concluded that sexual orientation properly should be considered a suspect classification for purposes of analysis under their state equal protection clauses. (See *Hernandez v. Robles, supra,* 855 N.E.2d 1, 27–29 (dis. opn. of Kaye, C. J.); *Andersen v. King County, supra,* 138 P.3d 963, 1029–1032 (conc. opn. of Bridge, J.); see also *Egan v. Canada* [1995] 2 S.C.R. 513, 528–529, 536 [¶¶ 5 & 22] [finding sexual orientation to be analogous to enumerated classifications, such as race or sex, that are constitutionally suspect under the equal protection clause of the Canadian Charter].)

[61] In *Citizens for Responsible Behavior v. Superior Court* (1991) 1 Cal.App.4th 1013 [2 Cal.Rptr.2d 648], the court held that a proposed ordinance that would have repealed existing ordinances relating to gay rights and required voter approval for any future ordinances on the subject was invalid under the rational basis equal protection standard, and thus found no need to determine whether heightened scrutiny should be applied. (1 Cal.App.4th at p. 1026, fn. 8.) In *Children's Hospital & Medical Center v. Bonta´* (2002) 97 Cal.App.4th 740, 769 [118 Cal.Rptr.2d 629], the appellate court, in dicta, referred in an off-hand comment to "suspect classifications, such as race or sexual orientation," but the court cited no authority addressing

the California Constitution's equal protection clause and that statutes that treat persons differently because of their sexual orientation should be subjected to strict scrutiny under this constitutional provision.

In addressing this issue, the majority in the Court of Appeal stated: "For a statutory classification to be considered 'suspect' for equal protection purposes, generally three requirements must be met. The defining characteristic must (1) be based upon an 'immutable trait'; (2) 'bear[] no relation to [a person's] ability to perform or contribute to society'; and (3) be associated with a 'stigma of inferiority and second class citizenship,' manifested by the group's history of legal and social disabilities. (*Sail'er Inn, Inc. v. Kirby, supra*, 5 Cal.3d at pp. 18–19.) While the latter two requirements would seem to be readily satisfied in the case of gays and lesbians, the first is more controversial." Concluding that "whether sexual orientation is immutable presents a factual question" as to which an adequate record had not been presented in the trial court, the Court of Appeal ultimately held that "[l]acking guidance from our Supreme Court or decisions from our sister Courts of Appeal," the court would review the marriage statutes under the rational basis, rather than the strict scrutiny, standard.

Past California cases fully support the Court of Appeal's conclusion that sexual orientation is a characteristic (1) that bears no relation to a person's ability to perform or contribute to society (see, e.g., *Gay Law Students, supra*, 24 Cal.3d 458, 488), and (2) that is associated with a stigma of inferiority and second-class citizenship, manifested by the group's history of legal and social disabilities. (See, e.g., *People v. Garcia* (2000) 77 Cal.App.4th 1269 [92 Cal.Rptr.2d 339] ["Lesbians and gay men . . . share a history of persecution comparable to that of Blacks and women." (*id.* at p. 1276); "Outside of racial and religious minorities, we can think of no group which has suffered such 'pernicious and sustained hostility' [citation], and such 'immediate and severe opprobrium' [citation] as homosexuals." (*id.* at p. 1279)].)

We disagree, however, with the Court of Appeal's conclusion that it is appropriate to reject sexual orientation as a suspect classification, in applying the California Constitution's equal protection clause, on the ground that there is a question as to whether this characteristic is or is not "immutable." Although we noted in *Sail'er Inn, supra*, 5 Cal.3d 1, that generally a person's gender is viewed as an immutable trait (*id.* at p. 18), immutability is not invariably required in order for a characteristic to be considered a suspect classification for equal protection purposes. California cases establish that a person's religion is a suspect classification for equal protection purposes (see, e.g., *Owens v. City of Signal Hill* (1984) 154 Cal.App.3d 123, 128 [201

the question whether sexual orientation is a suspect classification, and this brief reference clearly was not intended to have (and does not have) any precedential significance.

Cal.Rptr. 70]; *Williams v. Kapilow & Son, Inc.* (1980) 105 Cal.App.3d 156, 161–162 [164 Cal.Rptr. 176]), and one's religion, of course, is not immutable but is a matter over which an individual has control. (See also *Raffaelli v. Committee of Bar Examiners* (1972) 7 Cal.3d 288, 292 [101 Cal.Rptr. 896, 496 P.2d 1264] [alienage treated as a suspect classification notwithstanding circumstance that alien can become a citizen].) Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment. (Accord, *Hernandez-Montiel v. I.N.S.* (9th Cir. 2000) 225 F.3d 1084, 1093 ["[s]exual orientation and sexual identity . . . are so fundamental to one's identity that a person should not be required to abandon them"]; *Egan v. Canada, supra,* 2 S.C.R. 513, 528 ["whether or not sexual orientation is based on biological or physiological factors, which may be a matter of some controversy, it is a deeply personal characteristic that is either unchangeable or changeable only at unacceptable personal costs . . .".)

In his briefing before this court, the Attorney General does not maintain that sexual orientation fails to satisfy the three requirements for a suspect classification discussed by the Court of Appeal, but instead argues that a *fourth* requirement should be imposed before a characteristic is considered a constitutionally suspect basis for classification for equal protection purposes—namely, that "a 'suspect' classification is appropriately recognized only for minorities who are unable to use the political process to address their needs." The Attorney General's brief asserts that "[s]ince the gay and lesbian community in California is obviously able to wield political power in defense of its interests, this Court should not hold that sexual orientation constitutes a suspect classification."

▓▓▓ Although some California decisions in discussing suspect classifications have referred to a group's "political powerlessness" (see, e.g., *Raffaelli v. Committee of Bar Examiners, supra,* 7 Cal.3d 288, 292), our cases have not identified a group's *current* political powerlessness as a necessary *prerequisite* for treatment as a suspect class.[62] Indeed, if a group's *current* political powerlessness were a prerequisite to a characteristic's being considered a

---

[62] In *Bowens v. Superior Court* (1991) 1 Cal.4th 36, 42 [2 Cal.Rptr.2d 376, 820 P.2d 600], in discussing the factors that are relevant under the federal equal protection clause to the issue of suspect classification, the court explained: "The determination of whether a suspect class exists focuses on whether '[t]he system of alleged discrimination and the class it defines have [any] of the traditional indicia of suspectness: [such as a class] saddled with such disabilities, *or* subjected to such a history of purposeful unequal treatment, *or* relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" (Quoting *San Antonio School District v. Rodriguez* (1973) 411 U.S. 1, 28 [36 L.Ed.2d 16, 93 S.Ct. 1278], bracketed material added in *Bowens,* italics added.)

constitutionally suspect basis for differential treatment, it would be impossible to justify the numerous decisions that continue to treat sex, race, and religion as suspect classifications.[63] Instead, our decisions make clear that the most important factors in deciding whether a characteristic should be considered a constitutionally suspect basis for classification are whether the class of persons who exhibit a certain characteristic historically has been subjected to invidious and prejudicial treatment, and whether society now recognizes that the characteristic in question generally bears no relationship to the individual's ability to perform or contribute to society. Thus, "courts must look closely at classifications based on that characteristic lest *outdated* social stereotypes result in invidious laws or practices." (*Sail'er Inn, supra*, 5 Cal.3d 1, 18, italics added; see, e.g., *Arp v. Workers' Comp. Appeals Bd., supra*, 19 Cal.3d 395, 404–406.) This rationale clearly applies to statutory classifications that mandate differential treatment on the basis of sexual orientation.

In sum, we conclude that statutes imposing differential treatment on the basis of sexual orientation should be viewed as constitutionally suspect under the California Constitution's equal protection clause.

The Attorney General argues that even if sexual orientation is viewed as a suspect classification and statutes that classify persons on such a basis are subject to heightened review, this court should apply an intermediate scrutiny standard of review (comparable to the standard applied by the United States Supreme Court to discriminatory classifications based on sex or illegitimacy (see *Clark v. Jeter, supra*, 486 U.S. 456, 461)), rather than strict scrutiny, to statutes that draw distinctions between persons on the basis of their sexual orientation.[64] In enforcing the California Constitution's equal protection clause, however, past California cases have not applied an intermediate scrutiny standard of review to classifications involving any suspect (or quasi-suspect) characteristic. Unlike decisions applying the federal equal protection clause, California cases continue to review, under strict scrutiny rather than intermediate scrutiny, those statutes that impose differential treatment on the basis of sex or gender. (See, e.g., *Catholic Charities of Sacramento, Inc. v. Superior Court, supra*, 32 Cal.4th 527, 564; see also

---

[63] In *Frontiero v. Richardson* (1973) 411 U.S. 677, 687–688 [36 L.Ed.2d 583, 93 S.Ct. 1764], the lead opinion of Justice Brennan pointed to the enactment of laws prohibiting sex discrimination as confirming that a class of individuals had been subjected to widespread discrimination in the past and thus as supporting the need for heightened judicial scrutiny of statutory provisions that impose differential treatment on the basis of such a characteristic.

[64] In describing its intermediate scrutiny standard in *Clark v. Jeter, supra*, 486 U.S. 456, 461, the high court explained: "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." By contrast, under the strict scrutiny standard, the state bears the burden of demonstrating that the disparate treatment imposed by a statute is *necessary* to serve a *compelling* state interest. (See, e.g., *Hernandez, supra*, 41 Cal.4th 279, 299.)

*Darces v. Woods* (1984) 35 Cal.3d 871, 888–893 [201 Cal.Rptr. 807, 679 P.2d 458] [applying strict scrutiny rather than the intermediate scrutiny standard that was applied in a related federal decision].)

There is no persuasive basis for applying to statutes that classify persons on the basis of the suspect classification of sexual orientation a standard less rigorous than that applied to statutes that classify on the basis of the suspect classifications of gender, race, or religion. Because sexual orientation, like gender, race, or religion, is a characteristic that frequently has been the basis for biased and improperly stereotypical treatment and that generally bears no relation to an individual's ability to perform or contribute to society, it is appropriate for courts to evaluate with great care and with considerable skepticism any statute that embodies such a classification. The strict scrutiny standard therefore is applicable to statutes that impose differential treatment on the basis of sexual orientation.

## C

Plaintiffs additionally contend that the strict scrutiny standard applies here not only because the statutes in question impose differential treatment between individuals on the basis of the suspect classification of sexual orientation, but also because the classification drawn by the statutes impinges upon a same-sex couple's fundamental, constitutionally protected privacy interest, creating unequal and detrimental consequences for same-sex couples and their children.

As discussed above (*ante,* at pp. 830–831), one of the core elements embodied in the state constitutional right to marry is the right of an individual and a couple to have their own official family relationship accorded respect and dignity equal to that accorded the family relationship of other couples. Even when the state affords substantive legal rights and benefits to a couple's family relationship that are comparable to the rights and benefits afforded to other couples, the state's assignment of a different name to the couple's relationship poses a risk that the different name itself will have the effect of denying such couple's relationship the equal respect and dignity to which the couple is constitutionally entitled. Plaintiffs contend that in the present context, the different nomenclature prescribed by the current California statutes properly must be understood as having just such a constitutionally suspect effect.

We agree with plaintiffs' contention in this regard. Although in some contexts the establishment of separate institutions or structures to remedy the past denial of rights or benefits has been found to be constitutionally

permissible,[65] and although it may be possible to conceive of some circumstances in which assignment of the name "marriage" to one category of family relationship and of a name other than marriage to another category of family relationship would not likely be stigmatizing or raise special constitutional concerns,[66] for a number of reasons we conclude that in the present context, affording same-sex couples access only to the separate institution of domestic partnership, and denying such couples access to the established institution of marriage, properly must be viewed as impinging upon the right of those couples to have their family relationship accorded respect and dignity equal to that accorded the family relationship of opposite-sex couples.

■ First, because of the long and celebrated history of the term "marriage" and the widespread understanding that this term describes a union unreservedly approved and favored by the community, there clearly is a considerable and undeniable symbolic importance to this designation. Thus, it is apparent that affording access to this designation exclusively to opposite-sex couples, while providing same-sex couples access to only a novel alternative designation, realistically must be viewed as constituting significantly unequal treatment to same-sex couples. In this regard, plaintiffs persuasively invoke by analogy the decisions of the United States Supreme Court finding inadequate a state's creation of a separate law school for Black students rather than granting such students access to the University of Texas Law School (*Sweatt v. Painter* (1950) 339 U.S. 629, 634 [94 L.Ed. 1114, 70 S.Ct. 848]),[67] and a state's founding of a separate military program for women rather than admitting women to the Virginia Military Institute (*United*

---

[65] For example, the establishment and maintenance of separate women's collegiate athletic teams to address the long-standing discrimination against women in the allocation of athletic resources has been found to be constitutionally valid. (See, e.g., *O'Connor v. Bd. of Ed. of School Dist. No. 23* (7th Cir. 1981) 645 F.2d 578, 582; *Force by Force v. Pierce City R-VI School Dist.* (W.D.Mo. 1983) 570 F.Supp. 1020, 1026.) Courts similarly have held it is constitutionally permissible for a state to remedy the constitutional problem resulting from the inability of indigent criminal defendants to retain counsel by establishing a separate public defender's office through which such defendants are represented by government-selected attorneys, instead of by providing funds to such defendants with which they can obtain their own self-selected attorneys. (See, e.g., *People v. Miller* (1972) 7 Cal.3d 562, 574 [102 Cal.Rptr. 841, 498 P.2d 1089]; *People v. Hughes* (1961) 57 Cal.2d 89, 97–99 [17 Cal.Rptr. 617, 367 P.2d 33].)

[66] One such conceivable (albeit unlikely) example would be a statutory scheme that designated all formal family unions as a "marriage" during the first five years of the union's existence, and thereafter renamed the relationship, for official purposes, as an "enduring union," and provided additional benefits to the couple for so long as the enduring union remained intact. In this setting, the withholding of the official designation "marriage" to all long-term formal relationships would not appear to be stigmatizing or necessarily to warrant, in itself, application of the strict scrutiny standard.

[67] In *Sweatt v. Painter, supra,* 339 U.S. 629, the high court stated in this regard: "What is more important, the University of Texas Law School possesses to a far greater degree those qualities which are incapable of objective measurement [such as] . . . standing in the

*States v. Virginia* (1996) 518 U.S. 515, 555–556 [135 L.Ed.2d 735, 116 S.Ct. 2264]). As plaintiffs maintain, these high court decisions demonstrate that even when the state grants ostensibly equal benefits to a previously excluded class through the creation of a new institution, the intangible symbolic differences that remain often are constitutionally significant.

■ Second, particularly in light of the historic disparagement of and discrimination against gay persons, there is a very significant risk that retaining a distinction in nomenclature with regard to this most fundamental of relationships whereby the term "marriage" is denied only to same-sex couples inevitably will cause the new parallel institution that has been made available to those couples to be viewed as of a lesser stature than marriage and, in effect, as a mark of second-class citizenship. As the Canada Supreme Court observed in an analogous context: "One factor which may demonstrate that legislation that treats the claimant differently has the effect of demeaning the claimant's dignity is the existence of pre-existing disadvantage, stereotyping, prejudice, or vulnerability experienced by the individual or group at issue. . . . [¶] '. . . It is logical to conclude that, in most cases, further differential treatment will contribute to the perpetuation or promotion of their unfair social characterization, and will have a more severe impact upon them, since they are already vulnerable.' " (*M. v. H.* [1999] 2 S.C.R. 3, 54–55 [¶ 68].)

Third, it also is significant that although the meaning of the term "marriage" is well understood by the public generally, the status of domestic partnership is not. While it is true that this circumstance may change over time, it is difficult to deny that the unfamiliarity of the term "domestic partnership" is likely, for a considerable period of time, to pose significant difficulties and complications for same-sex couples, and perhaps most poignantly for their children, that would not be presented if, like opposite-sex couples, same-sex couples were permitted access to the established and well-understood family relationship of marriage. (See generally N.J. Civil Union Review Com., First Interim Rep. (Feb. 19, 2008) pp. 6–18 <http://www.nj.gov/oag/dcr/downloads/1st-InterimReport-CURC.pdf> [as of May 15, 2008].)

■ Under these circumstances, we conclude that the distinction drawn by the current California statutes between the designation of the family relationship available to opposite-sex couples and the designation available to same-sex couples impinges upon the fundamental interest of same-sex

community, traditions and prestige. It is difficult to believe that one who had a free choice between these law schools would consider the question close." (339 U.S. at p. 634.)

couples in having their official family relationship accorded dignity and respect equal to that conferred upon the family relationship of opposite-sex couples.

In addition, plaintiffs' briefs disclose a further way in which the different designations established by the current statutes impinge upon the constitutionally protected privacy interest of same-sex couples. Plaintiffs point out that one consequence of the coexistence of two parallel types of familial relationships is that—in the numerous everyday social, employment, and governmental settings in which an individual is asked whether he or she "is married or single"—an individual who is a domestic partner and who accurately responds to the question by disclosing that status will (as a realistic matter) be disclosing his or her homosexual orientation, even if he or she would rather not do so under the circumstances and even if that information is totally irrelevant in the setting in question.[68] Because the constitutional right of privacy ordinarily would protect an individual from having to disclose his or her sexual orientation under circumstances in which that information is irrelevant (see, e.g., *People v. Garcia, supra*, 77 Cal.App.4th 1269, 1280; *Urbaniak v. Newton* (1991) 226 Cal.App.3d 1128, 1140–1141 [277 Cal.Rptr. 354]), the existence of two separate family designations—one available only to opposite-sex couples and the other to same-sex couples—impinges upon this privacy interest, and may expose gay individuals to detrimental treatment by those who continue to harbor prejudices that have been rejected by California society at large.

For all of these reasons, we conclude that the classifications and differential treatment embodied in the relevant statutes significantly impinge upon the fundamental interests of same-sex couples, and accordingly provide a further reason requiring that the statutory provisions properly be evaluated under the strict scrutiny standard of review.

### D

As already explained, in circumstances, as here, in which the strict scrutiny standard of review applies, the state bears a heavy burden of justification. In order to satisfy that standard, the state must demonstrate not simply that there is a rational, constitutionally legitimate interest that supports the differential treatment at issue, but instead that the state interest is a *constitutionally compelling* one that justifies the disparate treatment prescribed by the statute in question. (See, e.g., *Darces v. Woods, supra*, 35 Cal.3d

---

[68] Although the disclosure that an individual is a registered domestic partner does not *necessarily* mean that he or she is in a same-sex relationship, because opposite-sex couples comprised of at least one partner who is more than 62 years of age may register as domestic partners, in most instances the revelation that one is a domestic partner will be understood (accurately) to signify that the individual is gay.

871, 893–895.) Furthermore, unlike instances in which the rational basis test applies, the state does not meet its burden of justification under the strict scrutiny standard merely by showing that the classification established by the statute is rationally or reasonably related to such a compelling state interest. Instead, the state must demonstrate that the distinctions drawn by the statute (or statutory scheme) are *necessary* to further that interest. (See, e.g., *Ramirez v. Brown* (1973) 9 Cal.3d 199, 207–212 [107 Cal.Rptr. 137, 507 P.2d 1345].)

In the present case, the question before us is whether the state has a constitutionally *compelling* interest in reserving the designation of marriage only for opposite-sex couples and excluding same-sex couples from access to that designation, and whether this statutory restriction is *necessary* to serve a compelling state interest. In their briefing before this court, various defendants have advanced different contentions in support of the current statutes, and we discuss each of these arguments.

The Proposition 22 Legal Defense Fund and the Campaign initially contend that retention of the traditional definition of marriage not only constitutes a compelling state interest, but that the Legislature (and the people in adopting an initiative statute) had no choice but to retain this definition, because according to these defendants the California Constitution itself mandates this limitation on the meaning of the term "marriage." The Fund and the Campaign assert that the common law definition of marriage as the union of a man and a woman is enshrined in the California Constitution by virtue of language in the 1849 and 1879 Constitutions that employed the terms "marriage," "wife," and "husband" in providing constitutional protection for separate-property rights,[69] thereby precluding the Legislature or the people through the statutory initiative power from modifying the current statutes to permit same-sex couples to marry. There is no indication, however, that the constitutional provisions were intended to place the common law understanding of marriage beyond legislative control (see *Dow v. Gould & Curry Silver Mining Co.* (1867) 31 Cal. 629, 640 ["the laws in force at the

---

[69] As set forth *ante*, at pages 792–793, footnote 12, article XI, section 14 of the California Constitution of 1849 provided in full: "All property, both real and personal, of the wife, owned or claimed by marriage, and that acquired afterwards by gift, devise, or descent, shall be her separate property; and laws shall be passed more clearly defining the rights of the wife, in relation as well to her separate property, as to that held in common with her husband. Laws shall also be passed providing for the registration of the wife's separate property."

Article XX, section 8 of the California Constitution of 1879 contained a similar provision, stating: "All property, real and personal, owned by either husband or wife before marriage, and that acquired by either of them afterwards by gift, devise, or descent, shall be their separate property."

The current analogous provision of the California Constitution is contained in article I, section 21, and since 1970 has provided: "Property owned before marriage or acquired during marriage by gift, will, or inheritance is separate property."

time of the adoption of the Constitution were continued in force until altered or repealed by the Legislature . . ."]), and throughout this state's history the Legislature, of course, has effected numerous fundamental changes in the institution of marriage, dramatically altering its nature from how it existed at common law. As discussed above, because section 308.5 is an initiative statute, any action by the Legislature redefining marriage to include same-sex couples would require a confirming vote of approval by the electorate (see, *ante*, at pp. 797–801), but the California Constitution imposes no constitutional bar to a legislative revision of the marriage statutes consistent with the requirement of voter approval. (Accord, *In re Mana* (1918) 178 Cal. 213, 214–216 [172 P. 986] [holding that a statute authorizing women to sit as jurors did not violate the defendant's constitutional right to trial by jury, even though, at common law, a jury was composed only of men].)

In contrast to the position advanced by the Proposition 22 Legal Defense Fund and the Campaign, the Attorney General and the Governor recognize that the California Constitution does not define or limit the marriage relationship to a union of a man and a woman. These officials acknowledge that the Legislature (consistent with the constitutional limitations imposed by the initiative provisions) or the people (through the exercise of the initiative power) have the authority to revise the current marriage statutes to permit same-sex couples to marry. The Attorney General and the Governor maintain, however, that because the institution of marriage traditionally (both in California and throughout most of the world) has been limited to a union between a man and a woman, any change in that status necessarily is a matter solely for the legislative process. Thus, they suggest that the separation-of-powers doctrine precludes a court from modifying the traditional definition of marriage.

Although, as noted at the outset of this opinion (*ante*, at p. 780), we agree with the Attorney General and the Governor that the separation-of-powers doctrine precludes a court from "redefining" marriage on the basis of the court's view that public policy or the public interest would be better served by such a revision, we disagree with the Attorney General and the Governor to the extent they suggest that the traditional or long-standing nature of the current statutory definition of marriage *exempts* the statutory provisions embodying that definition *from the constraints imposed by the California Constitution*, or that the separation-of-powers doctrine precludes a court from determining that constitutional question. On the contrary, under "the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve" (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53 [51 Cal.Rptr.2d 837, 913 P.2d 1046]), a court has an *obligation* to enforce the limitations that the California Constitution imposes upon legislative measures, and a court would shirk the

responsibility it owes to each member of the public were it to consider such statutory provisions to be insulated from judicial review.

■ As Chief Justice Poritz of the New Jersey Supreme Court observed in her concurring and dissenting opinion in *Lewis v. Harris, supra,* 908 A.2d 196: "Perhaps the political branches will right the wrong presented in this case by amending the marriage statutes to recognize fully the fundamental right of same-sex couples to marry. That possibility does not relieve this Court of its responsibility to decide constitutional questions, no matter how difficult. . . . [¶] The question of access to civil marriage by same-sex couples 'is not a matter of social policy but of constitutional interpretation.' [Citation.] It is a question for this Court to decide." (*Id.* at pp. 230–231 (conc. & dis. opn. of Poritz, C. J.).) As noted generally by Professor Jesse Choper, "the Court should review individual rights questions, unabated by its judgment about whether a particular result will be subject to criticism, hostility, or disobedience." (Choper, Judicial Review and the National Political Process: A Functional Reconsideration of the Role of the Supreme Court (1980) p. 167.)

The circumstance that in the present instance the statutory limitation upon who may enter into the marriage relationship is contained in statutory provisions that may be viewed as defining the marriage relationship, rather than, for example, in a separate statutory provision stating that a marriage between persons of the same sex is void, does not render this aspect of the statutory scheme immune from constitutional constraints. The statutory provisions prohibiting interracial marriage at issue in *Perez, supra,* 32 Cal.2d 711, would not have been exempt from, or subject to a more deferential, constitutional scrutiny had the relevant statutes in that case defined marriage as a union between two persons of the same race, rather than providing that an interracial marriage was void. The form in which a statutory limitation or prohibition on marriage is set forth does not justify different constitutional treatment or preclude judicial review.

Furthermore, history belies the notion that any element that traditionally has been viewed as an integral or definitional feature of marriage constitutes an impermissible subject of judicial scrutiny. Many examples exist of legal doctrines that once were viewed as central components of the civil institution of marriage—such as the doctrine of coverture under which the wife's legal identity was treated as merged into that of her husband, whose property she became, or the doctrine of recrimination which significantly limited the circumstances under which a marriage could be legally terminated, or the numerous legal rules based upon the differing roles historically occupied by a man and by a woman in the marriage relationship and in family life generally. Courts have not hesitated to subject such legal doctrines to judicial scrutiny when the fairness or continuing validity of the doctrine or rule was challenged, on occasion ultimately modifying or invalidating it as a result of such

judicial scrutiny. (See, e.g., Stone, The Family, Sex and Marriage in England 1500–1800 (1979) p. 221 [coverture]; *De Burgh v. De Burgh, supra,* 39 Cal.2d 858 [recrimination]; *Arp v. Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 395 [assumption of dependent nature of wife but not husband]; *Kirchberg v. Feenstra* (1981) 450 U.S. 455 [67 L.Ed.2d 428. 101 S.Ct. 1195] [control over community property].) Accordingly, we reject the contention that the separation-of-powers doctrine renders judicial scrutiny improper because the statutory provisions in question embody an integral aspect of the definition of marriage.

By the same token, the circumstance that the limitation of marriage to a union between a man and a woman embodied in section 308.5 was enacted as an initiative measure by a vote of the electorate similarly neither exempts the statutory provision from constitutional scrutiny nor justifies a more deferential standard of review. Although California decisions consistently and vigorously have safeguarded the right of voters to exercise the authority afforded by the initiative process (see, e.g., *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473]), our past cases at the same time uniformly establish that initiative measures adopted by the electorate are subject to the same constitutional limitations that apply to statutes adopted by the Legislature, and our courts have not hesitated to invalidate measures enacted through the initiative process when they run afoul of constitutional guarantees provided by either the federal or California Constitution.

For example, in *Mulkey v. Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825], affd. *sub nom. Reitman v. Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627], this court invalidated, as violative of federal equal protection principles, a state initiative measure that purported to overturn recently enacted state laws prohibiting racial discrimination in housing. Although the dissenting justices in that case referred repeatedly to the circumstance that the measure at issue had been adopted by a vote of the people under the initiative power (see 64 Cal.2d at pp. 546, 553, 559 (dis. opn. of White, J.); *id.* at p. 559 (dis. opn. of McComb, J.))—and, indeed, noted that the electorate's approval had been "[b]y an overwhelming margin of popular votes" (*id.* at p. 553 (dis. opn. of White, J.))—the majority nonetheless clearly explained that the governing constitutional principles require that an initiative measure "like any other state law, conform to federal constitutional standards before it may be enforced against persons who are entitled to protection under that Constitution." (*Id.* at p. 533; see also *Romer v. Evans* (1996) 517 U.S. 620 [134 L.Ed.2d 855, 116 S.Ct. 1620] [invalidating, as violative of the federal equal protection clause, a provision of the Colorado Constitution, adopted in a statewide referendum, that barred any municipality from enacting or enforcing any policy prohibiting discrimination on the basis of sexual orientation].) Similarly, in *Legislature v. Deukmejian* (1983) 34

Cal.3d 658 [194 Cal.Rptr. 781, 669 P.2d 17], this court held that a proposed reapportionment initiative measure was invalid under a state constitutional provision limiting legislative reapportionment to a single, valid, once-a-decade redistricting, emphasizing the "elementary principle" that "[a] statutory initiative is subject to the same state and federal constitutional limitations as are the Legislature and the statutes which it enacts." (*Id.* at p. 674.) (See also, e.g., *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 831–837 [258 Cal.Rptr. 161, 771 P.2d 1247] [invalidating, as violative of state constitutional provision prohibiting the designation of a named private corporation to perform any function, a section of an insurance reform initiative that created a nonprofit consumer advocacy corporation]; *Hays v. Wood* (1979) 25 Cal.3d 772, 786–795 [160 Cal.Rptr. 102, 603 P.2d 19] [invalidating, under federal and state equal protection principles, portions of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.), an initiative statute adopted by the voters]; *Weaver v. Jordan* (1966) 64 Cal.2d 235, 238–249 [49 Cal.Rptr. 537, 411 P.2d 289] [invalidating, as violative of the free speech provisions of the state and federal Constitutions, an initiative measure imposing a statewide ban on the business of home subscription television].)

Although defendants maintain that this court has an obligation to defer to the statutory definition of marriage contained in section 308.5 because that statute—having been adopted through the initiative process—represents the expression of the "people's will," this argument fails to take into account the very basic point that the provisions of the California Constitution itself constitute the ultimate expression of the people's will, and that the fundamental rights embodied within that Constitution for the protection of all persons represent restraints that the people themselves have imposed upon the statutory enactments that may be adopted either by their elected representatives or by the voters through the initiative process. As the United States Supreme Court explained in *Board of Education v. Barnette* (1943) 319 U.S. 624, 638 [87 L.Ed. 1628, 63 S.Ct. 1178]: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."

Indeed, Chief Justice Burger made the same point for a majority of the United States Supreme Court in *Citizens Against Rent Control v. Berkeley* (1981) 454 U.S. 290 [70 L.Ed.2d 492, 102 S.Ct. 434], observing emphatically that "[i]t is *irrelevant* that the voters rather than a legislative body enacted [the challenged law], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." (*Id.* at p. 295, italics added.) Accordingly, the circumstance that

the electorate voted in favor of retaining the traditional definition of marriage does not exempt the statutory limitation from constitutional review, nor does it demonstrate that the voters' objective represents a constitutionally compelling state interest for purposes of equal protection principles.

In defending the state's proffered interest in retaining the traditional definition of marriage as limited to a union between a man and a woman, the Attorney General and the Governor rely primarily upon the historic and well-established nature of this limitation and the circumstance that the designation of marriage continues to apply only to a relationship between opposite-sex couples in the overwhelming majority of jurisdictions in the United States and around the world.[70] Because, until recently, there has been widespread societal disapproval and disparagement of homosexuality in many cultures, it is hardly surprising that the institution of civil marriage generally has been limited to opposite-sex couples and that many persons have considered the designation of marriage to be appropriately applied only to a relationship of an opposite-sex couple.

 Although the understanding of marriage as limited to a union of a man and a woman is undeniably the predominant one, if we have learned anything from the significant evolution in the prevailing societal views and official policies toward members of minority races and toward women over the past half-century, it is that even the most familiar and generally accepted

---

[70] At this time, only six jurisdictions (Massachusetts and five foreign nations—Canada, South Africa, the Netherlands, Belgium, and Spain) authorize same-sex couples to marry. Of these six jurisdictions, three (Massachusetts, Canada, and South Africa) arrived at that position through judicial decision (*Goodridge v. Department of Public Health, supra,* 798 N.E.2d 941; *Halpern v. Canada* (Ont.Ct.App. 2003) 65 O.R.3d 161; *EGALE Canada, Inc. v. Canada* (B.C.Ct.App. 2003) 225 D.L.R.4th 472; *Hendricks v. Quebec* (Que.Super.Ct. 2002) R.J.Q. 2506; *Minister of Home Affairs v. Fourie* (S.Afr.Const.Ct. 2006) (3) BCLR 355), and three (the Netherlands, Belgium, and Spain) adopted that position legislatively, without compulsion or direction from a judicial decision. (Netherlands: Civ. code, art. 30 [as amended Dec. 21, 2000]; Belgium: Civ. code, art. 143 [as amended Feb. 13, 2003]; Spain: Civ. code, art. 44 [as amended by law 13/2005, July 1, 2005].) In Canada and South Africa, after the judiciary invalidated marriage statutes limiting marriage to opposite-sex couples, the legislative branch enacted laws complying with the judicial decisions. (Canada: Civil Marriage Act, 2005 S.C., ch. 33; South Africa: Civil Union Act, 2006 (art. No. 17 of 2006).)

Although to date the Supreme Judicial Court of Massachusetts is the only state high court in this nation to have found a statute limiting marriage to opposite-sex couples violative of its state constitution, we note that in each of the other instances in which a state high court has addressed this issue in recent years, each decision rejecting the constitutional challenge was determined by a divided court, frequently by a one-vote margin. (See, e.g., *Conaway v. Deane, supra,* 932 A.2d 571 [Md.; four-to-three decision]; *Hernandez v. Robles, supra,* 855 N.E.2d 1 [N.Y.; four-to-two decision]; *Andersen v. King County, supra,* 138 P.3d 963 [Wn.; five-to-four decision]; see also *Lewis v. Harris, supra,* 908 A.2d 196 [N.J.; court unanimously concluded that same-sex couples are constitutionally entitled to the rights and benefits of marriage, and three of the seven justices further concluded that denying such couples the designation of marriage necessarily would violate the state constitution].)

of social practices and traditions often mask an unfairness and inequality that frequently is not recognized or appreciated by those not directly harmed by those practices or traditions. It is instructive to recall in this regard that the traditional, well-established legal rules and practices of our not-so-distant past (1) barred interracial marriage,[71] (2) upheld the routine exclusion of women from many occupations and official duties, and (3) considered the relegation of racial minorities to separate and assertedly equivalent public facilities and institutions as constitutionally equal treatment. As the United States Supreme Court observed in its decision in *Lawrence v. Texas, supra,* 539 U.S. 558, 579, the expansive and protective provisions of our constitutions, such as the due process clause, were drafted with the knowledge that "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." For this reason, the interest in retaining a tradition that excludes a historically disfavored minority group from a status that is extended to all others—even when the tradition is long-standing and widely shared—does not necessarily represent a compelling state interest for purposes of equal protection analysis.

 After carefully evaluating the pertinent considerations in the present case, we conclude that the state interest in limiting the designation of marriage exclusively to opposite-sex couples, and in excluding same-sex couples from access to that designation, cannot properly be considered a compelling state interest for equal protection purposes. To begin with, the limitation clearly is not necessary to preserve the rights and benefits of marriage currently enjoyed by opposite-sex couples. Extending access to the designation of marriage to same-sex couples will not deprive any opposite-sex couples or their children of any of the rights and benefits conferred by the marriage statutes, but simply will make the benefit of the marriage designation available to same-sex couples and their children. As Chief Judge Kaye of the New York Court of Appeals succinctly observed in her dissenting opinion in *Hernandez v. Robles, supra,* 855 N.E.2d 1, 30 (dis. opn. of Kaye, C. J.): "There are enough marriage licenses to go around for everyone." Further, permitting same-sex couples access to the designation of marriage will not alter the substantive nature of the legal institution of marriage; same-sex couples who choose to enter into the relationship with that designation will be subject to the same duties and obligations to each other, to their children, and to third parties that the law currently imposes upon opposite-sex couples who marry. Finally, affording same-sex couples the opportunity to obtain the designation of marriage will not impinge upon the religious freedom of any religious

---

[71] This court's 1948 decision in *Perez, supra,* 32 Cal.2d 711, was the first judicial decision to hold that a statute prohibiting interracial marriage was unconstitutional. It was not until nearly 20 years later, in 1967, that the United States Supreme Court reached the same conclusion in *Loving v. Virginia, supra,* 388 U.S. 1, striking down a comparable Virginia statute.

organization, official, or any other person; no religion will be required to change its religious policies or practices with regard to same-sex couples, and no religious officiant will be required to solemnize a marriage in contravention of his or her religious beliefs. (Cal. Const., art. I, § 4.)[72]

While retention of the limitation of marriage to opposite-sex couples is not needed to preserve the rights and benefits of opposite-sex couples, the exclusion of same-sex couples from the designation of marriage works a real and appreciable harm upon same-sex couples and their children. As discussed above, because of the long and celebrated history of the term "marriage" and the widespread understanding that this word describes a family relationship unreservedly sanctioned by the community, the statutory provisions that continue to limit access to this designation exclusively to opposite-sex couples—while providing only a novel, alternative institution for same-sex couples—likely will be viewed as an official statement that the family relationship of same-sex couples is not of comparable stature or equal dignity to the family relationship of opposite-sex couples. Furthermore, because of the historic disparagement of gay persons, the retention of a distinction in nomenclature by which the term "marriage" is withheld only from the family relationship of same-sex couples is all the more likely to cause the new parallel institution that has been established for same-sex couples to be considered a mark of second-class citizenship. Finally, in addition to the potential harm flowing from the lesser stature that is likely to be afforded to the family relationships of same-sex couples by designating them domestic partnerships, there exists a substantial risk that a judicial decision upholding the differential treatment of opposite-sex and same-sex couples would be understood as *validating* a more general proposition that our state by now has repudiated: that it is permissible, under the law, for society to treat gay individuals and same-sex couples differently from, and less favorably than, heterosexual individuals and opposite-sex couples.

In light of all of these circumstances, we conclude that retention of the traditional definition of marriage does not constitute a state interest sufficiently compelling, under the strict scrutiny equal protection standard, to justify withholding that status from same-sex couples. Accordingly, insofar as

---

[72] Contrary to the contention of the Proposition 22 Legal Defense Fund and the Campaign, the distinction in nomenclature between marriage and domestic partnership cannot be defended on the basis of an asserted difference in the effect on children of being raised by an opposite-sex couple instead of by a same-sex couple. Because the governing California statutes permit same-sex couples to adopt and raise children and additionally draw no distinction between married couples and domestic partners with regard to the legal rights and responsibilities relating to children raised within each of these family relationships, the asserted difference in the effect on children does not provide a justification for the differentiation in nomenclature set forth in the challenged statutes.

the provisions of sections 300 and 308.5 draw a distinction between opposite-sex couples and same-sex couples and exclude the latter from access to the designation of marriage, we conclude these statutes are unconstitutional.[73]

## VI

Having concluded that sections 300 and 308.5 are unconstitutional to the extent each statute reserves the designation of marriage exclusively to opposite-sex couples and denies same-sex couples access to that designation, we must determine the proper remedy.

■ When a statute's differential treatment of separate categories of individuals is found to violate equal protection principles, a court must determine whether the constitutional violation should be eliminated or cured by extending to the previously excluded class the treatment or benefit that the statute affords to the included class, or alternatively should be remedied by withholding the benefit equally from both the previously included class and the excluded class. A court generally makes that determination by considering whether extending the benefit equally to both classes, or instead withholding it equally, would be most consistent with the likely intent of the Legislature, had that body recognized that unequal treatment was constitutionally impermissible. (See, e.g., *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 626–662 [47 Cal.Rptr.2d 108, 905 P.2d 1248]; *Arp v. Workers' Comp. Appeals Bd., supra,* 19 Cal.3d 395, 407–410.)

In the present case, it is readily apparent that extending the designation of marriage to same-sex couples clearly is more consistent with the probable legislative intent than withholding that designation from both opposite-sex couples and same-sex couples in favor of some other, uniform designation. In view of the lengthy history of the use of the term "marriage" to describe the family relationship here at issue, and the importance that both the supporters of the 1977 amendment to the marriage statutes and the electors who voted in favor of Proposition 22 unquestionably attached to the designation of marriage, there can be no doubt that extending the designation of marriage to same-sex couples, rather than denying it to all couples, is the equal protection remedy that is most consistent with our state's general legislative policy and preference.

---

[73] We emphasize that in reaching this conclusion we do not suggest that the current marriage provisions were enacted with an invidious intent or purpose. (Cf. *Hernandez v. Robles, supra,* 855 N.E.2d 1, 8 ["A court should not lightly conclude that everyone who held this belief [that the right to marriage did not extend to same-sex couples] was irrational, ignorant or bigoted."].) We conclude that because of the detrimental effect that such provisions impose on gay individuals and couples on the basis of their sexual orientation, the statutes are inconsistent with the constitutional principles embodied in the California Constitution and accordingly cannot be upheld.

Accordingly, in light of the conclusions we reach concerning the constitutional questions brought to us for resolution, we determine that the language of section 300 limiting the designation of marriage to a union "between a man and a woman" is unconstitutional and must be stricken from the statute, and that the remaining statutory language must be understood as making the designation of marriage available both to opposite-sex and same-sex couples. In addition, because the limitation of marriage to opposite-sex couples imposed by section 308.5 can have no constitutionally permissible effect in light of the constitutional conclusions set forth in this opinion, that provision cannot stand.

Plaintiffs are entitled to the issuance of a writ of mandate directing the appropriate state officials to take all actions necessary to effectuate our ruling in this case so as to ensure that county clerks and other local officials throughout the state, in performing their duty to enforce the marriage statutes in their jurisdictions, apply those provisions in a manner consistent with the decision of this court. Further, as the prevailing parties, plaintiffs are entitled to their costs.

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further action consistent with this opinion.

Kennard, J., Werdegar, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—I write separately to explain how the court's decision here is consistent with *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055 [17 Cal.Rptr.3d 225, 95 P.3d 459] (*Lockyer*), to note *Lockyer*'s effect on marriages of same-sex couples previously performed in this state, and to emphasize my agreement with the Chief Justice that the constitutionality of the marriage laws' exclusion of same-sex couples is an issue particularly appropriate for decision by this court.

As the opening words of the Chief Justice's majority opinion indicate, this case is a continuation of *Lockyer*. There, this court held that local officials had acted unlawfully by issuing gender-neutral marriage licenses to same-sex couples after the officials made a legal determination that depriving same-sex couples of the right to marry was unconstitutional. (*Lockyer, supra*, 33 Cal.4th at pp. 1069, 1104–1105.) Here, this court holds that under the state Constitution's equal protection guarantee, same-sex couples have a right to marry, and that state officials should take all necessary and appropriate steps so that local officials may begin issuing marriage licenses to same-sex couples. (Maj. opn., *ante*, at pp. 855–857.)

From such brief descriptions, these two decisions may appear inconsistent. What this court determined to be unlawful in *Lockyer*, and ordered city

officials to immediately stop doing, is the same action that must now, by virtue of this court's decision here, be recommenced—issuing marriage licenses to couples consisting of either two women or two men. There is no inconsistency, however, in these two decisions. In *Lockyer*, this court did not decide whether the California Constitution's equal protection guarantee affords a right of marriage to same-sex couples. (*Lockyer, supra*, 33 Cal.4th at p. 1069.) Rather, this court decided only that local officials lacked authority to decide the constitutional validity of the state marriage statutes and instead should have submitted that question to the judiciary for resolution. (*Ibid.*) Now that this court has authoritatively and conclusively resolved the underlying constitutional question by holding that state marriage laws are constitutionally invalid insofar as they discriminate on the basis of sexual orientation, the issuance of marriage licenses to same-sex couples is lawful, and indeed constitutionally required.

In *Lockyer*, this court declared void all of the approximately 4,000 marriages performed in San Francisco under the licenses issued to same-sex couples (*Lockyer, supra*, 33 Cal.4th at pp. 1117–1118), and the court here does not undertake any reconsideration of the validity of those marriages. I disagreed with *Lockyer*'s nullification of those marriages. Recognizing that many of the individuals to whom those licenses had been issued had "waited years, sometimes several decades, for a chance to wed, yearning to obtain the public validation that only marriage can give" (*Lockyer, supra*, at p. 1132 (conc. & dis. opn. of Kennard, J.)), I took the position that the validity of those marriages should be determined "after the constitutionality of California laws restricting marriage to opposite-sex couples has been authoritatively resolved through judicial proceedings now pending in the courts of California" (*id.* at p. 1125).

I explained my position in these words: "Whether the issuance of a gender-neutral license to a same-sex couple, in violation of state laws restricting marriage to opposite-sex couples, is a defect that precludes any possibility of a valid marriage may well depend upon resolution of the constitutional validity of that statutory restriction. If the restriction is constitutional, then a marriage between persons of the same sex would be a legal impossibility, and no marriage would ever have existed. But if the restriction violates a fundamental constitutional right, the situation could be quite different. A court might then be required to determine the validity of same-sex marriages that had been performed *before* the laws prohibiting those marriages had been invalidated on constitutional grounds. [¶] When a court has declared a law unconstitutional, questions about the effect of that determination on prior actions, events, and transactions 'are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified.'

(*Chicot County Dist. v. Bank* (1940) 308 U.S. 371, 374 [84 L.Ed. 329, 60 S.Ct. 317]; accord, *Lemon v. Kurtzman* [(1973) 411 U.S. 192,] 198 [36 L.Ed.2d 151, 93 S.Ct. 1463].) This court has acknowledged that, in appropriate circumstances, an unconstitutional statute may be judicially reformed to retroactively extend its benefits to a class that the statute expressly but improperly excluded. (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 624–625 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (lead opn. of Lucas, C. J.), 685 (conc. & dis. opn. of Baxter, J.) [joining in pt. III of lead opn.].) Thus, it is possible, though by no means certain, that if the state marriage laws prohibiting same-sex marriage were held to violate the state Constitution, same-sex marriages performed before that determination could then be recognized as valid." (*Lockyer, supra,* 33 Cal.4th at pp. 1131–1132 (conc. & dis. opn. of Kennard, J.).)

Recognizing that this court's decision in *Lockyer* finally and conclusively invalidated the marriages of same-sex couples performed in San Francisco in 2004, the parties have not asked this court to again address that issue here, and this court has not done so. Nevertheless, in my view, it is important to recognize how today's holding could have affected a decision on the validity of those marriages. In light of our determination here that same-sex couples are entitled under the state Constitution to the same marriage rights as opposite-sex couples, this court—had it in *Lockyer* deferred until now a decision on the validity of the previously performed marriages of same-sex couples—necessarily would have recognized that the defects in those marriages were not substantive (in other words, no *valid* law prohibited the marriages) but rather procedural (the marriages were premature in the sense that they were performed before rather than after a judicial determination of the couples' right to marry), and that the parties to these marriages were attempting in good faith to exercise their rights under the state Constitution. Because of *Lockyer,* however, those marriage ceremonies, performed with great joy and celebration, must remain "empty and meaningless . . . in the eyes of the law." (*Lockyer, supra,* 33 Cal.4th at p. 1132 (conc. & dis. opn. of Kennard, J.).)

The court's opinion, authored by the Chief Justice, carefully and fully explains why the constitutionality of the marriage laws' exclusion of same-sex couples is an issue particularly appropriate for decision by this court, rather than a social or political issue inappropriate for judicial consideration. (See maj. opn., *ante,* at pp. 849–853.) Because of its importance, this point deserves special emphasis.

In holding today that the right to marry guaranteed by the state Constitution may not be withheld from anyone on the ground of sexual orientation, this court discharges its gravest and most important responsibility under our

constitutional form of government. There is a reason why the words "Equal Justice Under Law" are inscribed above the entrance to the courthouse of the United States Supreme Court. Both the federal and the state Constitutions guarantee to all the "equal protection of the laws" (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7), and it is the particular responsibility of the judiciary to enforce those guarantees. The architects of our federal and state Constitutions understood that widespread and deeply rooted prejudices may lead majoritarian institutions to deny fundamental freedoms to unpopular minority groups, and that the most effective remedy for this form of oppression is an independent judiciary charged with the solemn responsibility to interpret and enforce the constitutional provisions guaranteeing fundamental freedoms and equal protection. (See *Davis v. Passman* (1979) 442 U.S. 228, 241 [60 L.Ed.2d 846, 99 S.Ct. 2264] [describing the judiciary as "the primary means" for enforcement of constitutional rights]; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 141 [93 Cal.Rptr. 234, 481 P.2d 242] [stating that, under our constitutional system of checks and balances, "probably the most fundamental [protection] lies in the power of the courts to test legislative and executive acts by the light of constitutional mandate and in particular to preserve constitutional rights, whether of individual or minority, from obliteration by the majority"].)

Here, we decide only the scope of the equal protection guarantee under the state Constitution, which operates independently of the federal Constitution. (See Cal. Const., art. I, § 24 ["Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."].) Absent a compelling justification, our state government may not deny a right as fundamental as marriage to any segment of society. Whether an unconstitutional denial of a fundamental right has occurred is not a matter to be decided by the executive or legislative branch, or by popular vote, but is instead an issue of constitutional law for resolution by the judicial branch of state government. Indeed, this court's decision in *Lockyer* made it clear that the courts alone must decide whether excluding individuals from marriage because of sexual orientation can be reconciled with our state Constitution's equal protection guarantee. (*Lockyer, supra,* 33 Cal.4th at pp. 1068–1069.) The court today discharges its constitutional obligation by resolving that issue.

With these observations, I concur fully in the court's opinion authored by the Chief Justice.

**BAXTER, J.,** Concurring and Dissenting.—The majority opinion reflects considerable research, thought, and effort on a significant and sensitive case, and I actually agree with several of the majority's conclusions. However, I cannot join the majority's holding that the California Constitution gives

same-sex couples a right to marry. In reaching this decision, I believe, the majority violates the separation of powers, and thereby commits profound error.

Only one other American state recognizes the right the majority announces today. So far, Congress, and virtually every court to consider the issue, has rejected it. Nothing in our Constitution, express or implicit, compels the majority's startling conclusion that the age-old understanding of marriage—an understanding recently confirmed by an initiative law—is no longer valid. California statutes already recognize same-sex unions and grant them all the substantive legal rights this state can bestow. If there is to be a further sea change in the social and legal understanding of marriage itself, that evolution should occur by similar democratic means. The majority forecloses this ordinary democratic process, and, in doing so, oversteps its authority.

The majority's mode of analysis is particularly troubling. The majority relies heavily on the *Legislature's* adoption of progressive civil rights protections for gays and lesbians to find a *constitutional* right to same-sex marriage. In effect, the majority gives the Legislature *indirectly* power that body does not *directly* possess to amend the Constitution and repeal an initiative statute. I cannot subscribe to the majority's reasoning, or to its result.

As noted above, I do not dispute everything the majority says. At the outset, I join the majority's observation that "[f]rom the beginning of California statehood, the legal institution of civil marriage has been understood to refer to a relationship between a man and a woman." (Maj. opn., *ante*, at p. 792, fn. omitted.)

Moreover, I endorse the majority's interpretation of California's Domestic Partnership Act (DPA; Fam. Code, § 297 et seq.). As the majority makes clear, the DPA now allows same-sex partners to enter legal unions which "afford . . . virtually all of the [substantive] benefits and responsibilities afforded by California law to married opposite-sex couples." (Maj. opn., *ante*, at p. 807; see also Fam. Code, § 297.5.) As the majority further correctly observes, California *has done all it can do* with regard to providing these substantive rights, benefits, and responsibilities to same-sex partners. (Maj. opn., *ante*, at pp. 806–807.)[1]

---

[1] As the majority acknowledges, California cannot force other jurisdictions to recognize California same-sex legal partnerships, by any name. Indeed, the federal Defense of Marriage Act (DOMA; 28 U.S.C. § 1738C, as added by Pub.L. 104-199, § 2(a) (Sept. 21, 1996), 110 Stat. 2419) specifies that an American state, territory, possession, or Indian tribe may refuse to recognize any same-sex legal relationship created under the laws of another state, territory, possession, or tribe, and "treated as a marriage" by that other entity. As the majority concedes, many American jurisdictions have exercised this authority, and have enacted laws refusing to

I also agree with the majority's construction of Family Code section 308.5. As the majority explains, this initiative statute, adopted by a popular vote of 61.4 percent and thus immune from unilateral repeal by the Legislature (Cal. Const., art. II, § 10, subd. (c)), does not merely preclude California's recognition of same-sex "marriage[s]" consummated elsewhere, but also invalidates same-sex "marriage[s]" contracted under that name in this state.[2]

In addition, I am fully in accord with the majority's conclusion that Family Code sections 300 and 308.5, insofar as they recognize only legal relationships between opposite-sex partners as "marriage[s]," do not discriminate on the basis of gender.

Finally, I concur that the actions in *Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco* (Super. Ct. S.F. City & County, No. CPF-04-503943) and *Campaign for California Families v. Newsom* (Super. Ct. S.F. City & County, No. CGC-04-428794) should have been dismissed as moot in the wake of this court's decision in *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055 [17 Cal.Rptr.3d 225, 95 P.3d 459].

However, I respectfully disagree with the remainder of the conclusions reached by the majority.

The question presented by this case is simple and stark. It comes down to this: Even though California's progressive laws, recently adopted through the democratic process, have pioneered the rights of same-sex partners to enter legal unions with all the substantive benefits of opposite-sex legal unions, do those laws nonetheless violate the California Constitution because at present, in deference to long and universal tradition, by a convincing popular vote, and in accord with express national policy (see fns. 1, 2, *ante*), they reserve the label "marriage" for opposite-sex legal unions?[3] I must conclude that the answer is no.

---

recognize same-sex marriages or equivalent same-sex legal unions created under the laws of other jurisdictions. Moreover, under the DOMA, all *federal* laws and regulations affecting marital or spousal rights, responsibilities, and benefits expressly apply only to opposite-sex unions. (1 U.S.C. § 7, as added by Pub.L. 104-199, § 3(a) (Sept. 21, 1996), 110 Stat. 2419.)

[2] Insofar as Family Code section 308.5 *does* represent California's decision not to recognize same-sex marriages contracted in another jurisdiction, that choice is expressly sanctioned, of course, by 28 United States Code section 1738C, part of the DOMA. (See fn. 1, *ante*.) This provision is an exercise of Congress's power under the full faith and credit clause (U.S. Const., art. IV, § 1). (E.g., *Wilson v. Ake* (M.D.Fla. 2005) 354 F.Supp.2d 1298, 1303–1304 (*Wilson*).)

[3] Before addressing the "label" issue—the only one actually presented by this case—the majority spends much time and effort to find that there is a fundamental *constitutional* right to enter a legally recognized familial union with a partner of the same sex. The focus on this subject is puzzling, for, as the majority concedes, California law *already provides*, to the maximum extent of the state's power, a right to same-sex legal unions with all the substantive

The People, directly or through their elected representatives, have every right to adopt laws abrogating the historic understanding that civil marriage is between a man and a woman. The rapid growth in California of statutory protections for the rights of gays and lesbians, as individuals, as parents, and as committed partners, suggests a quickening evolution of community attitudes on these issues. Recent years have seen the development of an intense debate about same-sex marriage. Advocates of this cause have had real success in the marketplace of ideas, gaining attention and considerable public support. Left to its own devices, the ordinary democratic process might well produce, ere long, a consensus among most Californians that the term "marriage" should, in civil parlance, include the legal unions of same-sex partners.

But a bare majority of this court, not satisfied with the pace of democratic change, now abruptly forestalls that process and substitutes, by judicial fiat, its own social policy views for those expressed by the People themselves. Undeterred by the strong weight of state and federal law and authority,[4] the majority invents a new constitutional right, immune from the ordinary

legal benefits of their opposite-sex counterparts. Thus, as the majority further acknowledges, plaintiffs *have no occasion* to establish a constitutional basis for these rights, and the issue is simply "whether, *in light of the enactment of California's domestic partnership legislation,* the current California statutory scheme is constitutional." (Maj. opn., *ante,* at p. 808, fn. 27, original italics.) The majority's objective appears to be to establish that the so-called fundamental right to same-sex legal unions includes, as a "core element[]," the right to have those unions "accorded the same dignity, respect, and stature" as opposite-sex legal partnerships enjoy. (*Id.,* at p. 830.) This, in turn, supports the majority's later conclusion that the labeling distinction in the current scheme directly infringes this fundamental right, and is therefore subject to strict scrutiny for reasons independent of the equal protection theory also advanced by the majority. (*Id.,* at pp. 844–847.)

As I explain below, however, I conclude that there is no fundamental constitutional right to a same-sex legal union that equates in every respect with marriage. I would also reject the majority's alternative theory, based on the equal protection clause, for subjecting the labeling distinction to strict scrutiny. Hence, in my view, the naming distinction preserved by California's statutes must be upheld under our Constitution unless it is irrational. By that standard, the People's decision to retain the traditional definition of marriage as between a man and a woman is amply justified.

[4] Among American jurisdictions, only the high court of Massachusetts (*Goodridge v. Department of Public Health* (2003) 440 Mass. 309 [798 N.E.2d 941] (*Goodridge*); see also *Opinions of the Justices to the Senate* (2004) 440 Mass. 1201 [802 N.E.2d 565, 572]) has previously found or confirmed in its state Constitution a right of civil marriage to partners of the same sex. Several years earlier, in *Baehr v. Lewin* (1993) 74 Haw. 530 [852 P.2d 44], the Hawaii Supreme Court had held that the denial of marriage licenses to same-sex couples was subject, under the state Constitution, to strict scrutiny, and had remanded the cause for further proceedings on the issue whether strict scrutiny was satisfied. However, before the lower court's "no" answer (see *Baehr v. Miike* (Haw.Cir.Ct., Dec. 3, 1996, No. 91-1394) 1996 WL 694235) could be reviewed on appeal, the voters ratified a state constitutional amendment giving the Hawaii Legislature the right to reserve marriage to opposite-sex unions (Haw. Const., art. I, § 23, as adopted at Gen. Elec. (Nov. 3, 1998) pursuant to Haw. H.R. Bill No. 117 (1997 Reg. Sess.)), a step that body had already taken (Haw.Rev.Stat. § 572-1, as

process of legislative consideration. The majority finds that our Constitution suddenly demands no less than a permanent redefinition of marriage, regardless of the popular will.

In doing so, the majority holds, in effect, that the *Legislature* has done *indirectly* what the Constitution prohibits it from doing directly. Under article II, section 10, subdivision (c), that body cannot unilaterally repeal an initiative statute, such as Family Code section 308.5, unless the initiative measure itself so provides. Section 308.5 contains no such provision. Yet the majority suggests that, by enacting *other statutes* which *do* provide substantial rights to gays and lesbians—including domestic partnership rights which, under section 308.5, the Legislature *could not call* "marriage"—the Legislature has given "explicit official recognition" (maj. opn., *ante*, at pp. 822, 823) to a California right of equal treatment which, because it includes the right to marry, thereby invalidates section 308.5.[5]

I cannot join this exercise in legal jujitsu, by which the Legislature's own weight is used against it to create a constitutional right from whole cloth, defeat the People's will, and invalidate a statute otherwise immune from legislative interference. Though the majority insists otherwise, its pronouncement seriously oversteps the judicial power. The majority purports to apply certain fundamental provisions of the state Constitution, but it runs afoul of another just as fundamental—article III, section 3, the separation of powers clause. This clause declares that "[t]he powers of state government are legislative, executive, and judicial," and that "[p]ersons charged with the exercise of one power *may not exercise either of the others*" except as the Constitution itself specifically provides. (Italics added.)

---

amended by Haw. Sess. Laws 1994, Act 217, § 3). Meanwhile, a substantially greater number of courts have rejected claims of state constitutional rights to same-sex marriage. (E.g., *Conaway v. Deane* (2007) 401 Md. 219 [932 A.2d 571]; *Hernandez v. Robles* (2006) 7 N.Y.3d 338 [821 N.Y.S.2d 770, 855 N.E.2d 1]; *Andersen v. King County* (2006) 158 Wn.2d 1 [138 P.3d 963]; *Morrison v. Sadler* (Ind.Ct.App. 2005) 821 N.E.2d 15; *Standhardt v. Superior Court* (Ct.App. 2003) 206 Ariz. 276 [77 P.3d 451]; *Baker v. Nelson* (1971) 291 Minn. 310 [191 N.W.2d 185], app. dism. (1972) 409 U.S. 810 [34 L.Ed.2d 65, 93 S.Ct. 37]; see *Dean v. District of Columbia* (D.C.App. 1995) 653 A.2d 307, 332–333 (conc. & dis. opn. of Ferren, J.); *Dean*, at pp. 361–364 (conc. opns. of Terry, J. & Steadman, J.) [federal Const.]; see also *Lewis v. Harris* (2006) 188 N.J. 415 [908 A.2d 196] [finding right to same-sex civil union with benefits of marriage, but concluding that label issue is premature]; *Baker v. State* (1999) 170 Vt. 194 [744 A.2d 864] [same].) In the wake of these developments, "[w]ith the exception of Massachusetts, every state's law, explicitly or implicitly, defines marriage to mean the union of a man and a woman." (*Lewis v. Harris, supra,* 908 A.2d at p. 208, fn. omitted.) As we have seen, federal statutory law also expressly does so.

[5] The majority refrains from declaring explicitly that same-sex legal unions must be called marriage, suggesting only that the name chosen must be equivalent in respect and dignity to the name allotted to opposite-sex unions. Thus, the majority suggests, the Legislature might choose a new, common name for civil unions of both kinds. Either way, as the majority clearly holds, Family Code section 308.5 must be struck down. (Maj. opn., *ante*, at pp. 856–857.)

History confirms the importance of the judiciary's constitutional role as a check against majoritarian abuse. Still, courts must use caution when exercising the potentially transformative authority to articulate constitutional rights. Otherwise, judges with limited accountability risk infringing upon our society's most basic shared premise—the People's general right, directly or through their chosen legislators, to decide fundamental issues of public policy for themselves. Judicial restraint is particularly appropriate where, as here, the claimed constitutional entitlement is of recent conception and challenges the most fundamental assumption about a basic social institution.

The majority has violated these principles. It simply does not have the right to erase, then recast; the age-old definition of marriage, as virtually all societies have understood it, in order to satisfy its own contemporary notions of equality and justice.

The California Constitution says nothing about the rights of same-sex couples to marry. On the contrary, as the majority concedes, our original Constitution, effective from the moment of statehood, evidenced an assumption that marriage was between partners of the opposite sex. Statutes enacted at the state's first legislative session confirmed this assumption, which has continued to the present day. When the Legislature realized that 1971 amendments to the Civil Code, enacted for other reasons, had created an ambiguity on the point, the oversight was quickly corrected, and the definition of marriage as between a man and a woman was made explicit. (Maj. opn., *ante*, at pp. 792–801.) The People themselves reaffirmed this definition when, in the year 2000, they adopted Proposition 22 by a 61.4 percent majority.

Despite this history, plaintiffs first insist they have a fundamental right, protected by the California Constitution's due process and privacy clauses (Cal. Const., art. I, §§ 1, 7, subd. (a)), to marry the adult consenting partners of their choice, regardless of gender. The majority largely accepts this contention. It holds that "the right to marry, as embodied in article I, sections 1 and 7 of the California Constitution, guarantees same-sex couples the same substantive constitutional rights as opposite-sex couples to . . . enter with [one's chosen life partner] into a committed, officially recognized, and protected family relationship that enjoys all of the constitutionally based incidents of marriage." (Maj. opn., *ante*, at p. 829, fn. omitted.) Further, the majority declares, a "core element[] of this fundamental right is the right of same-sex couples to have their official family relationship accorded the same dignity, respect, and stature as that accorded to all other officially recognized family relationships." (*Id.*, at p. 830.)

To the extent this means same-sex couples have a fundamental right to enter legally recognized family unions called "marriage" (or, as the majority

unrealistically suggests, by another name common to both same-sex and opposite-sex unions), I cannot agree. I find no persuasive basis in our Constitution or our jurisprudence to justify such a cataclysmic transformation of this venerable institution.

Fundamental rights entitled to the Constitution's protection are those "which are, objectively, 'deeply rooted in this [society's] history and tradition,' [citations], and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice could exist if they were sacrificed,' [citation]." (*Washington v. Glucksberg* (1997) 521 U.S. 702, 720–721 [138 L.Ed.2d 772, 117 S.Ct. 2258] (*Glucksberg*); see, e.g., *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 940 [72 Cal.Rptr.2d 871, 952 P.2d 1139].) Moreover, an assessment whether a fundamental right or interest is at stake requires "a 'careful description' of the asserted fundamental . . . interest. [Citations.]" (*Glucksberg, supra,* at p. 721; *Dawn D., supra,* at p. 941.)

These principles are crucial restraints upon the overreaching exercise of judicial authority in violation of the separation of powers. Courts have " 'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' [Citation.] By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' [citation], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of judges. (*Glucksberg, supra,* 521 U.S. 702, 720.)

It is beyond dispute, as the Court of Appeal majority in this case persuasively indicated, that there is no deeply rooted tradition of same-sex marriage, in the nation or in this state. Precisely the opposite is true. The concept of same-sex marriage was unknown in our distant past, and is novel in our recent history, because the universally understood *definition* of marriage has been the legal or religious union of a man and a woman.[6]

---

[6] This traditional understanding is certainly confirmed by the definitions of "marriage" contained in standard dictionaries. (See, e.g., Webster's Third New Internat. Dict. (2002) p. 1384, col. 3 ["1 a: the state of being united to a person of the opposite sex as husband or wife. b: the mutual relation of husband and wife: WEDLOCK . . ."]; Random House Webster's College Dict. (2d rev. ed. 2001) p. 814, col. 1 ["1. the social institution under which a man and woman live as husband and wife by legal or religious commitments . . ."]; IX Oxford English Dict. (2d ed. 1989) p. 396, cols. 1, 2 ["1.a. The condition of being a husband or wife; . . . [¶] . . . [¶] 2.a. . . . the ceremony or procedure by which two persons are made husband and wife"]; American Heritage Dict. (2d ed. 1985) p. 768, col. 1 ["1.a. The state of being married: wedlock. b. The legal union of a man and a woman as husband and wife. . . ."].) In light of the recent development of the issue, late editions of some such works dutifully allude to the

One state, Massachusetts, has within the past five years recognized same-sex marriage. (*Goodridge, supra,* 798 A.2d 941; see fn. 4, *ante.*) However, as the Court of Appeal majority in our case observed, "the Massachusetts Supreme Judicial Court's decision establishing this right has been controversial. (See, e.g., Note, *Civil Partnership in the United Kingdom and a Moderate Proposal for Change in the United States* (2005) 22 Ariz. J. Int'l & Comp. L. 613, 630–631 [describing the controversy engendered by *Goodridge*]; see also *Lewis v. Harris* [(2005) 378 N.J. Super. 168 [875 A.2d 259, 274]] [concluding from 'the strongly negative public reactions' to *Goodridge*, and similar decisions from lower courts of other states, that 'there is not yet any public consensus favoring recognition of same-sex marriage'].) Several other states have reacted negatively by, for example, amending their constitutions to prohibit same-sex marriage. (See Stein, *Symposium on Abolishing Civil Marriage: An Introduction* (2006) 27 Cardozo L.Rev. 1155, 1157, fn. 12 [noting, as of January 2006, '39 states [had] either passed laws or amended their constitutions (or done both) to prohibit same-sex marriages, to deny recognition of same-sex marriages from other jurisdictions, and/or to deny recognition to other types of same-sex relationships'].)"

California's history falls squarely along this nationwide spectrum, though at its more progressive end. As the majority itself explains, despite the Legislature's passage of the DPA and other statutes pioneering gay and lesbian rights, California law has always assumed that marriage itself is between a man and a woman. *In recent years, both the Legislature and the People themselves have enacted measures to make that assumption explicit.* Under these circumstances, there is no basis for a conclusion that same-sex marriage is a deeply rooted California tradition.

Undaunted, the majority nonetheless claims California's legal history as *evidence* of the constitutional right it espouses. According to the majority, the very fact that the Legislature has, over time, adopted progressive laws such as the DPA, thereby granting many substantial rights to gays and lesbians, constitutes "explicit official recognition" (maj. opn., *ante,* at pp. 822, 823) of "[t]his state's current policies and conduct regarding homosexuality," i.e.,

---

concept of same-sex marriage. (See, e.g., American Heritage Dict. (4th ed. 2000) p. 1073, col. 1 ["d. A union having the customary but usually not the legal force of marriage: *a same-sex marriage*"]; compare, e.g., Black's Law Dict. (8th ed. 2004) p. 994, col. 2 [noting that "[t]he United States government and most American states do not recognize same-sex marriages," but citing recent decisions on the issue], with Black's Law Dict. (7th ed. 1999) pp. 986, col. 2, 987, cols. 1–2, 988, col. 1; compare also, e.g., Merriam Webster's Collegiate Dict. (11th ed. 2004) p. 761, col. 2, with Merriam Webster's Collegiate Dict. (10th ed. 2000) p. 711, cols. 1–2.) But such recent acknowledgements in reference books do not undermine the fact that, until very recently, the institution of marriage has universally been understood as the union of opposite-sex partners.

"that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation." (Maj. opn., *ante*, at pp. 821–822, fn. omitted.) "In light of this recognition," the majority concludes, "sections 1 and 7 of article I of the California Constitution cannot properly be interpreted to withhold from gay individuals" full equality of rights with heterosexual persons, including the right to same-sex legal unions that are fully equivalent—including in name—to those of opposite-sex partners. (*Id.*, at p. 823; see also *id.*, at pp. 830–831, 844–856.)

This analysis is seriously flawed. At the outset, it overlooks the most salient facts. The Legislature has indeed granted many rights to gay and lesbian individuals, including the right to enter same-sex legal unions with all the substantive rights and benefits of civil marriage. As the majority elsewhere acknowledges, however, our current statutory scheme, which includes an initiative measure enacted by the People, specifically *reserves* marriage itself for opposite-sex unions. (Fam. Code, §§ 300, 308.5.) Under these circumstances, it is difficult to see how our legislative history reflects a current community value in favor of same-sex marriage that must now be enshrined in the Constitution.[7]

Of even greater concern is the majority's mode of analysis, which places heavy reliance on *statutory* law to establish a *constitutional* right. When a pattern of legislation makes current community values clear, the majority seems to say, those values can become locked into the Constitution itself.[8]

Of course, only the People can amend the Constitution; the Legislature has no unilateral power to do so. (Cal. Const., art. XVIII.) However, the effect of the majority's reasoning is to suggest that the Legislature can accomplish such amendment indirectly, whether it intends to do so or not, by reflecting current community attitudes in the laws it enacts.

---

[7] In this respect, California's situation differs materially from that of Massachusetts, the only other state that now recognizes a constitutional right to same-sex marriage. In finding such a right, the Massachusetts Supreme Judicial Court addressed marriage statutes that imposed no facial prohibition on the issuance of marriage licenses to same-sex couples. (See *Goodridge, supra*, 798 A.2d 941, 951–952.) The Massachusetts court did not confront, as we do, a law, recently adopted by the voters, that gave explicit voice to a prevailing community standard in favor of retaining the traditional man-woman definition of marriage.

[8] The majority protests that, contrary to my assertion, the constitutional right it finds is not "grounded upon" the Legislature's passage of the DPA or any other laws, and such legislation "[was] not required" in order to confer equal rights on gay and lesbian individuals. (Maj. opn., *ante*, at p. 822.) As noted, however, the majority's analysis depends heavily on the Legislature's efforts in behalf of gays and lesbians as "explicit official recognition" (*id.*, at p. 822) of California's policies on this subject, and as consequent justification for concluding, despite an express contrary statute, that our Constitution grants gays and lesbians a right to marry.

The notion that legislation can become "constitutionalized" is mischievous for several reasons. As indicated above, it violates the constitutional scheme by which only the People can amend the state's charter of government. It abrogates the legislative power to reconsider what the law should be as public debate on an issue ebbs and flows. And, for that very reason, it may discourage efforts to pass progressive laws, out of fear that such efforts will ultimately, and inadvertently, place the issue beyond the power of legislation to affect.

As applied in this case, the majority's analysis has also given the Legislature, indirectly, a power it does not otherwise possess to thwart the People's express legislative will. As noted above, under article II, section 10, subdivision (c) of the California Constitution, "[t]he Legislature may amend or repeal . . . an initiative statute by another statute that becomes effective *only when approved by the electors unless the initiative statute permits amendment or repeal without their approval.*" (Italics added.) Family Code section 308.5, adopted by Proposition 22, includes no provision allowing its unilateral repeal or amendment by the Legislature.

According to the majority, however, the Legislature's adoption of progressive laws on the subject of gay and lesbian rights, including the DPA, makes it impossible not to recognize a *constitutional* right to same-sex legal unions with full equivalency to opposite-sex legal unions. This development, the majority ultimately concludes, requires the invalidation of Family Code section 308.5. In other words, in the majority's view, the *Legislature's own actions* have, by indirection, caused this initiative statute to be erased from the books. To say the least, I find such a constitutional approach troubling.[9]

---

[9] It is true, as the majority suggests, that initiative statutes are not immune from constitutional scrutiny, for " 'the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation.' " (Maj. opn., *ante,* at p. 852, quoting *Citizens Against Rent Control v. Berkeley* (1981) 454 U.S. 290, 295 [70 L.Ed.2d 492, 102 S.Ct. 434].) I do not suggest otherwise. I say only that the majority has made three serious mistakes en route to its conclusion that the initiative statute at issue here, Family Code section 308.5, violates the due process clause of the California Constitution. First, the majority finds such a violation largely on the basis of its assessment of prevailing contemporary values in this state, though section 308.5 itself makes clear that our citizens have not yet embraced the concept of same-sex marriage. Second, as evidence that prevailing community attitudes support full marital rights for same-sex couples, the majority cites the Legislature's efforts to accord various rights and benefits to gays and lesbians, including the right to enter same-sex unions that are substantively equivalent to marriage. But this effectively means the Legislature has, by indirection, undermined section 308.5, though the Constitution expressly denies that body express power to do so. (Cal. Const., art. II, § 10, subd. (c).) Third, and most fundamentally, the majority has eschewed the judicial restraint and caution that should always apply, under separation of powers principles, before clear expressions of popular will on fundamental issues are overturned.

Other grounds advanced by the majority for its claim of a fundamental right are equally unpersuasive. The majority accepts plaintiffs' unconvincing claim that they seek no new " 'right to same-sex marriage' " (maj. opn., *ante*, at p. 811), but simply a recognition that the well-established right to marry one's chosen partner is not limited to those who wish to marry persons of the opposite sex. However, by framing the issue simply as whether the undoubted right to marry is *confined* to opposite-sex couples, the majority mischaracterizes the entitlement plaintiffs actually claim. The majority thus begs the question and violates the requirement of " 'careful description' " that properly applies when a court is asked to break new ground in the area of substantive due process. (*Glucksberg, supra*, 521 U.S. 702, 721–722.)

Though the majority insists otherwise, plaintiffs seek, and the majority grants, a *new* right to *same-sex* marriage that only recently has been urged upon our social and legal system. Because civil marriage is an institution historically defined as the legal union of a man and a woman, plaintiffs could not succeed except by convincing this court to insert in our Constitution an altered and expanded definition of marriage—one that includes same-sex partnerships for the first time. By accepting that invitation, the majority places this controversial issue beyond the realm of legislative debate and substitutes its own judgment in the matter for the considered wisdom of the People and their elected representatives. The majority advances no persuasive reason for taking that step.

In support of its view that marriage is a constitutional entitlement without regard for the genders of the respective partners, the majority cites the many California and federal decisions broadly describing the basic rights of personal autonomy and family intimacy, including the right to marry, procreate, establish a home, and bring up children. (See maj. opn., *ante*, at pp. 809–820.) However, none of the cited decisions holds, or remotely suggests, that any right to marry recognized by the Constitution extends beyond the traditional definition of marriage to include same-sex partnerships.

Certainly *Perez v. Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17] (*Perez*) does not support the majority's expansive view. There we struck down racial restrictions on the right of a man and a woman to marry. But nothing in *Perez* suggests an intent to alter the definition of marriage as a union of opposite-sex partners. In sum, there is no convincing basis in federal or California jurisprudence for the majority's claim that same-sex couples have a fundamental constitutional right to marry.[10]

---

[10] The majority can draw no comfort from *Lawrence v. Texas* (2003) 539 U.S. 558 [156 L.Ed.2d 508, 123 S.Ct. 2472] (*Lawrence*), which struck down a state law prohibiting same-sex sodomy. (Overruling *Bowers v. Hardwick* (1986) 478 U.S. 186 [92 L.Ed.2d 140, 106 S.Ct. 2841].) The five-member *Lawrence* majority, asserting privacy and personal autonomy interests

In a footnote, the majority insists that, though same-sex couples are included within the fundamental constitutional right to marry, the state's absolute bans on marriages that are incestuous (Fam. Code, § 2200; see Pen. Code, § 285), or nonmonogamous (Pen. Code, § 281 et seq.; Fam. Code, § 2201) are not in danger. Vaguely the majority declares that "[p]ast judicial decisions explain why our nation's culture has considered [incestuous and polygamous] relationships inimical to the mutually supportive and healthy family relationships promoted by the constitutional right to marry. [Citations.]" (Maj. opn., *ante*, at p. 829, fn. 52.) Thus, the majority asserts, though a denial of same-sex marriage is no longer justified, "the state continues to have a strong and adequate justification for refusing to officially sanction polygamous or incestuous relationships because of their potentially detrimental effect on a sound family environment. [Citations.]" (*Id.*, at p. 829.)

The bans on incestuous and polygamous marriages are ancient and deep-rooted, and, as the majority suggests, they are supported by strong considerations of social policy. Our society abhors such relationships, and the notion that our laws could not forever prohibit them seems preposterous. Yet here, the majority overturns, in abrupt fashion, an initiative statute confirming the equally deep-rooted assumption that marriage is a union of partners of the opposite sex. The majority does so by relying on its own assessment of contemporary community values, and by inserting in our Constitution an expanded definition of the right to marry that contravenes express statutory law.

That approach creates the opportunity for further judicial extension of this perceived constitutional right into dangerous territory. Who can say that, in 10, 15, or 20 years, an activist court might not rely on the majority's analysis to conclude, on the basis of a perceived evolution in community values, that the laws prohibiting polygamous and incestuous marriages were no longer constitutionally justified?

---

under the due process clause, emphasized that the law, as applied to consenting adults, constituted an intrusion into the most intimate form of human behavior, sexual conduct, in the most private of places, the home. Even if the personal relationships in which such consensual private conduct occurred were "not entitled to formal recognition in the law," the majority concluded, the government could not prohibit the conduct itself. (*Lawrence*, at p. 567.) In response to concerns expressed in dissent by Justice Scalia, the majority made clear that the case "[did] not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." (*Id.*, at p. 578.) Justice O'Connor, concurring in the judgment, found the antisodomy law invalid on equal protection grounds, seeing no rational basis for the statute's limitation to homosexual conduct. This did not mean, she made clear, that all distinctions between gay and heterosexual persons would similarly fail. In the case at hand, she noted, "Texas cannot assert any legitimate state interest [in such a classification], such as . . . preserving the traditional institution of marriage." (*Id.*, at p. 585 (conc. opn. of O'Connor, J.).)

In no way do I equate same-sex unions with incestuous and polygamous relationships as a matter of social policy or social acceptance. California's adoption of the DPA makes clear that our citizens find merit in the desires of gay and lesbian couples for legal recognition of their committed partnerships. Moreover, as I have said, I can foresee a time when the People might agree to assign the label marriage itself to such unions. It is unlikely, to say the least, that our society would ever confer such favor on incest and polygamy.

My point is that the majority's approach has removed the sensitive issues surrounding same-sex marriage from their proper forum—the arena of legislative resolution—and risks opening the door to similar treatment of other, less deserving, claims of a right to marry. By thus moving the policy debate from the legislative process to the court, the majority engages in faulty constitutional analysis and violates the separation of powers.

I would avoid these difficulties by confirming clearly that there is no constitutional right to same-sex marriage. That is because marriage is, as it always has been, the right of a woman and an unrelated man to marry each other.

From this conclusion, it follows, for substantive due process purposes, that the marriage statutes are valid unless unreasonable or arbitrary (see, e.g., *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 771 [66 Cal.Rptr.2d 672, 941 P.2d 851]), and are not subject to the strict scrutiny that applies when a statute infringes a fundamental right or interest. As I discuss below, California's preservation of the traditional definition of marriage is entirely reasonable. Accordingly, I would reject plaintiffs' due process claim.

Besides concluding that Family Code sections 300 and 308.5 are subject to strict scrutiny as an infringement on the fundamental state constitutional right to marry, the majority also independently holds that such scrutiny is required under the *equal protection* clause of the California Constitution. This is so, the majority declares, because by withholding from same-sex legal unions the label that is applied to opposite-sex legal unions, the scheme discriminates on the basis of sexual orientation, which the majority now deems to be a suspect classification.

I find this analysis flawed at several levels. For two reasons, I would reject plaintiffs' equal protection claim at the threshold. And even if that were not appropriate, I disagree that sexual orientation is a suspect classification.

Hence, as with the majority's due process theory, I would not apply strict scrutiny, and would uphold the statutory scheme as reasonable. I explain my conclusions.

"The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. [Citations.] When *social* or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, [citations], and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 440 [87 L.Ed.2d 313, 105 S.Ct. 3249], italics added (*Cleburne*).)

"The initial inquiry in any equal protection analysis is whether persons are '*similarly situated* for purposes of the law challenged.' [Citation.]" (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 47 [58 Cal.Rptr.3d 597, 158 P.3d 148].) A statute does not violate equal protection when it recognizes real distinctions that are pertinent to the law's legitimate aims. (E.g., *People v. Smith* (2007) 40 Cal.4th 483, 527 [54 Cal.Rptr.3d 245, 150 P.3d 1224]; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654]; *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 [278 Cal.Rptr. 346, 805 P.2d 300]; *Purdy & Fitzpatrick v. State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645]; see *Cleburne, supra,* 473 U.S. 432, 441.) In such cases, judicial deference to legislative choices is consistent with "our respect for the separation of powers." (*Cleburne, supra,* at p. 441.)

Though the majority insists otherwise (see maj. opn., *ante*, at pp. 831–832, fn. 54), I agree with Justice Corrigan that same-sex couples and opposite-sex couples are not similarly situated with respect to the valid purposes of Family Code sections 300 and 308.5. As Justice Corrigan indicates, the state has a legitimate interest in enforcing the express legislative and popular will that the traditional definition of marriage be preserved. Same-sex and opposite-sex couples cannot be similarly situated for that limited purpose, precisely because the traditional definition of marriage is a union of partners of the opposite sex.

Of course, statutory classifications do not serve legitimate state interests when adopted for their own sake, out of animus toward a disfavored group. (E.g., *Romer v. Evans* (1996) 517 U.S. 620, 633–635 [134 L.Ed.2d 855,

116 S.Ct. 1620] (*Romer*); *U.S. Dept. of Agriculture v. Moreno* (1973) 413 U.S. 528, 534 [37 L.Ed.2d 782, 93 S.Ct. 2821]; see *Lawrence, supra,* 539 U.S. 558, 582–583 (conc. opn. of O'Connor, J.); see also *Cleburne, supra,* 473 U.S. 432, 441.) Here, however, the majority itself expressly disclaims any suggestion "that the current marriage provisions were enacted with an invidious intent or purpose." (Maj. opn., *ante,* at p. 856, fn. 73.) I therefore concur fully in Justice Corrigan's conclusion that plaintiffs' equal protection challenge fails for this reason alone.

I also disagree with the majority's premise that, by assigning different labels to same-sex and opposite-sex legal unions, the state discriminates directly on the basis of sexual orientation. The marriage statutes are facially neutral on that subject. They allow all persons, whether homosexual or heterosexual, to enter into the relationship called marriage, and they do not, by their terms, prohibit any two persons from marrying each other *on the ground that* one or both of the partners is gay. (Cf. *Perez, supra,* 32 Cal.2d 711, 712–713 [statutes prohibited marriage between certain partners *on the basis of* their respective races].)

The marriage statutes may have a *disparate impact* on gay and lesbian individuals, insofar as these laws prevent such persons from marrying, by that name, the partners they would actually choose. But, as we explained in *Baluyut v. Superior Court* (1996) 12 Cal.4th 826 [50 Cal.Rptr.2d 101, 911 P.2d 1] (*Baluyut*), a facially neutral statute that merely has a disparate effect on a particular class of persons does not violate equal protection absent a showing the law was adopted for a discriminatory purpose. In this regard, discriminatory purpose " 'implies more than intent as volition or intent as awareness of consequences. See *United Jewish Organizations v. Carey* [(1977)] 430 U.S. 144, 179 [51 L.Ed.2d 229, 97 S.Ct. 996] (concurring opinion). It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.' [Citation.]" (*Baluyut, supra,* at p. 837.)

There is no evidence that when the Legislature adopted Family Code section 300, and the People adopted Family Code section 308.5, they did so " ' "because of" ' " (*Baluyut, supra,* 12 Cal.4th at p. 837) its consequent adverse effect on gays and lesbians as a group. On the contrary, it appears the legislation was simply intended to maintain an age-old understanding of the meaning of marriage. Indeed, California's adoption of

pioneering legislation that grants gay and lesbian couples all the substantive incidents of marriage further dispels the notion that an invidious intent lurks in our statutory scheme. As indicated above, the majority itself expressly disclaims any suggestion that the laws defining marriage were passed for the purpose of discrimination. For this reason as well, I believe our equal protection analysis need go no further.

Even if the distinction were subject to further examination under the equal protection clause, I disagree that strict scrutiny is the applicable standard of review. This is because I do not agree with the majority's decision to hold, under current circumstances, that sexual orientation is a suspect classification.

The United States Supreme Court has never declared, for federal constitutional purposes, that a classification based on sexual orientation is entitled to any form of scrutiny beyond rational basis review. (See *Cleburne, supra,* 473 U.S. 432, 440–441 [recognizing race, alienage, and national origin as suspect classifications requiring strict scrutiny review, and gender and illegitimacy as quasi-suspect classifications requiring "somewhat heightened" review].)[11] Moreover, as the majority concedes, its conclusion that sexual orientation is a suspect classification subject to strict scrutiny *contravenes* "the great majority of out-of-state decisions"—indeed, all but one of those cited by the majority. (Maj. opn., *ante,* at p. 840 & fn. 60.)[12]

---

[11] In *Lawrence, supra,* 539 U.S. 558, the majority held that Texas's law prohibiting homosexual sodomy violated the due-process-derived fundamental right of all consenting adults to engage in intimate activity, including sexual conduct, in private. (*Id.,* at pp. 564–579.) Concurring in the judgment, Justice O'Connor found, for equal protection purposes, that insofar as the law drew a distinction based simply on dislike and moral disapproval of homosexuals, it served no legitimate state interest. (*Id.,* at pp. 581–585 (conc. opn. of O'Connor, J.).) As noted above, both the majority and Justice O'Connor were careful to state that they were not calling into question laws denying formal legal recognition to gay and lesbian relationships. In *Romer, supra,* 517 U.S. 620, the majority found that a Colorado constitutional amendment which prohibited all state and local agencies from enacting or enforcing laws whereby homosexuality or bisexuality could be the basis for claims of minority or protected status, or of discrimination, was obviously motivated by antigay animus, an illegitimate state purpose, and thus could not survive rational basis review. The *Romer* majority specifically noted (*id.,* at p. 625), but did not adopt, the Colorado Supreme Court's theory that the amendment was subject to strict scrutiny because it invaded fundamental political rights.

[12] Numerous other decisions have held that sexual orientation is not a suspect or quasi-suspect classification. (E.g., *Lofton v. Secretary of Dept. of Children & Family* (11th Cir. 2004) 358 F.3d 804, 818; *Equality Foundation v. City of Cincinnati* (6th Cir. 1997) 128 F.3d 289, 292–293; *Holmes v. California Army National Guard* (9th Cir. 1997) 124 F.3d 1126, 1132; *Richenberg v. Perry* (8th Cir. 1996) 97 F.3d 256, 260; *High Tech Gays v. Defense Ind. Sec. Clearance Off.* (9th Cir. 1990) 895 F.2d 563, 573–574 (*High Tech Gays*); *Woodward v. U.S.* (Fed.Cir. 1989) 871 F.2d 1068, 1076; *Rich v. Secretary of the Army* (10th Cir. 1984) 735 F.2d 1220, 1229; *Wilson, supra,* 354 F.Supp.2d 1298, 1307–1308 [DOMA and Florida marriage statutes]; *Selland v. Perry* (D.Md. 1995) 905 F.Supp. 260, 265–266, affd. (4th Cir. 1996) 100

As the majority also notes, the issue is one of first impression in California. I find that circumstance highly significant. Considering the current status of gays and lesbians as citizens of 21st century California, the majority fails to persuade me we should now hold that they qualify, under our state Constitution, for the extraordinary protection accorded to suspect classes.

The concept that certain identifiable groups are entitled to extra protection under the equal protection clause stems, most basically, from the premise that because these groups are unpopular minorities, or otherwise share a history of insularity, persecution, and discrimination, *and are politically powerless*, they are especially susceptible to continuing abuse by the majority. Laws that single out groups in this category for different treatment are presumed to "reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons, *and because such discrimination is unlikely to be soon rectified by legislative means*," the deference normally accorded to legislative choices does not apply. (*Cleburne, supra*, 473 U.S. 432, 440, italics added; see also *San Antonio School District v. Rodriguez* (1973) 411 U.S. 1, 28 [36 L.Ed.2d 16, 93 S.Ct. 1278] [noting relevance, for purposes of identification as suspect class, that group is "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"].)

Recognizing that the need for special constitutional protection arises from the political impotence of an insular and disfavored group, several courts holding that sexual orientation is not a suspect class have focused particularly on a determination that, in contemporary times at least, the gay and lesbian community does not lack political power. (*High Tech Gays, supra*, 895 F.2d 563, 574; *Conaway v. Deane, supra*, 932 A.2d 571, 609–614 [same-sex marriage]; *Andersen v. State, supra*, 138 P.3d 963, 974–975 [same].)

In California, the political emergence of the gay and lesbian community is particularly apparent. In this state, the progress achieved through democratic means—progress described in detail by the majority—demonstrates that, despite undeniable past injustice and discrimination, this group now " 'is obviously able to wield political power in defense of its interests.' " (Maj. opn., *ante*, at p. 842, quoting the Attorney General's brief.)

Nor are these gains so fragile and fortuitous as to require extraordinary state constitutional protection. On the contrary, the majority itself declares that recent decades have seen "a fundamental and dramatic transformation in this state's understanding and legal treatment of gay individuals and gay couples" (maj. opn., *ante*, at p. 821), whereby "California has repudiated past

F.3d 950; see *Thomasson v. Perry* (4th Cir. 1996) 80 F.3d 915, 928; *Ben-Shalom v. Marsh* (7th Cir. 1989) 881 F.2d 454, 464.)

practices and policies that . . . denigrated the general character and morals of gay individuals" and now recognizes homosexuality as "simply one of the numerous variables of our common and diverse humanity" (*ibid.*). Under these circumstances, I submit, gays and lesbians in this state currently lack the insularity, unpopularity, and consequent political vulnerability upon which the notion of suspect classifications is founded.

The majority insists that a determination whether a historically disfavored group is a suspect class should not depend on the group's *current* political power. Otherwise, the majority posits, "it would be impossible to justify the numerous decisions that continue to treat sex, race, and religion as suspect classifications." (Maj. opn., *ante*, at p. 843, fn. omitted.)

I do not quarrel with those decisions. At the times suspect-class status was first assigned to race, and in California to sex and religion, there were ample grounds for doing so. They may well still exist in some or all of those cases. Moreover, I do not suggest that once a group is properly found in need of extraordinary protection, it should later be "declassified" when circumstances change.

I only propose that, when, as here, the issue is before us as a matter of first impression, we cannot ignore current reality. In such a case, we should consider whether, despite a history of discrimination, a particular group remains so unpopular, disfavored, and susceptible to majoritarian abuse that suspect-class status is necessary to safeguard its rights. I would not draw that conclusion here.

Accordingly, I would apply the normal rational basis test to determine whether, by granting same-sex couples all the substantive rights and benefits of marriage, but reserving the marriage label for opposite-sex unions, California's laws violate the equal protection guarantee of the state Constitution. By that standard, I find ample grounds for the balance currently struck on this issue by both the Legislature and the People.

First, it is certainly reasonable for the Legislature, having granted same-sex couples all substantive marital rights within its power, to assign those rights a name other than marriage. After all, an initiative statute adopted by a 61.4 percent popular vote, and constitutionally immune from repeal by the Legislature, *defines marriage as a union of partners of the opposite sex.*

Moreover, in light of the provisions of federal law that, for purposes of federal benefits, limit the definition of marriage to opposite-sex couples (1 U.S.C. § 7), California must distinguish same-sex from opposite-sex couples in administering the numerous federal-state programs that are governed by

federal law. A separate nomenclature applicable to the family relationship of same-sex couples undoubtedly facilitates the administration of such programs.

Most fundamentally, the People themselves cannot be considered irrational in deciding, for the time being, that the fundamental definition of marriage, as it has universally existed until very recently, should be preserved. As the New Jersey Supreme Court observed, "We cannot escape the reality that the shared societal meaning of marriage—passed down through the common law into our statutory law—has always been the union of a man and a woman. To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin." (*Lewis v. Harris, supra,* 908 A.2d 196, 222.)

If such a profound change in this ancient social institution is to occur, the People and their representatives, who represent the public conscience, should have the right, and the responsibility, to control the pace of that change through the democratic process. Family Code sections 300 and 308.5 serve this salutary purpose. The majority's decision erroneously usurps it.

For all these reasons, I would affirm the judgment of the Court of Appeal.

Chin, J., concurred.

**CORRIGAN, J.,** Concurring and Dissenting.—In my view, Californians should allow our gay and lesbian neighbors to call their unions marriages. But I, and this court, must acknowledge that a majority of Californians hold a different view, and have explicitly said so by their vote. This court can overrule a vote of the people only if the Constitution compels us to do so. Here, the Constitution does not. Therefore, I must dissent.

It is important to be clear. Under California law, domestic partners have "virtually all of the benefits and responsibilities" available to traditional spouses. (Maj. opn., *ante,* at p. 807.) I believe the Constitution requires this as a matter of equal protection. However, the single question in this case is whether domestic partners have a constitutional right to the name of "marriage."[1]

---

[1] Like Justice Baxter, I agree with the majority on the following subsidiary issues: (1) Family Code section 308.5 applies to both in-state and out-of-state marriages; (2) the marriage statutes do not discriminate on the basis of gender; and (3) the Court of Appeal properly dismissed as moot the actions in *Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco* (Super. Ct. S.F. City & County, No. CPF-04-503943) and *Campaign for*

Proposition 22 was enacted only eight years ago. By a substantial majority the people voted to recognize, as "marriage," only those unions between a man and a woman. (Fam. Code, § 308.5.) The majority concludes that the voters' decision to retain the traditional definition of marriage is unconstitutional. I disagree.

The majority correctly notes that it is not for this court to set social policy based on our individual views. Rather, this is a question of constitutional law. (Maj. opn., *ante*, at pp. 780–781, 849–850.) I also agree with the majority that we must consider both the statutes defining marriage and the domestic partnership statutes. (*Id.* at pp. 779, 808.) The California Domestic Partner Rights and Responsibilities Act of 2003 (DPA), and other recent legislative changes, represent a dramatic and fundamental transformation of the rights of gay and lesbian Californians. It is a remarkable achievement of the legislative process that the law now expressly recognizes that domestic partners have the same substantive rights and obligations as spouses.

The majority, however, fails to give full and fair consideration to the DPA. Indeed, the majority says its conclusion that "California's current recognition that gay individuals are entitled to equal and nondiscriminatory legal treatment" is not grounded on the DPA. (Maj. opn., *ante*, at p. 822.) Surely greater consideration is due to legislation broadly proclaiming that "[r]egistered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon spouses." (Fam. Code, § 297.5, subd. (a).) As the majority acknowledges, the Legislature intended that the DPA be liberally applied, to secure for domestic partners the full range of legal rights and responsibilities enjoyed by spouses. (Maj. opn., *ante*, at pp. 802–803.)

This court has previously held that the "chief goal of the [DPA] is to equalize the status of registered domestic partners and married couples." (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 839 [31 Cal.Rptr.3d 565, 115 P.3d 1212].) In this case, however, the majority fails to honor that goal. Instead of recognizing the equality conferred by the Legislature, the majority denigrates domestic partnership as "only a novel alternative designation . . . constituting significantly unequal treatment," and "a mark of second-class citizenship." (Maj. opn., *ante*, at pp. 845–846.) Without foundation, the majority claims that to hold the domestic partnership laws constitutional would be a statement "that it is permissible, under the law, for society

*California Families v. Newsom* (Super. Ct. S.F. City & County, No. CGC-04-428794). I confine my discussion to the central disputed issue before the court.

to treat gay individuals and same-sex couples differently from, and less favorably than, heterosexual individuals and opposite-sex couples." (Maj. opn., *ante*, at p. 855.) This is simply not so. The majority's narrow and inaccurate assertions are just the opposite of what the Legislature intended. To make its case for a constitutional violation, the majority distorts and diminishes the historic achievements of the DPA, and the efforts of those who worked so diligently to pass it into law.

Domestic partnerships and marriages have the same legal standing, granting to both heterosexual and homosexual couples a societal recognition of their lifelong commitment. This parity does not violate the Constitution, it is in keeping with it. Requiring the same substantive legal rights is, in my view, a matter of equal protection. But this does not mean the traditional definition of marriage is unconstitutional.

The majority refers to the race cases, from which our equal protection jurisprudence has evolved. The analogy does not hold. The civil rights cases banning racial discrimination were based on duly enacted amendments to the United States Constitution, proposed by Congress and ratified by the people through the states. To our nation's great shame, many individuals and governmental entities obdurately refused to follow these constitutional imperatives for nearly a century. By overturning Jim Crow and other segregation laws, the courts properly and courageously held the people accountable to their own constitutional mandates. Here the situation is quite different. In less than a decade, through the democratic process, same-sex couples have been given the equal legal rights to which they are entitled.

In *Perez v. Sharp* (1948) 32 Cal.2d 711 [198 P.2d 17], we struck down a law prohibiting interracial marriages. The majority places great reliance on the *Perez* court's statement that "the right to marry is the right to join in marriage with the person of one's choice." (*Id.* at p. 715.) However, *Perez* and the many other cases establishing the fundamental right to marry were all based on the common understanding of marriage as the union of a man and a woman. (See maj. opn., *ante*, at pp. 813–819.) The majority recognizes this, as it must. (*Id.* at p. 820.) Because those cases involved the traditional definition of marriage, they do not support the majority's analysis. The question here is whether the meaning of the term as it was used in those cases must be changed.

What is unique about this case is that plaintiffs seek both to join the institution of marriage and at the same time to alter its definition. The majority maintains that plaintiffs are not attempting to change the existing institution of marriage. (Maj. opn., *ante*, at p. 812.) This claim is irreconcilable with the majority's declaration that "[f]rom the beginning of California

statehood, the legal institution of civil marriage has been understood to refer to a relationship between a man and a woman." (*Id.* at p. 792, fn. omitted.) The people are entitled to preserve this traditional understanding in the terminology of the law, recognizing that same-sex and opposite-sex unions are different. What they are not entitled to do is *treat* them differently under the law.

The distinction between substance and nomenclature makes this case different from other civil rights cases. The definition of the rights to education, to vote, to pursue an office or occupation, and the other celebrated civil rights vindicated by the courts, were not altered by extending them to all races and both genders. The institution of marriage was not fundamentally changed by removing the racial restrictions that formerly encumbered it. Plaintiffs, however, seek to change the definition of the marital relationship, as it has consistently been understood, into something quite new. They could certainly accomplish such a redefinition through the initiative process. As a voter, I might agree. But that change is for the people to adopt, not for judges to dictate.

My view on this question of terminology rests on both an equal protection analysis and a recognition of the appropriate scope of judicial authority. As a matter of equal protection, while plaintiffs are in the same position as married couples when it comes to the substantive legal rights and responsibilities of family members, they are not in the same position with regard to the title of "marriage." " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' [Citation.] 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654]; see also *Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439 [87 L.Ed.2d 313, 105 S.Ct. 3249].)

The legitimate purpose of the statutes defining marriage is to preserve the traditional understanding of the institution.[2] For that purpose, plaintiffs are

---

[2] The majority recognizes that these statutes were not enacted with an invidious purpose. (Maj. opn., *ante*, at p. 856, fn. 73.) Thus, this is not a case like *Mulkey v. Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825], where this court declared an initiative measure unconstitutional because it was enacted "with the clear intent to overturn state laws" prohibiting racial discrimination. (*Id.* at p. 534.)

not similarly situated with spouses. While their unions are of equal legal dignity, they are different because they join partners of the same gender. Plaintiffs are in the process of founding a new tradition, unfettered by the boundaries of the old one.

The majority relegates the threshold question of "similar situation" to a footnote, observing that "[b]oth groups at issue consist of pairs of individuals who wish to enter into a formal, legally binding and officially recognized, long-term family relationship that affords the same rights and privileges and imposes the same obligations and responsibilities." (Maj. opn., *ante*, at pp. 831–832, fn. 54.) The majority ignores the fact that plaintiffs already have those rights and privileges under the DPA. The majority aptly articulates how domestic partnerships and marriages are the same. But it fails to recognize that this case involves only the *names* of those unions. The fact that plaintiffs enjoy equal substantive rights does not situate them similarly with married couples in terms of the traditional designation of marriage. Society may, if it chooses, recognize that some legally authorized familial relationships unite partners of the same gender while others join partners of opposite sexes. There is nothing pernicious or constitutionally defective in this approach.[3]

The voters who passed Proposition 22 not long ago decided to keep the meaning of marriage as it has always been understood in California. The majority improperly infringes on the prerogative of the voters by overriding their decision. It does that which it acknowledges it should not do: it redefines marriage because it believes marriage should be redefined. (See maj. opn., *ante*, at pp. 780–781, 849–850.) It justifies its decision by finding a constitutional infirmity where none exists. Plaintiffs are free to take their case to the people, to let them vote on whether they are now ready to accept such a redefinition. Californians have legalized domestic partnership, but decided not to call it "marriage." Four votes on. this court should not disturb the balance reached by the democratic process, a balance that is still being tested in the political arena.[4]

---

[3] The majority correctly observes that if plaintiffs are not similarly situated to married couples for the purpose of the laws they challenge, those laws are insulated from equal protection review. (Maj. opn., *ante*, at pp. 831–832, fn. 54.) That is the purpose of the well-settled requirement that plaintiffs making an equal protection claim first show that they are similarly situated. (*Cooley v. Superior Court, supra,* 29 Cal.4th at p. 253.) It is particularly appropriate for us to refrain from employing equal protection doctrine to thwart the will of the voters in this case. Whether the institution of marriage should be expanded to include same-sex couples is a question properly reserved for the political process.

[4] The majority details the latest legislative and gubernatorial moves, which occurred in 2005 and 2007. (Maj. opn., *ante*, at pp. 796–797, fn. 17.)

Certainly initiative measures are not immune from constitutional review. However, we should hesitate to use our authority to take one side in an ongoing political debate. The accommodation of disparate views is democracy's essential challenge. Democracy is never more tested than when its citizens honestly disagree, based on deeply held beliefs. In such circumstances, the legislative process should be given leeway to work out the differences. It is inappropriate for the judiciary to interrupt that process and impose the views of its individual members, while the opinions of the people are still evolving.

Restraint is the hallmark of constitutional review. "[I]f the judiciary is to fulfill its role in our tripartite system of government as the final arbiter of constitutional issues, it cannot hope to escape the tension between legislative policy determinations and the challenges raised by those who would seek exceptions thereto. We can, however, while entertaining such challenges, seek to hold the tension in check by always *presuming the constitutional validity* of legislative acts and resolving doubts in favor of the statute." (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 939 [72 Cal.Rptr.2d 871, 952 P.2d 1139], italics added.)

The majority abandons this judicious approach. Instead of presuming the validity of the statutes defining marriage and establishing domestic partnership, in effect the majority *presumes them to be constitutionally invalid* by characterizing domestic partnership as a "mark of second-class citizenship." (Maj. opn., *ante*, at p. 855.) This judicial presumption contravenes the express intent of the Legislature to equalize the rights of spouses and domestic partners.

The principle of judicial restraint is a covenant between judges and the people from whom their power derives. It protects the people against judicial overreaching. It is no answer to say that judges can break the covenant so long as they are enlightened or well-meaning.

The process of reform and familiarization should go forward in the legislative sphere and in society at large. We are in the midst of a major social change. Societies seldom make such changes smoothly. For some the process is frustratingly slow. For others it is jarringly fast. In a democracy, the people should be given a fair chance to set the pace of change without judicial interference. That is the way democracies work. Ideas are proposed, debated, tested. Often new ideas are initially resisted, only to be ultimately embraced. But when ideas are imposed, opposition hardens and progress may be hampered.

We should allow the significant achievements embodied in the domestic partnership statutes to continue to take root. If there is to be a new understanding of the meaning of marriage in California, it should develop among the people of our state and find its expression at the ballot box.

The petition for rehearing of appellants Proposition 22 Legal Defense and Education Fund and appellant Campaign for California Families was denied June 4, 2008. Baxter, J., Chin, J., and Corrigan, J., were of the opinion that the petition should be granted.